**Derrick JAMISON, Petitioner,**

v.

**Terry J. COLLINS, Warden, Respondent.**

**No. C–1–94–175.**

United States District Court, S.D. Ohio, Western Division.

May 10, 2000.

---

See also: 100 F.Supp.2d 521.

James Edward Davidson, John Patrick Gilligan, Schottenstein Zox & Dunn—2, J Joseph Bodine, Jr, Parnela J Prude–Smithers, Ohio Public Defender Commission—2, William Sheldon Lazarow, Assistant State Public Defender, Columbus, for Derrick Jamison, plaintiffs.

Jonathan R Fulkerson, Assistant Attorney General, Capital Crimes Secton, Columbus, Stuart Alan Cole, Ohio Attorney General—2, Capital Crimes Section, Columbus, for Betty Mitchell, Warden, defendants.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Petitioner's Amended Petition for a Writ of Habeas Corpus (doc. 94), Respondent's Supplemental Return of Writ (doc. 95), and Petitioner's Amended Traverse (doc. 96.)

## INTRODUCTION

This is a capital case. Petitioner Derrick Jamison, an inmate in the custody of the Mansfield Correctional Institution, is under sentence of death in the State of Ohio. Petitioner seeks a writ of habeas corpus pursuant to Title 28 U.S.C. § 2254 on the grounds that both his conviction and his sentence are in violation of the

United States Constitution. Because the Court concludes that the State of Ohio violated Petitioner's constitutional rights by suppressing exculpatory evidence material to the questions of guilt and sentencing, the Court conditionally grants the petition and orders that a writ shall issue unless the State of Ohio retries Petitioner within 120 days. Execution of this judgment shall be stayed pending any appeal.

## BACKGROUND

Petitioner was convicted of aggravated murder and sentenced to death by the Hamilton County Court of Common Pleas for the August 1, 1984 murder of Gary Mitchell at the Central Bar in Cincinnati, Ohio. The following factual background comes directly from the Ohio Supreme Court's opinion in *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990), in which the court affirmed the conviction and sentence of Petitioner.

On August 1, 1984, Gary Mitchell was alone, tending bar at the Central Bar. The Central Bar, located near downtown Cincinnati, had been owned by Mitchell's family for forty years. When two patrons came into the bar, around 2:00 p.m., they found the bar empty and Mitchell unconscious, lying face down behind the bar. The cash register was open and empty. One patron called the police and an ambulance.

Soon thereafter the police and an ambulance arrived. When the ambulance crew carried Mitchell out, he had a large bruise on the side of his head. Upon arrival at the hospital, Mitchell was found nearly brain dead by treating physicians. Eight days later, Mitchell died from multiple brain bruises and bleeding caused by a traumatic blunt injury.

Cincinnati police found few clues to solve this crime. They did find a gym shoe print on the top of the bar. After photographing the print, they lifted an impression of it, discovering it was made by a Pony gym shoe. One bystander described two males that he saw running

from the area of the bar at approximately the time of the crime as being in their mid-twenties, one, 6'2″ to 6'4″, weighing approximately two hundred pounds, and the other, shorter, 5'3″ to 5'9″.

Police investigated other robberies similar in pattern to the Central Bar homicide. Two earlier robbery victims had suffered severe head injuries, requiring extensive hospitalization. After the Central Bar homicide, other similar robberies continued to occur.

On October 12, 1984, the police, after being alerted by an automatic alarm, arrested appellant, Derrick Jamison, shortly after he had robbed a Gold Star Chili restaurant. A hidden automatic camera photographed appellant when he robbed Gold Star Chili. Appellant was arrested and taken into custody. Police found on his person marked money from Gold Star Chili, jewelry from another robbery, and a gun taken from a third robbery. In addition, appellant was wearing Pony gym shoes, the soles of which were similar to the shoe print found at the Central Bar two and one-half months earlier. Appellant, 6'3″ tall, twenty-three years old, and weighing one hundred seventy pounds, fit the earlier general description of one of the suspects running from the Central Bar on August 1, 1984. Appellant, while being a suspect, was not charged with the Central Bar incident at that time since he could not be positively identified. Police continued their investigation.

In January 1985, police apprehended Charles Howell, appellant's accomplice in the Central Bar homicide. Police discovered Howell through a Crime Stopper tip. Howell told police he and appellant were playing basketball at about noon on August 1st and on the spur of the moment, they decided to rob the Central Bar. Howell acted as the lookout. It was appellant who attacked the bartender. Appellant took the cash from the register, later giving Howell $80. Howell agreed to testify against

appellant and pled guilty to aggravated robbery. Howell testified before a grand jury, which indicted appellant for aggravated robbery and the felony murder of Gary Mitchell. *Jamison*, 49 Ohio St.3d at 182–183, 552 N.E.2d at 181–82.

On October 12, 1985, a jury found Petitioner guilty of the aggravated robbery and felony murder of Mr. Mitchell. Five days later, on October 17, 1985, the same jury recommended that the Hamilton County Court of Common Pleas sentence Petitioner to death. Representing Petitioner at his trial were attorneys Calvin W. Prem and William E. Flax (Return of Writ, Ex. C). Petitioner pursued his direct appeals in the Hamilton County Court of Appeals and the Ohio Supreme Court, and both courts affirmed his conviction and sentence (*Id.*, Exs. E & H). Attorneys Albert J. Rodenberg, Jr. and Mr. Flax represented Petitioner in the Hamilton County Court of Appeals (*Id.*, Ex. D), while attorneys Peter Pandilidis and Mr. Flax represented Petitioner in the Ohio Supreme Court (*Id.*, Ex. F). The Ohio Supreme Court affirmed Petitioner's convictions and death sentence on March 7, 1990 (*Id.*, Ex. H). *Jamison*, 49 Ohio St.3d at 193, 552 N.E.2d at 190. On April 11, 1990, the Ohio Supreme Court also denied Petitioner's Motion for Reconsideration (*Id.*, Ex. I). The United States Supreme Court denied Petitioner's Petition for Writ of Certiorari on October 9, 1990 (*Id.*, Ex. K).

Petitioner pursued post-conviction relief in the Ohio courts. He filed his post-conviction petition on June 25, 1991 (Return of Writ, Ex. L). The Ohio courts denied post-conviction relief at all stages (*Id.*, Exs. N, Q, T & U). On August 28, 1992, Petitioner filed his Application for Delayed Reconsideration of his Direct Appeal with the Hamilton County Court of Appeals pursuant to Rules 14(B) and 26 of the Ohio Rules of Appellate Procedure and *State v. Murnahan*, 63 Ohio St.3d 60, 584 N.E.2d 1204 (1992), in order to assert a claim of ineffective assistance of appellate counsel (Return of Writ, Ex. V). The Hamilton County Court of Appeals denied Petitioner's Application for Delayed Reconsideration as untimely (*Id.*, Ex. X). Thereafter, Petitioner filed a Notice of Appeal from the decision denying his Application for Delayed Reconsideration (State Court App., Vol. X, Tab A). The Ohio Supreme Court entered a decision on this appeal on April 14, 1993, dismissing the appeal *sua sponte* for the reason that no substantial constitutional question existed therein (*Id.* at Tab F). Petitioner also filed a Motion for Delayed Reinstatement of Direct Appeal as of Right in the Ohio Supreme Court (*Id.*, Vol. XI, Tab A). On October 27, 1993, the Ohio Supreme Court denied Petitioner's motion without an opinion (*Id.*, Vol. IX, Tab G). On November 8, 1993, Petitioner filed a Motion for Rehearing (*Id.*, Vol. XI, Tab E). The Ohio Supreme Court denied Petitioner's motion without an opinion on December 15, 1993 (*Id.*, Vol. IX, Tab F).

Petitioner filed a petition for a writ of habeas corpus in federal court pursuant to Title 28 U.S.C. § 2254 on March 10, 1994 (doc. 3). Respondent filed his Return of Writ on April 2, 1994 (doc. 9). On January 30, 1996, the Court granted Petitioner leave to conduct discovery to be completed within ninety days (doc. 66). Thereafter, on January 31, 1997, Petitioner filed an Amended Petition, which is the Petition currently before the Court (doc. 94). Respondent filed a Supplemental Return of Writ on March 3, 1997, arguing that the Anti–Terrorism and Effective Death Penalty Act of 1996 (hereinafter, the "AEDPA") applies to Petitioner's claims, that Petitioner's claims are not entitled to a merits review because of various procedural defaults, that Petitioner's claims lack merit, and that the Court is bound by the state courts' findings of fact (doc. 95). Petitioner filed his Amended Traverse on May 2, 1997 in which he disputes all of Respondent's arguments (doc. 96).

The Court held oral argument on the procedural default questions and the merits of the Amended Petition on December 22 and 23, 1997. Transcripts of the hearing were filed on March 23, 1998 (docs. 121 & 122). The Parties submitted pre-hearing and post-hearing proposed findings of fact and conclusions of law as well as numerous notices of additional authority. On December 21, 1998, this Court issued an Order focusing on the procedural default questions (doc. 143). In the Order, the Court (1) held that Claims Two, Eight, Fourteen, Nineteen, and Twenty were waived in toto; (2) reserved ruling on Claim Six; (3) required that Petitioner show cause and actual prejudice for the issues not procedurally defaulted in Claims One, Three, Four, Five, Seven, Nine, Eleven, Twelve, Sixteen, and Eighteen; and (4) granted Petitioner a hearing on the merits of Claim Seventeen.

On June 7, 1999, Petitioner and Respondent filed pre-hearing proposed findings of fact and conclusions of law (docs. 164 & 165). The Court heard oral argument on July 7–9, 1999 on the procedural default questions remaining in Claims One, Three, Four, Five, Seven, Nine, Eleven, Twelve and Sixteen, and on the merits of Claim Seventeen. Transcripts of this hearing were filed August 6, 1999 (docs. 180, 181 & 182). Petitioner then filed post-hearing findings of fact and conclusions of law on October 29, 1999 (doc. 188). Petitioner also requested a limited hearing to complete testimony on Claims Thirteen, Fifteen, and Twenty–One (doc. 179), which the Court granted (doc. 185). The Court thereafter heard oral argument on January 11, 2000 on Claims Thirteen, Fifteen and Twenty–One.

The Court notes that Betty Mitchell, who is currently the Warden of Mansfield Correctional Institution, was automatically substituted as the Respondent in place of Terry J. Collins pursuant to Federal Rule of Civil Procedure 25(d).

**STANDARD OF REVIEW**

Petitioner seeks relief pursuant to Title 28 U.S.C. § 2254. Section 2254, Title 28 of the United States Code, provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Court observes that our December 21, 1998 Order (doc. 143) concluded that pre-AEDPA law applies to Petitioner's petition.

The following claims will be addressed in this Order: Claims One, Three, Four, Five, Six, Seven, Nine, Ten, Eleven, Twelve, Thirteen, Fifteen, Sixteen, Seventeen, Eighteen, and Twenty–One. As noted above, this Court previously held that Petitioner waived Claims Two, Eight, Fourteen, Nineteen and Twenty due to his procedural default in the state courts of the issues contained therein. This Order completes our findings on the procedural default issues arising in this case and analyzes the merits of the claims where required.

## I. Procedural Default

■ Principles of comity necessary to a federal system narrow a federal court's review of a petition for a writ of habeas corpus brought by a state prisoner. *See Coleman v. Thompson*, 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The Supreme Court explains that "[u]nder our federal system, the federal and the state 'courts [are] equally bound to guard and protect rights secured by the Constitution.'" *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (quoting *Ex parte Royall*, 117 U.S. 241, 251, 6 S.Ct. 734, 29 L.Ed. 868 (1886)); *see Coleman*, 501 U.S. at 731, 111 S.Ct. 2546 (quoting same). Thus, to ensure the states an opportunity to protect these rights, the doctrine of procedural default requires that the state courts retain "the first op-

portunity to address and correct alleged violations of state prisoner's rights." *Coleman*, 501 U.S. at 731, 111 S.Ct. 2546. The doctrine of procedural default provides that, if a state court previously dismisses a state prisoner's federal claim on the grounds that the prisoner failed to comply with a state procedural rule, then a federal court ordinarily cannot consider the merits of that federal claim. *Id.* at 729–730, 111 S.Ct. 2546.

This procedural default doctrine bars federal habeas review of a state court ruling only if the following requirements have been satisfied:

(1) the petitioner actually violated an applicable state procedural rule;

(2) the procedural violation provides an "adequate and independent state ground" for denying the petitioner's federal constitutional claim; and

(3) the state court actually enforced the procedural violation; that is, the highest state court to rule on the claim clearly and unambiguously relied upon the procedural violation as the reason for rejecting the claim.

*See generally Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. However, the petitioner can excuse the procedural default by demonstrating either:

(a) that there was "cause" for the procedural default and actual prejudice by the alleged constitutional error; *or*

(b) that the case falls within the category of cases considered "fundamental miscarriage of justice."

*See id.* (emphasis added); *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986); *Harris v. Reed*, 489 U.S. 255, 260–62, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Ylst v. Nunnemaker*, 501 U.S. 797, 802, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

For the cause and prejudice standard, the petitioner must provide a "substantial" reason that is "external" to the petitioner as the cause for the procedural default. *See Murray v. Carrier*, 477 U.S.

478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir.1994). In addition, the petitioner must show that the alleged trial errors "not merely ... created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

To demonstrate a "fundamental miscarriage of justice," a petitioner must show that the alleged constitutional violation probably resulted in the conviction of one who is actually innocent. *Murray*, 477 U.S. at 496, 106 S.Ct. 2639. This exception applies only in "extraordinary cases." *Id.* The standard requires a petitioner to show that he is "actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). To establish a probability of innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.*

We will discuss these requirements in greater detail as they apply to the various claims.

## II. Presumption of Correctness

Once a claim is properly before a federal court on habeas corpus review, the federal court must "presume a state trial or appellate court's conclusions as to facts are correct unless the petitioner demonstrates by convincing evidence that the facts are erroneous under one of the eight conditions enumerated in 28 U.S.C. § 2254(d)(1)-(8)." *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir.1996) (citing *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (per curiam) (applying pre-AEDPA law)). Based on pre-AEDPA law, this presumption of correctness applies unless the petitioner can establish:

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

28 U.S.C. § 2254(d)(1)-(8); *see Cooey v. Anderson,* 988 F.Supp. 1066, 1074–75 (N.D.Ohio 1997).

 The burden rests upon the petitioner to establish by convincing evidence that the state court's factual determination is erroneous. 28 U.S.C. § 2254(d); *McQueen,* 99 F.3d at 1310. The presumption of correctness does not apply to mixed questions of law and fact, but rather to "basic, primary or historical facts." *Levine v. Torvik,* 986 F.2d 1506, 1514 (6th

Cir.1993). For example, the issue of ineffective assistance of counsel is a mixed question of law and fact. *Sims v. Livesay,* 970 F.2d 1575, 1579 (6th Cir.1992). As explained by the Sixth Circuit, "[t]he presumption also applies to implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *McQueen,* 99 F.3d at 1310. The state court findings supported in the record must control even though the federal court may have rendered contrary findings that also would have been supported by the record. *Id.* (citing *Wainwright v. Goode,* 464 U.S. 78, 85, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983)). The Sixth Circuit further requires that:

> If a federal district court does not defer to the state court findings of fact, it must provide a written justification and state which of the first seven factors under § 2254(d) are present, or it must provide reasons for concluding that the state court findings are not fairly supported by the record, pursuant to the eighth factor of § 2254(d).

*Id.* (citing *Sumner,* 449 U.S. at 551, 101 S.Ct. 764). Accordingly, this Court defers, where relevant, to the factual determinations reached by the Ohio courts in Petitioner's case.

## OVERVIEW OF OUR ANALYSIS

During our consideration of this case, the Court has understood that " '[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" *Kyles v. Whitley,* 514 U.S. 419, 422, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *Burger v. Kemp,* 483 U.S. 776, 785, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)). As Sixth Circuit Court of Appeals Judge Gilbert S. Merritt has observed, this process takes time:

> It is not the function of the federal courts to kowtow to the political passions of the day that decree that we supply only a swift execution without

regard to whether the accused is guilty or received a fair trial. In the judicial arena, there is no traditional social value or constitutional principle requiring rapid execution or extinction of human life....

It is our job to make sure that the traditional principles of federalism are honored. It is our job to see that a life is not taken in the absence of a fair trial in which the constitutional rights granted to the accused are observed or to allow an execution while there remains a serious unanswered question about whether the accused is in fact guilty of the crime charged. The process of deliberation, reflection, trial, review and the elimination of error and uncertainty takes time, including the time it takes to review new evidence when it becomes necessary. The traditional deliberative process must be fully complied with in order to insure that innocent life and the attributes of human dignity are preserved in the face of the biological passion and hostility in our species that lead us to kill each other without reason. If this traditional process of deliberation and reflection takes time, we must take the time. In light of the fallibility of human judgment, it is better that even the life of a guilty man be spared for a few years while we make sure that we are not making another fatal mistake.

*O'Guinn v. Dutton*, 88 F.3d 1409, 1413 n. 1 (1996) (Merritt, C.J., concurring).

This Court addresses each of Petitioner's claims properly before us to gain insight into the case and to provide a complete record for appellate review. As becomes apparent in the following sections, mistakes plagued the prosecution and defense of this case. Nonetheless, we realize that a criminal defendant " " 'is entitled to a fair trial but not a perfect one,' " for there are no perfect trials." *Brown v. United States*, 411 U.S. 223, 231–32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (quoting *Bruton v. United States*, 391 U.S. 123, 135, 88

S.Ct. 1620, 20 L.Ed.2d 476 (1968)) (quoting *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953)). Here the sole claim rising to a denial of constitutional rights involves the alleged suppression by the State of Ohio of exculpatory and material evidence. We reach the merits of this claim now.

### CLAIM ONE

**The State of Ohio failed to provide Petitioner with all relevant, material and exculpatory evidence at pretrial discovery proceedings. This failure violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

The substance of Claim One is based on the rule announced in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and explored in prominent cases such as *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). These cases held that the suppression by the prosecution of evidence favorable to the accused in a criminal case violates due process if the evidence is material to guilt or to sentencing and regardless of the degree of culpability of the prosecution. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194; *see also Kyles*, 514 U.S. at 432, 115 S.Ct. 1555; *Bagley*, 473 U.S. at 675, 105 S.Ct. 3375; *Agurs*, 427 U.S. at 103–108, 96 S.Ct. 2392. The trial prosecutor's duty to disclose exculpatory evidence extends to information in the possession of the prosecutor's office or in the possession of the law enforcement agency responsible for investigating the offense. *Kyles*, 514 U.S. at 437–38, 115 S.Ct. 1555 (indicating that the individual prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf ... including the police"). This duty to disclose also applies to impeachment evidence.

*Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375.

A true *Brady* violation consists of three components. *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). First, a petitioner must show that the evidence at issue was favorable to him. *Id.* Secondly, the petitioner must demonstrate that the State suppressed the evidence. *Id.* Thirdly, the petitioner must satisfy the materiality inquiry by establishing the prejudice suffered because of the suppression. *Id.* at 1948–49. In making a decision whether certain exculpatory evidence is material, the reviewing court must assess the cumulative effect of all such suppressed evidence. *Kyles,* 514 U.S. at 436–37, 115 S.Ct. 1555. The favorable evidence is material when there is a reasonable probability that the result of the proceeding would have been different if the prosecutor had disclosed the evidence to the defense. *Id.* at 434–35, 115 S.Ct. 1555; *see also United States v. Presser,* 844 F.2d 1275, 1281 (6th Cir.1988). The question is not whether the defense would more likely than not have received a different verdict with the evidence. *Kyles,* at 434–35, 115 S.Ct. 1555. Rather, a reasonable probability of a different result means that the net effect of the suppressed evidence would undermine the confidence in the outcome of the trial. *Id.* at 435, 115 S.Ct. 1555.

Following federal habeas discovery in this case[1], Petitioner alleged in his Amended Petition that the Hamilton County Prosecutor's Office did not disclose all of the exculpatory information in its and the Cincinnati Police Department's (hereinafter, the "C.P.D.") possession to Petitioner's trial counsel before the Central

Bar trial began. William E. Flax, one of Petitioner's trial attorneys, avers in his affidavit that he did not receive 35 documents from the prosecution despite the fact that his co-counsel Calvin W. Prem filed a written discovery demand more than seven months before Petitioner's trial began in the fall of 1985 (*see* doc. 103, Vol. 1, Attach. 1, at 13). The document sought the "full disclosure of all evidence known now, or which may hereafter become known to he [sic] Prosecuting Attorney, which is favorable to the Defendant, and material either to the question of guilt or punishment" (*Id.* at 14).

Petitioner asserts that the trial preparation practices of the C.P.D. and the Hamilton County Prosecutor's Office complicated his efforts at discovery in 1985. At that time, the C.P.D. routinely selected certain information and evidence from its files that it judged to be relevant to a homicide case and assembled these documents into what was referred to as a "homicide book" (*see* 1999 Hearing Tr. at 238). Rather than turn over the entire case file to the Hamilton County Prosecutor's Office, the C.P.D. would only provide this "homicide book" (*Id.*) According to Petitioner, this "homicide book" did not contain all of the evidence gathered by the police. This fact is undisputed by Respondent. Moreover, Petitioner's trial prosecutor Mark E. Piepmeier testified during the hearing on July 7–9, 1999 that he relied on the "homicide book" when he answered Petitioner's discovery demands in 1985. Mr. Piepmeier and R. Daniel Reif also stated that they received no training from the Hamilton County Prosecutor's Office as to what constituted exculpatory evidence (doc. 85, Vol. 2, Piepmeier Dep. at 47–48, Reif Dep. at 51; 1999 Hearing Tr. at 259).

---

**1.** The Court recognizes that the Sixth Circuit in *O'Guinn v. Dutton,* 88 F.3d 1409, 1413 (6th Cir.1996), dismissed a petition for a writ of habeas corpus brought by a Tennessee prisoner so that an unexhausted *Brady* claim could be addressed in the first instance by the Tennessee courts. However, in this case, the Parties agreed that the petition is not subject to dismissal on exhaustion grounds because all claims raised by Petitioner have either been raised properly in the Ohio courts or are excused from the exhaustion requirement on the ground of futility in light of the Ohio Supreme Court's decision in *State v. Steffen,* 70 Ohio St.3d 399, 639 N.E.2d 67 (1994) (*see* docs. 33 & 143).

In general, the alleged undisclosed evidence falls within the following groups:

(1) Evidence relating to eyewitness James Suggs who provided identification information about the perpetrators of the Central Bar robbery/homicide to the C.P.D.

(2) Evidence relating to Charles Howell, Petitioner's co-defendant who plead guilty to aggravated robbery in connection with the Central Bar robbery/homicide and who testified in the Central Bar robbery/homicide against Petitioner.

(3) Evidence relating to the other eyewitnesses to the Central Bar robbery/homicide who provided descriptions of the two assailants.

(4) Evidence relating to other suspects for the Central Bar robbery/homicide identified by the C.P.D.

(5) Evidence relating to the cause of death of Gary Mitchell.

(6) Evidence relating to Petitioner's waiver of his *Miranda* rights during police questioning.

(7) Evidence relating to pretrial statements of eyewitnesses of the so-called similar robberies who testified at the Central Bar robbery/homicide trial.

(8) Evidence relating to other robberies investigated by the C.P.D. that occurred in the same geographical area of Cincinnati during the time Petitioner allegedly committed the so-called similar robberies that were introduced at trial.

 Nevertheless, Respondent argues that this claim is procedurally defaulted because Petitioner failed to raise this claim in the state court at any stage. Thus, Respondent contends, the state courts have been totally deprived of any opportunity to hear this claim. In our December 21, 1998 Order (doc. 143), this Court concluded that, in fact, this claim was not raised on direct appeal or in post-conviction in the Ohio courts; rather, Petitioner raised the claim for the first time in his Amended Habeas Petition. According to the Sixth Circuit, a petitioner's failure to raise a claim on direct appeal in the Ohio Court of Appeals or in the Ohio Supreme Court constitutes procedural default. *Leroy v. Marshall*, 757 F.2d 94, 97 (6th Cir.1985). Where, as here, Petitioner can no longer present the federal claim in state court, he has waived the claim for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Leroy*, 757 F.2d at 97.

 Although the Supreme Court has not fully shaped the contours of the cause standard in the context of procedural default, *Amadeo v. Zant*, 486 U.S. 214, 221, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988), a petitioner generally demonstrates cause where he presents a substantial reason to excuse the procedural default. *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir.1994). The Supreme Court has emphasized "that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 486–89, 106 S.Ct. 2639. In addition to constitutionally ineffective assistance of counsel, the Supreme Court has found the following circumstances constitute cause: (1) interference by officials that makes compliance with the procedural rule impracticable, and (2) a showing that the factual or legal basis for a claim was not reasonably available to counsel. *Id.* at 488, 106 S.Ct. 2639.

 A court's analysis does not end at a determination of cause. Once a petitioner demonstrates cause for the procedural

default, he still must show that he was actually prejudiced by the claimed constitutional error. *United States v. Frady,* 456 U.S. 152, 168, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (concluding that a petitioner has "the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions"); *see also Rust,* 17 F.3d at 161. The prejudice prong is not satisfied "if there is strong evidence of a petitioner's guilt and a lack of evidence to support his claim." *Rust,* 17 F.3d at 161–62. In the context of a *Brady* claim, the Supreme Court has held that a petitioner satisfies the prejudice, as well as the materiality, inquiry when he shows that " 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler,* 119 S.Ct. at 1952 (quoting *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555).

In the case at bar, Petitioner argues that he was prevented from discovering the factual basis of Claim One because of the State's withholding of evidence and the state court's refusal to allow him an opportunity to conduct post-conviction discovery. These facts, he argues, demonstrate cause for the procedural default. In contrast, Respondent asserts that much of the alleged undisclosed *Brady* information was actually known and used by Petitioner's trial counsel during the trial. For the most part, Respondent relies on citations to the trial transcript to attempt to prove that trial counsel did in fact have the information.

▮ Certainly, the withholding of evidence by the state that precludes an individual from discovering the factual basis of a claim constitutes cause for the procedural default. *Amadeo,* 486 U.S. at 222, 108 S.Ct. 1771; *Strickler,* 119 S.Ct. at 1949, 1952. In *Amadeo,* the petitioner raised on direct appeal in the state court a challenge to the composition of the juries that had indicted, convicted, and sentenced him. *Amadeo,* 486 U.S. at 218, 108 S.Ct. 1771. The state supreme court affirmed the convictions and sentences, rejecting his challenge on the ground that it should have been objected to before the indictment or voir dire. *Id.* at 219, 108 S.Ct. 1771. The basis of the challenge was a district attorney's memorandum discovered nine months after the petitioner's state court trial that composed the figures for the number of African–Americans and women to be placed on the master jury list in order to ensure their under-representation on juries. *Id.* at 217–18, 108 S.Ct. 1771.

The petitioner in *Amadeo* argued that his claim was not waived because he did not have an opportunity to discover the purposeful discrimination before the time he discovered the memo. *Id.* at 218, 108 S.Ct. 1771. The federal district court, after holding an evidentiary hearing, found cause for the procedural default and granted the writ of habeas corpus. *Id.* at 220, 108 S.Ct. 1771. The district court found that the petitioner's claim was reasonably unknown to the petitioner's attorneys because it was concealed by the county officials and that the concealment, rather than a tactical consideration, was the reason for the failure to raise the challenge in state court. *Id.* at 220–21, 108 S.Ct. 1771. The Court of Appeals reversed the district court, reasoning that neither of the two factual predicates from the district court's legal conclusion was adequately supported by the record. However, the Supreme Court concluded that the facts found by the district court did constitute cause for the procedural default. *Id.* at 222, 108 S.Ct. 1771. The Supreme Court reversed the appellate court, holding that the factual findings of the district court were not clearly erroneous. *Id.* at 224, 228.

Likewise, in *Strickler,* the Supreme Court found that the petitioner established cause for failing to raise his *Brady* claim prior to his federal habeas action because (1) the Commonwealth of Virginia withheld exculpatory impeachment evidence; (2) the

petitioner's defense counsel had reasonably relied on the prosecution's open file policy; and (3) the Commonwealth had incorrectly asserted to defense counsel during state habeas proceedings that petitioner had already seen "'everything known to the government.'" *Id.*, 119 S.Ct. at 1952. The Supreme Court in *Strickler* suggested that proof of only one or two of these facts "would be sufficient to constitute cause." *Id.* Thus, the peculiar aspect about the *Brady* claim is that the procedural cause for failing to raise it before in state court is intertwined with the substantive basis for the claim. The Supreme Court explained:

> In this case, cause and prejudice parallel two of the three components of the alleged Brady violation itself. The suppression of the [witness's] documents constitutes one of the causes for the failure to assert a Brady claim in the state courts, and unless those documents were "material" for Brady purposes, their suppression did not give rise to sufficient prejudice to overcome the procedural default.

*Id.* at 1949.

In keeping with Supreme Court precedent, this Court approaches the cause inquiry by focusing on whether the State of Ohio suppressed evidence and whether Petitioner's trial counsel knew or reasonably could have known of the alleged undisclosed evidence. *See Strickler*, at 1951; *McCleskey v. Zant*, 499 U.S. 467, 498, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (stating the issue of cause as "whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim" at the first opportunity); *Fairchild v. Lockhart*, 979 F.2d 636, 640 (8th Cir. 1992) (finding cause for failure to bring a *Brady* claim by analyzing what evidence the prosecution disclosed, what defense counsel knew, and whether anything disclosed to defense counsel would have alerted him to the new evidence).

As far as determining what defense counsel knew, the Court cannot be certain of the contents of the prosecutor's file or the "homicide book." However, the Court observes that, before the trial began, the prosecution gave the defense counsel a pleading entitled "Discovery by State of Ohio" (doc. 103, Vol.1, Attach.2). The pleading listed the State's witnesses as well as the criminal record of Co–Defendant Charles Howell and Petitioner. It further indicated that the physical evidence was available for inspection in the prosecutor's office and that the lab reports had already been provided. The pleading quoted a statement by Petitioner,[2] and it indicated that a statement by Co–Defendant Charles Howell had already been provided to defense counsel. According to the pleading, Mr. Howell's grand jury testimony was "enclosed" (*Id.*). Under the heading, "Evidence Favorable," it listed as the response, "None known" (*Id.*).

Petitioner's defense counsel also sought other evidence prior to or during the 1985 trial. In fact, the discovery issue raised in this federal habeas action is foreshadowed in a discussion between Petitioner's defense counsel, the prosecutors, and the trial judge that occurred before Petitioner's 1985 trial even began. During this discussion, Mr. Flax states, "[t]he problem we run into when we subpoena police records is the policemen get very uptight, they run right to the prosecutor, and we have to go through a series of baffles before we get what we subpoena … We're having difficulty getting the whole picture" (Tr. at 812)[3]. Later in the discussion, however, Mr. Reif maintained that "[w]e have, in fact, complied with discovery" (*Id.* at 813).

---

**2.** The pleading quoted Petitioner as saying to the C.P.D.: "When arrested, defendant told police he had stolen the bike he was riding and denied ever having been in the Acres of Book Store." (doc. 103, Vol.1., Attach.2).

**3.** References to the transcript of the Central Bar Robbery/Homicide Trial are designated as "(Tr. at __)".

As we concluded in our December 21, 1998 Order (doc. 143), for the evidence that defense counsel was either aware of, or could reasonably have been aware of, there is no cause for failing to raise the *Brady* claim with respect to that issue. More specifically, the Court held in the December 21, 1998 Order that Petitioner failed to overcome his procedural default with respect to the evidence relating to the cause of death of Gary Mitchell and with respect to certain evidence relating to Co–Defendant Howell (doc. 143). In the following sections, this Court examines the remaining pieces of evidence Petitioner alleges the State suppressed to determine, where necessary: (1) whether Petitioner can show cause as to why he did not raise a *Brady* claim in the state courts; and (2) whether the evidence was favorable to Petitioner, either as exculpatory direct evidence or impeaching evidence. The Court also explores Petitioner's and Respondent's arguments related to the prejudice, and materiality, inquiry. In our concluding section of this Claim, we decide whether the net effect of the suppressed evidence undermines our confidence in the outcome of the trial. *See Kyles*, 514 U.S. at 435, 115 S.Ct. 1555.

### I. *Exploring the Allegedly Suppressed Evidence Where Cause Was Established by Petitioner*

In our December 21, 1998 Order, this Court found that, with respect to the evidence below that was alleged to have been undisclosed to Petitioner's trial counsel, the fact that Mr. Flax avers that he did not receive the documents from the Prosecution constitutes cause for failing to raise the *Brady* claim as to those documents

prior to federal habeas review. Respondent does not argue that Petitioner did in fact receive these documents; rather, Respondent asserts that defense counsel actually knew the factual background of these documents. With one exception, the Court disagrees with Respondent for the reasons explained in more detail below. Accordingly, the Court now must determine whether the following evidence was favorable to Petitioner and the Court must explore Petitioner's and Respondent's arguments related to the prejudice, and materiality, inquiry. *Strickler*, 119 S.Ct. at 1952.

**A. Petitioner alleges that his trial counsel did not receive this information: "Mr. Suggs selected from a police photo array photographs of individuals whom he identified as the taller and shorter of the perpetrators whom he had seen flee the Central Bar homicide. Neither of the photographs he selected depicted Mr. Jamison" (doc. 100).**

▮▮▮▮ A defense witness, Mr. Suggs testified on direct examination that "I seen a lot of pictures, but I was unable to identify" (Tr. at 2054). He restated on cross examination that he could not identify the individuals he saw on the day of the robbery/homicide (Tr. at 2058). In addition, Officer William Davis testified at trial that, while the police showed Mr. Suggs photographs of possible suspects, Mr. Suggs could not identify the assailants among them (Tr. at 1026, 1144).[4] Respondent still maintains that Mr. Suggs never identified another suspect and was fully cross-examined with the same information

---

**4.** Officer Davis's testimony seems to waiver on this issue. During the cross-examination of Officer Davis, the police detective at one point states, "[Mr. Suggs] could identify the individuals involved. As time passed, it became obvious he couldn't" (Tr. at 1133). Almost immediately thereafter, Officer Davis stated, "It just became obvious to me he couldn't identify anybody" (Tr. at 1134). Then, on redirect, the prosecutor asked Offi-

cer Davis, "Was (Mr. Suggs) ever able to make an identification?" Officer Davis answered, "No, sir." The prosecutor then asked, "Among all those photographs that you showed him, he never identified anyone, is that correct?" Officer Davis stated, "That's correct." Given this testimony, the Court finds that defense counsel were reasonable in believing that no positive identification of any suspect from the photo array occurred.

that Petitioner is now suggesting is exculpatory (doc. 124).

The undisclosed documents to which Petitioner refers are copies of photographs. The photographs are distorted due to the photocopying and, thus, the individuals that the photographs depict are unrecognizable. However, on the bottom of one of the photographs is written "picked by Mr. Suggs as a look-a-like for the taller suspect" (doc. 100, Tab 1 at 16). The other document, which is preceded in the record by a number of copies of photographs that are completely distorted, appears to be the criminal record of Eugene Vassar (*Id.* at 19–20). Handwritten on the record next to the name Eugene Vassar is "alias Charles Howell" (*Id.*). On the following page, which appears to be a continuation of the criminal record for Eugene Vassar, is the statement, "James Suggs picked this photo out of 7 photos and said he thinks it was the shorter of the 2 suspects in the Central Cafe Robbery—Just passed over picture of Greg Ivory" (*Id.*). Mr. Flax attached these documents to his affidavit and stated that they were among those not disclosed to him by the prosecution (doc. 103, Vol. 1, Aff. Flax ¶¶ 8(A), 10(A)). At the December 22–23, 1997 hearing, Respondent argued that a look alike is not an identification because it is not a positive identification.

Although Petitioner's defense counsel apparently knew about the photo array,[5] Petitioner asserts that this evidence is exculpatory because the evidence that Mr. Suggs had actually picked two individuals out of that array was not known to his defense counsel at trial. Had his defense counsel reviewed this evidence, Petitioner argues, he could have used the evidence to (1) refresh Mr. Suggs's memory during the trial and ultimately to raise further suspicion that another person committed the crime and (2) show that Officer Davis lied about whether Mr. Suggs ever identified

anyone as an assailant in the Central Bar homicide. In support of his argument related to Officer Davis, Petitioner draws the Court's attention to *Simos v. Gray*, 356 F.Supp. 265, 270 (E.D.Wis.1973). In *Simos*, the district court found that the prosecution should have disclosed identification evidence because it "bore not just upon the witness' general trustworthiness but bore firsthand upon the reliability of his specific testimony." *Id.; see also Simms v. Cupp*, 354 F.Supp. 698, 700 (D.Or.1972) (holding that the failure of the prosecution to disclose a witness's pretrial identification of her assailant violated due process).

The Court agrees with Petitioner that this evidence satisfies the first component of a *Brady* claim, namely that the evidence be favorable to Petitioner.

**B. Petitioner alleges that the prosecution failed to disclose to Petitioner's trial counsel other eyewitness statements about the Central Bar homicide that conflicted with the State's theory that Charles Howell (6′1″) and Petitioner (6′3″), both above average in height, were the assailants. "These eyewitness statements also contradicted Howell's testimony at trial. These eyewitnesses saw and described two suspects who were seen 'casing' the Central Bar shortly before the homicide and fleeing from the Central Bar at the time of the murder. The suppressed statements make clear that one of the perpetrators was quite tall, and the other was significantly shorter" (doc. 100).**

The eyewitnesses to which Petitioner refers are: Greg Mapp, Ellen Hall, Gene Martin, and George Richardson. Each of these persons provided statements to the police concerning the Central Bar

---

5. During the cross-examination of Officer Davis, defense counsel asked Officer Davis about his conversations with Mr. Suggs. Officer Davis commented that, "He was also shown photographs of individuals who surfaced as suspects" (Tr. at 1129–30).

robbery/homicide, although none of them testified at Petitioner's 1985 trial. Petitioner argues that the duty to disclose exculpatory eyewitness statements applies regardless of whether an eyewitness testifies at the trial. *See Kyles,* 514 U.S. at 435, 115 S.Ct. 1555 (reiterating that the critical question is whether the undisclosed exculpatory evidence undermines confidence in the verdict). Petitioner further contends that each of the eyewitnesses' descriptions of the assailants is exculpatory evidence that would have been material to the outcome of his trial. In general, Petitioner asserts that the statements of these eyewitnesses could have been used to impeach prosecution witness Mr. Howell and to cast suspicion away from Petitioner. Petitioner cites as support *Miller v. Angliker,* 848 F.2d 1312, 1323 (2d Cir.1988), a case in which the Second Circuit concluded that suppressed evidence related to another suspect undermined the federal court's confidence in the outcome of the state court proceeding. Respondent, however, argues that Mr. Howell was thoroughly impeached at trial and that any further impeachment evidence would have been cumulative. The following subsections examine in detail the eyewitness statements.

First, Petitioner alleges that his trial counsel did not receive this information: "Greg Mapp informed Officer Davis that he saw an individual flee the bar at the time of the homicide who was 5'7" to 5'9" and was carrying a brass pipe approximately one foot in length" (doc. 100). This information comes from the Investigative Summary, dated August 5, 1984, of Officer Davis. Petitioner's summary of the report is correct (doc. 103, Vol. 1, Attach. 13, at 34). In the report, Officer Davis indicated that Mr. Mapp, who was 12 years old in 1984, was able to provide details about the crime scene, and Officer Davis wrote that "[h]e seems like a fairly decent young man and somewhat reliable at this point." Mr. Flax attests that he did not receive this report.

During the July 7–9, 1999 Hearing, Respondent asserted that the C.P.D. later determined that Mr. Mapp lied about being at the Central Bar the day of the crime (1999 Hearing Tr. at 200–201, Respondent's Ex. A). Petitioner countered that, if Mr. Mapp's statements had been disclosed, his trial counsel would not have had to rely on the C.P.D.'s interpretation of Mr. Mapp's credibility and instead could have investigated the story on their own (*Id.* at 220). Petitioner maintains that if Mr. Mapp was credible, his testimony would have been "of immense importance to the defense" (doc. 188; *see* 1999 Hearing Tr. at 51–53, 199).

In demonstrating the importance of Mr. Mapp's statements, Petitioner points to the fact that Mr. Howell testified that a weapon was not used during the crime (Tr. at 1251–57). In addition, Dr. Paul N. Jolly, the chief deputy coroner for Hamilton County in 1985, testified that the victim died of a "blunt injury" to the head (Tr. at 959), but he did not state whether a weapon was used to cause the injury. Petitioner argues that testimony by Mr. Mapp about a brass pipe could have cast doubt on Mr. Howell's testimony by contradicting his story that the victim's fatal wound was caused by Petitioner's repeated stomping on the victim's head with his shoes. Mr. Mapp's description also conflicts with the State's theory that Mr. Howell (6'1") and Petitioner (6'3") committed the crime.

Secondly, Petitioner alleges that his trial counsel did not receive this information: "Ellen Hall, the cook at the Central Bar, told the C.P.D. that two African–Americans twice entered the bar just prior to robbery. One of the individuals was stocky and approximately 6'2" wearing a summer hat and the other individual was 5'5" and weighed between one hundred forty to one hundred fifty pounds" (doc. 100). This information comes from the C.P.D.'s Investigative Summary, dated August 12, 1984 (doc. 103, Vol.1, Attach.15). Petitioner's above statement is a correct

summary of the information contained in that report, with the exception that the second individual was identified as 5'6". Mr. Flax attests that he did not receive this report. Howell testified that he and the other accomplice had not entered the bar prior the robbery (Tr. at 1251–57).

Petitioner asserts that Ms. Hall's statements were exculpatory in that the statements further raise doubt about Petitioner's involvement in the Central Bar robbery/homicide. Ms. Hall provides descriptions of the assailants that match those of other eyewitnesses and she indicates that the two assailants entered the bar prior to the robbery. Petitioner contends that this information contradicts Mr. Howell, who testified that he and his accomplice did not enter the bar prior to the robbery (Tr. at 1251–57), and thus could have been used as impeachment evidence during Petitioner's trial. Ms. Hall also stated that the taller suspect was light-complected, stocky, and wore a summer hat. According to Petitioner, this information would have cast suspicion in the direction of another suspect.

Thirdly, Petitioner alleges that his trial counsel did not receive this information: "Gene Martin, who was in the Central Bar just prior the robbery, described two African Americans who entered the bar—the taller individual as a 'good size, 6' or over' and the shorter individual as 5'7". He also stated that two African Americans 'checked out' the Central Bar twice prior to the robbery, also contradicting Howell's trial testimony" (doc. 100). This information comes from the C.P.D.'s Investigative Summary dated August 12, 1984 (doc. 103, Vol.1, Attach.15). Mr. Flax attests that he did not receive this report. Petitioner's above statement is a correct summary of the information contained in the report with one exception: the report does not state that Mr. Martin said the two individuals "checked out the Central Bar twice." Mr. Martin said that the taller suspect came in the Bar to use the phone. One can infer from the report that Ms. Hall saw them twice in the Bar. Petitioner contends that Mr. Martin's observations corroborate those of the other eyewitnesses and, at the same time, contradict the testimony of Mr. Howell.

Fourthly, Petitioner alleges that his trial counsel did not receive this information: "George Richardson, who lived across the street from the Central Bar, provided a 'description of the suspects' that 'matches the description given by the other witnesses' one suspect 6'2" and the other suspect much shorter in medium 5' range" (doc. 100). This information comes from an Investigative Summary Report of Officer Davis dated August 2, 1984 and Officer Davis's deposition testimony (doc. 103, Vol. 1, Attach. 9; doc. 100, Tab 1 at 58–59). Mr. Flax attests that he did not receive this report. Petitioner asserts that, like the other eyewitnesses, Mr. Richardson indicated that the height difference between the two suspects amounted to more than the approximate two inches in height difference between Mr. Howell and Petitioner. In addition, Petitioner alleges that Mr. Richardson joined other eyewitnesses in his observation that one suspect wore a straw hat (see doc. 103, Vol. 1, Attach. 26).

The Court finds that Petitioner meets the requirements of the first component of a *Brady* claim by establishing how this evidence would have been favorable to him at trial.

**C. Petitioner alleges that his trial counsel did not receive this information: "David Anthony ... was found in possession of one of the wallets from one of the victims of the Sav–All Drug Store, one of the so-called similar offenses, immediately after the robbery in the area behind the store. He was wearing a straw hat. Two eyewitnesses (Suggs and Richardson) stated that one of the Central Bar assailants was wearing a straw hat" (doc. 100).**

This information comes from an arrest report on August 7, 1984 charging

David Anthony with "I.D. (trafficking in marijuana) (RSP over)" (doc. 103, Vol.1, Attach.24). The arresting officer observed Mr. Anthony "rooting thru wallet taken in Agg. Robbery Offense at 120 W. Elder Street" (*Id.*). Also, the arresting officer noted that Mr. Anthony wore a straw hat.

Additionally, there are photographs that state underneath them, "David Anthony; Suspect: Central Bar; 8–8–84" (doc. 103, Vol. 1, Attach. 21 at 49). There is also a sketch of a person wearing a straw hat with "Suspect # 1" written on top of it. The person depicted in the sketch is unidentifiable (doc. 103, Vol.1, Attach.25). There are handwritten notes, dated August 2, 1984, that have Mr. Richardson's name and address on the top of the sheet, and the description of the two individuals he saw run from the Central Bar, including that the second person was 5'11" and was wearing a tan straw hat (doc. 103, Vol.1, Attach.26).

Mr. Flax attests that he did not receive the arrest report, photographs, or notes. Even though the defense indicated during trial that someone other than Petitioner could have committed the crime, Petitioner asserts that the aforementioned eyewitness statements relating to the straw hat, together with the fact that Mr. Anthony was caught going through a wallet from the Sav–All Drug Store robbery while wearing a straw hat, would have been important exculpatory evidence. This undisclosed evidence, Petitioner argues, would have tied Mr. Anthony, who was about 5'11", to both the Central Bar robbery/homicide and the Sav–All Drug Store robbery.

Respondent disputes the exculpatory nature and materiality of this evidence, contending that the existence in the early stages of the Central Bar homicide investigation of possible suspects does not constitute exculpatory evidence. Citing to *Jarrell v. Balkcom*, 735 F.2d 1242, 1258 (11th Cir.1984), Respondent contends that "[t]he State has no obligation to release 'ephemeral' information on the possibility of other suspects pursuant to *Brady* and its progeny" (doc. 164). Petitioner in turn debates Respondent's impression of this information as "ephemeral." The Court notes that the record fails to demonstrate how long the C.P.D. considered anyone a suspect, including Mr. Anthony. Accordingly, the Court finds that Petitioner satisfies the first component of a *Brady* claim with relation to the evidence concerning the possibility of other suspects.

**D. Petitioner alleges that his trial counsel did not receive this information: "Robert Jordan and Percy Tait [ ] previously lived in the neighborhood of the Central Bar and matched the eye witness descriptions" (doc. 100).**

There are photographs in the record, which Mr. Flax attests he did not receive, that show an African American male wearing a straw hat. There is also an unidentifiable photograph with "Robt. Jordan, 2–12–64; 6'2½" 165; 8–17–84; Davis" written under it, and another unidentifiable photograph which reads "Percy Tait, 5'5 148 lbs, 8–12–84; lived across from ___ with Robt. Jordan" (doc. 103, Vol. 1, Attachs. 27 & 28). Petitioner asserts that this information is exculpatory as it points to suspects who fit the eyewitness descriptions and who live in the vicinity of the Central Bar. Petitioner also argues that he was unfairly prejudiced by the suppression of this evidence because he was prevented from demonstrating to the jury that suspects existed who better fit the eyewitness descriptions. After reviewing this information, the Court finds that Petitioner satisfies the first component of a *Brady* claim with relation to the evidence concerning the possibility of other suspects.

**E. Petitioner alleges that the prosecution failed to disclose to trial counsel that Petitioner after his arrest refused to waive his *Miranda* rights.**

Specifically, Petitioner alleges the prosecution failed to disclose the Noti-

fication of Rights/Waiver of Rights Form[6] (hereinafter, "Waiver Form") that indicated Petitioner's refusal to waive his *Miranda*[7] rights in writing following his arrest for the Gold Star Chili robbery (*see* doc. 103, Vol. 1, Attach. 33 at 80). Mr. Flax attests that he did not receive this document (1999 Hearing Tr. at 69). Rather than dispute whether the State provided the Waiver Form, Respondent discounts the value of the form (doc. 164). Specifically, Respondent cites *United States v. Barahona*, 990 F.2d 412, 418 (8th Cir. 1993), and argues that a valid waiver can be inferred if a suspect refuses to sign a form and nonetheless talks with police. Therefore, Respondent contends, the suppression of this document had no effect on the outcome of the trial. Petitioner counters that this evidence would have been used to call into question the credibility of Officer Dennis Luken, who indicated during his testimony at trial that Petitioner did waive his rights (Tr. at 1521–22).

Although this Court concluded in our December 21, 1998 Order that Petitioner established cause for his procedural default of this portion of Claim One, the Court now finds it necessary to review that conclusion. The Court observes that the prosecution provided Petitioner's trial counsel with a copy of Co–Defendant Howell's Waiver Form (Tr. at 1090–91). In asking whether the trial counsel reasonably could have been alerted to the existence and suppression of Petitioner's Waiver Form, the Court finds that the

trial counsel reasonably could have known that such a routinely-used standard form also existed in the police file on Petitioner. In addition, during the cross-examination of Officer Davis, the police officer told the defense that "[i]t was my understanding that [Derrick Jamison] did not want to talk to anybody concerning any offense that he was being investigated for" (Tr. at 1111).

Therefore, because the trial counsel knew to ask Officers Davis and Luken about the police questioning of Petitioner at trial, and they knew that such a form was used during the police questioning of Mr. Howell, then trial counsel also reasonably could have known that a form pertaining to the police discussion of Petitioner's *Miranda* rights existed and had been suppressed. Furthermore, the answer of Officer Davis indicates that perhaps Petitioner did not waive his rights, contrary to the later testimony of Officer Luken. Accordingly, the Court now revises our earlier conclusion and finds that Petitioner failed to establish cause as to Petitioner's Waiver Form.

■ Nevertheless, even without reexamining our earlier finding of cause in relation to the Waiver Form, the Court concludes that Petitioner also fails to meet the prejudice or materiality component of a *Brady* claim in relation to the Waiver Form. Because the Waiver Form would not establish whether Petitioner orally waived his rights after refusing to sign the

6. The Waiver of Rights section states:

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

(doc. 103, Vol. 1, Attach. 33 at 80.). The Waiver Form, dated October 12, 1984, states "refused to sign" on the signature line and "Sgt. Charles J. Mullen" as witness, but it does not mention Petitioner's name. *Id.* The Court assumes for the purposes of this discus-

sion that the Waiver Form relates to Petitioner's interrogation following his arrest for the Gold Star Chili robbery.

7. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), held that, under the Fifth Amendment, a defendant is guaranteed the right to remain silent and to the assistance of counsel during custodial interrogation, and a defendant is guaranteed that statements obtained in violation of these rights cannot be used by the prosecution. A defendant, however, can waive these rights as long as the waiver is voluntary, knowing, and intelligent. *Id.*

form, or, therefore, whether Officer Luken lied about Petitioner's waiver of his rights, the form would not have been significant to the defense's attempt to impeach Officer Luken's testimony. Accordingly, the Court finds that the Waiver Form fails to add any persuasive value to the other evidence allegedly suppressed by the state.

## II. Exploring the Allegedly Suppressed Evidence Where Cause Was Not Established by Petitioner Prior to July 1999 Hearing

For the following evidence, alleged to have been undisclosed by the Prosecution, the Court found in our December 21, 1998 Order that a question of fact existed as to whether Mr. Flax either knew of the evidence or documents or could have reasonably been aware of them. The Court heard oral argument on this matter on July 7–9, 1999. The following subsections complete our analysis of the cause element as to this evidence and examines the alleged importance of this evidence for Petitioner.

**A. Petitioner alleges that the prosecution did not disclose the following information: "James Suggs saw two individuals flee the Central Bar. The taller individual was '23–25, 6'2"—6'4" 200 lbs., brown pants, brown skin, and wearing a large brown hat (straw) and the shorter subject was "23–25, 5'9" 160 lbs., dark complexion, mustache, short Afro" (doc. 100).**

██ Most of the above description allegedly undisclosed to the defense was included in the August 1, 1984 Investigative Summary prepared by Officer Joseph Hoffman[8] (doc. 100, Tab 1 at 10). Mr. Flax testified at the July 7–9, 1999 Hear-

ing that the prosecution failed to disclose this document (1999 Hearing Tr. at 37–39). Nonetheless, the description of the two individuals that Mr. Suggs gave prior to the trial appears to be information about which the defense knew. At trial, Officer Davis testified that James Suggs told the officers that he observed two African American males in their twenties run from the area of the bar, that one was 6'2" to 6'4" and 200 pounds and the other was shorter, 5'3" to 5'9" (Tr. at 1123). Mr. Flax also elicited a similar description of the relative heights of the two individuals from Mr. Suggs at trial (Tr. at 2052).

However, Petitioner contends that the reference to the straw hat worn by the taller individual, which was not mentioned at trial, would have been exculpatory because it would have allowed the defense to direct suspicion onto Mr. Anthony. Mr. Anthony, mentioned in more detail above, was found in possession of a wallet from the Sav–All Drug Store robbery and arrested by the C.P.D. At the time of his arrest, Mr. Anthony was wearing a straw hat. Respondent does not assert that Petitioner's defense counsel knew about the straw hat description. After reviewing the trial transcript, the Court also does not find any mention of a straw hat. Based on these factors, the Court concludes that Petitioner establishes cause for his procedural default of this evidentiary portion of Claim One. Petitioner also succeeds in showing the favorable aspects of the evidence related to the straw hat.

As for the prejudice or materiality component, Petitioner urges two reasons for the importance of this description by Mr. Suggs. Besides allowing Petitioner to cast suspicion on Mr. Anthony, Petitioner argues the information about a "signature item of clothing" would have been used to

---

8. The description provided by Mr. Suggs as recorded in this report does not mention that the taller individual could have been between 6'2" and 6'4", just that he was "about 6'2"" and that the shorter individual had a short Afro (doc. 100, Tab 1 at 12). Petitioner does not provide any other citation from the record for this description.

show that Petitioner had never been described as wearing such a hat in any of the so-called similar robberies (1999 Hearing Tr. at 39–41). Petitioner also points out that several other eyewitnesses to the Central Bar robbery/homicide corroborated Mr. Suggs's observation about the straw hat (*Id.* at 38–40, 63–65).

**B. Petitioner also alleges that his trial counsel did not receive this information: "On August 9, 1984, Officers Hoffman and Davis took James Suggs to several hat shops where he picked out the straw hat similar to that which Suggs saw the taller perpetrator wearing as he fled the Central Bar homicide" (doc. 100).**

██ This information was included in the Investigative Summary of Officers Davis and Hoffman dated August 4, 1984 (doc. 100, Tab 1 at 14). Mr. Flax testified that the prosecution failed to disclose this document (1999 Hearing Tr. at 75). Respondent does not affirmatively state that the prosecution provided Petitioner's trial counsel with this document. Furthermore, the Court does not find any mention of this particular police investigation in the trial transcript. Therefore, Petitioner establishes cause for the procedural default of this evidentiary portion of Claim One.

Petitioner argues that this evidence is exculpatory and he asserts that the failure to disclose this evidence prejudiced him because he was unable to show not only the existence of the straw hat description but also how seriously the C.P.D. took the description. As mentioned above, Petitioner maintains that the straw hat would have allowed the defense to cast suspicion on Mr. Anthony for both the Central Bar robbery/homicide and the Sav–All Drug Store robbery. Respondent counters that any questioning during the trial about the straw hat would have been, at most, cumulative impeachment evidence.

**C. Petitioner alleges that the defense counsel were not informed that "Howell made two statements to the C.P.D. after his initial statement, both of which contradicted his initial statement. Initially, Howell stated that the robbery was unplanned, that he never jumped over the bar and that he never saw the victim lying on the floor. In his later statements, Howell stated that 'this was a planned robbery' and that 'they went there with the intention of doing the robbery.' He also stated that he jumped over the bar and saw a leg or shoe belonging to the victim" (doc. 100).**

██ In the December 21, 1998 Order (doc. 143), the Court discerned that, according to Mr. Flax's affidavit and the documents that were attached to Petitioner's brief, there were apparently three statements made prior to the testimony Howell gave at the grand jury hearing.

(1) Officer Davis wrote the following on his Investigative Summary dated January 23, 1985: Howell "states that himself and this DERRICK JAMISON went into the Central Bar. He said it was not a planned thing. He states he went to the back of the bar into the bathroom and that DERRICK went up to the bar where the victim was standing and when he came out of the restroom, out of the men's room, the victim was lying on the floor and JAMISON was going through the cash register. . . . At this point it seems like we're going to charge this CHARLES HOWELL with Aggravated Robbery, with the agreement that he testify before the Grand Jury and at Common Pleas against DERRICK JAMISON" (doc. 103 at 19–20).

(2) A handwritten document dated January 24, 1985, reads, "States he has a tape statement from his client. States his client went into the Bar to use the bathroom along with Jamison. States

he came out of the bathroom, Jamison was going through cash register. His client jumped over the bar, saw a shoe or leg belonging to the victim. Left the bar and received some of the money from Jamison while running on the street" (doc. 103 at 22).

(3) Officer Davis wrote the following on his Investigative Summary dated January 29, 1985: "[p]rior to him [Howell] going into the Grand Jury, he gave us another statement as to what occurred, this was in the presence of his attorney, TOM MILLER. He stated that this was a planned robbery. That they went in there with the intentions of doing the robbing and he still insists that he went to the bathroom and when he came out DERRICK JAMISON was at the register getting the money. He says he had already jumped over the bar and he jumped back over and DERRICK JAMISON went over and started stomping on the deceased's head.... TOM MILLER in his plan is agreed to plead guilty to Aggravated Robbery charges so as it appears now, we're in real good shape" (doc. 103 at 23).

(*see* Tr. at 1112, 1115).

Testimony during the July 7–9, 1999 Hearing sought to clarify which statements defense counsel did not receive. Mr. Flax asserted during the hearing that he did not receive any of the above-mentioned statements (1999 Hearing Tr. at 24–25, 28, 31). Respondent, however, maintains that the defense cross-examined Mr. Howell on inconsistencies in his grand jury testimony at trial and that defense counsel were provided with a copy of Mr. Howell's taped statement to the police at trial. Respondent also argues that defense counsel were aware that Mr. Howell had spoken to the police after Howell had spoken to Prosecutor Reif during the grand jury proceedings, and defense counsel knew that Mr. Howell made a second statement to the police after testifying. Finally, Respondent argues that Mr. Howell was cross-examined by defense counsel on in-

consistencies in his version of the events that took place at the Central Bar (doc. 124).

Although the prosecution stated that it gave defense counsel a transcript of the January 23, 1985 taped statement made by Mr. Howell at trial (Tr. at 1399), the defense counsel implied there may have been more than one taped statement because Mr. Howell testified on redirect that every time he gave a statement to the police it was taped (*Id.*). In answering the defense's questions, Mr. Howell testified that he spoke to the investigating officers after he spoke to the prosecution following his grand jury testimony (Tr. at 1420–21). However, Mr. Howell's testimony as to this point is unclear because he later stated that did not speak to the prosecution after testifying to the grand jury (*Id.*).

Mr. Flax did mention at trial the inconsistencies of Mr. Howell's statements, comparing the statements originally made to the officers, the statements made at the grand jury, and the statements at trial (*see* Tr. at 1320, 1340–50 & 1380–84). In two questions to Mr. Howell, Mr. Flax identified those inconsistencies as relating to the time of day of the robbery/homicide, whether Mr. Howell went behind the bar in the Central Bar, whether Mr. Howell saw the attack on Gary Mitchell, and the number of times Petitioner allegedly "stomped" on the victim's head (*Id.*). Mr. Howell admitted to changing his story as between the time the officers first interviewed him and the testimony he gave during the grand jury proceedings (*Id.*).

As we found in the December 21, 1998 Order (doc. 143), Respondent's citations to the transcript do not support his position that Petitioner's trial counsel knew of all the statements Mr. Howell made before trial. The transcript is unclear as to which statements the counsel are referring and as to the specific inconsistencies of Mr. Howell's statements. The only time defense counsel attempted to detail the inconsistencies of Mr. Howell's statements, they did so in the form of a statement or

question that went unanswered. Further, because the statements Petitioner alleges were undisclosed occurred before the grand jury as evidenced by the dates and the comments within the police reports, the inconsistencies referred to at trial were not the ones that Petitioner is speaking about here. Rather, Petitioner is referring to the inconsistencies among the three statements given prior to the grand jury testimony; thus, Respondent's argument is incorrect.

While Petitioner knew that Mr. Howell likely spoke to police more than once between his arrest on January 22, 1985 and the official taped statement he provided on January 23, 1985,[9] Petitioner did not know that any record was made of these conversations. Therefore, Petitioner succeeds in establishing cause for his failure to seek in state court the suppressed investigative summary prepared by Officer Davis on January 23, 1985. *See Strickler,* 119 S.Ct. at 1950 (finding cause where trial counsel knew of interviews with the police but did not know that records existed of the interviews or that the records had been suppressed).

Furthermore, Mr. Howell testified at trial that he did not carry on any conversations with police between January 23, 1985 to January 29, 1985 (Tr. at 1366–68; 1371–72). A review of the state court record in this action also produces no evidence of any conversations between Mr. Howell and the police from the January 23, 1985 official statement to the January 29, 1985 grand jury testimony. Thus, Petitioner establishes cause for his failure to seek in state court the suppressed handwritten document dated January 24, 1985 and the suppressed investigative summary dated January 29, 1985.

 Petitioner asserts that the suppressed statements show how dramatically Mr. Howell's story changed and how he embellished on Petitioner's alleged involvement over time (1999 Hearing Tr. at 23–26, 29, 36, Exs. 31–34). Had the trial counsel received these statements, Petitioner argues, they could have detailed the self-serving nature of the statements during the cross-examination of Mr. Howell. The grand jury testimony with which they compared Mr. Howell's trial testimony was "far less detailed", according to Mr. Flax (*Id.* at 36). For these reasons, the Court agrees with Petitioner that the evidence would have been favorable to Petitioner at trial. The Court also notes that Mr. Howell's memory of the victim's pleas for life was first expressed to the grand jury after he had spoken with police at least four times. Nevertheless, Respondent maintains that Petitioner's trial counsel thoroughly cross-examined Mr. Howell about inconsistencies in his story and Respondent argues that any further questioning would have been "cumulative to the jury's credibility determination" (doc. 164).

**D. Petitioner alleges that the Prosecution did not disclose the teletype from the C.P.D. officers who initially responded to the Mitchell homicide scene indicating that two individuals were involved in the offense—the first individual was 6'4", weighed two hundred pounds, and wore a large brown straw hat. The second individual was 5'3" (doc. 100).**

 Mr. Flax testified at the July 7–9, 1999 Hearing that he did not receive this teletype (1999 Hearing Tr. at 75). Respondent does not dispute the suppression of this teletype. Accordingly, the Court finds that Petitioner establishes cause for his failure to seek this document prior to federal habeas review. As for why this document would be exculpatory and material to the outcome of Petitioner's trial,

---

9. At one point, Mr. Howell testified that he talked with the police on January 22, 1985 and that the police did not tape the conversation (Tr. at 1357). Apparently, the prosecution provided the defense only one of Mr. Howell's statements made between January 22 and January 23, 1985 (*Id.* at 1399).

Petitioner draws the Court's attention once more to the description of a suspect who allegedly wore a straw hat. The possible significance of this detail is discussed above. In short, Petitioner argues that this evidence casts suspicion on another person, namely Mr. Anthony. Nonetheless, Respondent maintains that any questioning of witnesses about the straw hat would at most be cumulative impeachment evidence.

**E. Petitioner alleges that his trial counsel did not receive the following information: Based upon the descriptions provided by the above witnesses, the Crime Stoppers Program at the direction of C.P.D. issued the following release for the week of August 14, 1984 concerning the description of the two assailants at the Central Bar: "The suspects are described as # 1—a male/black, 25 years of age, 6′2″—4″ tall, 200 lbs., wearing brown pants and a brown straw hat; # 2—a male/black, 25 years of age, 5′3″ tall, 160 lbs., wearing blue press pants and a mustache."**

Mr. Flax testified that he did not receive this particular Crime Stoppers Report describing the clothing of the suspects (1999 Hearing Tr. at 76). Respondent does not dispute this allegation. Accordingly, the Court finds that Petitioner establishes cause for his failure to seek this evidence in the state court. Petitioner next argues that this evidence is exculpatory due to its tendency to cast suspicion on another person, namely Mr. Anthony. Respondent, in contrast, refers to this evidence as cumulative impeachment evidence.

**F. Petitioner alleges that the prosecution did not disclose evidence relating to pretrial statements of eyewitnesses of the so-called similar robberies who testified at the Central Bar trial.**

 Mr. Flax attests that he did not receive any of the following evidence related to the so-called similar robberies (1999 Hearing Tr. at 54–55, 62, 65, 76). Respondent, however, points out that the trials related to these so-called similar robberies took place prior to the Central Bar homicide trial, and Respondent argues that Petitioner retained the discovery and knowledge of the evidence that emanated from these trials (doc. 164). Nonetheless, Respondent fails to persuade this Court that Petitioner cannot establish cause as to any of the following evidence for this reason. Other than the fact that Petitioner's trial counsel apparently obtained the transcripts of the prior criminal trials (Tr. at 18), the record in this federal habeas action does not indicate exactly what Petitioner's trial counsel knew about the prior trials nor does the record here show what evidence was actually adduced at these prior trials.

As background, the Court notes that the trial judge admitted evidence related to these so-called similar robberies pursuant to Rule 404(B) of the Ohio Rules of Evidence and § 2945.59 of the Ohio Revised Code [10] to allow the prosecution to show

---

**10.** Ohio Evid. R. 404(B) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*State v. Jamison,* No. C–850753, 1988 WL 17121, at *11 n. 2 (Ohio App. 1 Dist. Feb.17, 1988).

Ohio Rev.Code § 2945.59 states:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to

the Central Bar robbery fit a pattern of other robberies allegedly committed by Petitioner.[11] The robberies occurred at: (1) Acres of Books; (2) Metropolitan Gallery; (3) Sav–All Drug Store; (4) Rensler Portrait Studio; (5) Kings News; (6) Curve Café; and (7) Gold Star Chili. Petitioner was convicted of committing all of the above robberies with the exception of the Kings News robbery (Tr. at 97, 102).

The prosecution presented evidence of the so-called similar robberies by calling as witnesses the victims of the robberies and by asking the police to detail any physical evidence that linked Petitioner to the scene of these so-called similar robberies. Petitioner now contends that the allegedly suppressed evidence relating to these so-called similar robberies is exculpatory in that it tends to impeach the credibility of the witnesses called to testify at the Central Bar trial. Petitioner further argues that the evidence would have allowed the defense to dilute the allegedly devastating in-court identifications of Petitioner made by these witnesses.

First, Petitioner alleges that his counsel did not know that Jack West, the victim of the Metropolitan Gallery robbery, provided a physical description of the assailant as 5′10″, 150 lbs. with a stocky build. Petitioner asserts that this description did not match Petitioner's physical appearance. Petitioner is 6′3″ and thin (doc. 100). This description came from the August 4, 1984 Offense Report, which Mr. Flax attests he did not receive (doc. 103, Vol.1, Attach.34). The Court notes that Petitioner's statement that Mr. West described the assailant as stocky is incorrect; Mr. West described the assailant as thin. Nonetheless,

at trial, Mr. West positively identified Petitioner as the man who knocked him unconscious and robbed his antique store on June 27, 1984 (Tr. at 1772). Mr. West had also identified Petitioner in a police line-up prior to the trial after Officer Luken had shown him that the police had recovered property stolen from his store (*Id.* at 1776–77, 1788–91).

During the cross-examination of Mr. West, the defense asked Mr. West whether he provided the police any description of his assailant immediately following the June 27, 1985 robbery. The following testimony followed:

> **Mr. West:** Yes, I did give a description of the assailant to Dennis Luken in June.
>
> **Defense:** Do you recall that description?
>
> **Mr. West:** Nigger faggot.
>
> **Defense:** That was your description?
>
> **Mr. West:** That was my description.
>
> **Defense:** Whoever it was, did they make some kind of homosexual advance to you?
>
> **Mr. West:** He had a very shrill-sounding voice, very feminine-sounding voice.
>
> **Defense:** And you told Dennis Luken that?
>
> **Mr. West:** Yes.

(Tr. at 1791–92).

As indicated by the above testimony, the defense became aware during trial that Mr. West had provided earlier descriptions of his assailant to police. However, nothing in this testimony would have necessarily alerted the defense to the existence, or the suppression, of the August 4, 1984

---

show the commission of another crime by the defendant.
*Id.*, No. C–850753, at *11 n.1.

**11.** The trial judge charted the basic facts of the so-called similar robberies during a pre-trial hearing and found that the robberies shared the following characteristics: (1) the robberies occurred within a few months of each other; (2) the targets of the robberies were first-floor walk-in establishments; (3)

the robberies took place in the general downtown area in the afternoon; (4) if violence erupted, the victims suffered head injuries; (6) the suspect was African American, the victims white; and (8) the purpose of the suspect's acts was robbery (Tr. at 95–102). The robberies differed with regards to whether the assailant displayed a gun, whether the assailant worked with an accomplice, and the gender of the victims (*Id.*).

Offense Report. Therefore, the Court finds that Petitioner establishes cause for his failure to seek this evidence at the state court level. *See Strickler*, 119 S.Ct. at 1950. Further, according to Petitioner, the exculpatory nature of this evidence is apparent in the fact that Mr. West describes an assailant much shorter than the 6'3" Petitioner. Thus, Petitioner argues that this evidence would have been valuable in impeaching the identification made by Mr. West both at the earlier police lineup and at trial.

Secondly, Petitioner alleges that, in the same Supplementary Offense Report dated August 4, 1984, Officer Luken wrote that there were varying descriptions of the possible suspects. Three young African American males, for instance, gave a description of the assailant as a young Caucasian male. Petitioner is African–American (doc. 103, Vol.1, Attach.34). As the Court concluded above, nothing exists in the record to show that Petitioner's counsel could have known of the existence or suppression of this offense report. Petitioner asserts that this evidence would have been used to impeach Mr. West's seemingly definitive identification of Petitioner at trial.

Thirdly, Petitioner asserts that his counsel did not receive a Supplementary Offense Report, dated August 7, 1984, that Petitioner alleges shows that JoAnne Davidson, the victim of the Sav–All Drug Store robbery, could not identify a suspect at the time of the robbery (doc. 121, Supp. Aff., Attach.48). Mr. Flax indicated at the July 7–9, 1999 Hearing that he did not receive this report (1999 Hearing Tr. at 54–55). After reviewing the record, the Court finds that Petitioner establishes cause for his failure to seek this suppressed evidence prior to federal habeas review. Petitioner asserts that this evidence would have allowed the defense to attack the credibility of Ms. Davidson's in-court identification of Petitioner. Mr. Flax testified that her identification of Petitioner as the one who kicked in the orbital bone of her face was "the single most damaging moment in the trial" (*Id.* at 54). Mr. Flax also stated that the above report would have helped them show that her subsequent identification of Petitioner was "highly suspect" (*Id.* at 55).

Fourthly, Petitioner alleges that his counsel did not receive a composite drawing, which was prepared with the assistance of the victim at the Sav–All Drug Store robbery, that depicted one of the assailants as slender, 6' to 6'1", with a light brown complexion and a mustache. According to Petitioner, that physical description matched the physical description of Charles Howell. The document, which Mr. Flax attests to having not received, is a drawing of a man, who appears to be African–American, wearing a straw hat (doc. 103, Vol. 1, Attach. 25; *see also* 1999 Hearing Tr. at 62, 65). Having reviewed the record, the Court finds that Petitioner establishes cause for his failure to seek this evidence in the state court. Petitioner asserts that this evidence would have been used to impeach the identifications made in trial by the witnesses to the Sav–All Drug Store robbery.

Fifthly, Petitioner alleges that his counsel did not know that one of the victims at the Sav–All Drug Store selected Tommy Rachel as a look alike for one of the assailants. The document, which Mr. Flax attests to not having received, is a handwritten note that reads, "also check prints of Tommy Rachel—per argo who showed picture to victim at Elder Street Robbery—Victim said look alike." Appearing right next to this line on the document is the comment, "cked 8/25/84 NEG." and initialed "O.J." (doc. 103, Vol.1, Attach.35). After reviewing the record, the Court finds that Petitioner establishes cause for his failure to seek this evidence in the state court. Petitioner asserts that this evidence would have been used to impeach the identifications made in trial by the witnesses to the Sav–All Drug Store robbery.

In summary, with regard to all of the above testimony, the Court also concludes that Petitioner satisfies the first component of a *Brady* claim.

**G. Petitioner alleges that his counsel were not informed that "[m]ost of these other robberies involved two perpetrators, including Ideal Furniture Co., Levine Furniture Co., Lafayette Hotel and Fashion Warehouse Outlet. There is no evidence linking Mr. Jamison to any of these other robberies" (doc. 100).**

The deposition transcript citations that Petitioner referred to only mention there were a number of robbery-type offenses that occurred in District One over a five month period, that one of the so-called similar offenses was the Lafayette Hotel, and that Petitioner was not charged with that robbery (doc. 85, Vol. 4, Luken Dep. I at 13–14, 20–21). The deposition citations do not mention the other robberies, but Petitioner provides an offense report detailing the robbery at the Ideal Furniture Company (doc. 103 at 242). Respondent asserts that the C.P.D. provided reports of other aggravated robberies that occurred in District One to the defense. However, the citations Respondent provides to the trial transcript primarily discuss only the robberies that occurred after Petitioner's arrest on October 12, 1984. The robberies mentioned by Petitioner above allegedly occurred prior to his arrest.

Despite the fact that Respondent fails to show that Petitioner's counsel were actually aware of the robberies at the Ideal Furniture Company, Levine Furniture Company, Lafayette Hotel, and Fashion Warehouse Outlet, the Court finds that his trial counsel reasonably could have known of any similar robberies that occurred prior to Petitioner's arrest. In fact, as evidenced by the following colloquy, Petitioner's trial counsel told the trial judge that they made a tactical decision to not investi-gate, or attempt to introduce at trial, these pre-arrest robberies.

**The Court:** Is there some reason you haven't chosen the period of time that Jamison was allegedly active?

**Mr. Flax:** Very definitely. Because the speculation as to who it is, he's a possible person involved in it.

(Tr. at 2133). Since we find that Petitioner's counsel could have been aware of these robberies, we hold that Petitioner fails to establish cause for his failure to seek the discovery of this evidence prior to federal habeas review.

### III. Whether the Above Favorable Evidence Found to Have Been Suppressed by the State of Ohio, When Considered Cumulatively, Raises the Suspicion of an Unfair Trial

According to the Supreme Court, the purpose of the *Brady* rule "is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *Bagley,* 473 U.S. at 675, 105 S.Ct. 3375. Thus, this Court must now focus on the question of whether the suppression of the above favorable evidence acted cumulatively to deprive Petitioner of a fair trial, understood by the Supreme Court to be " 'a trial resulting in a verdict worthy of confidence.' " *Strickler,* 119 S.Ct. at 1952 (quoting *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555). In doing so, the Court must evaluate the evidence within the context of the state court record and inquire as to whether " 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict' " *Id.* at 1952 (quoting *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555); *see also United States v. Phillip,* 948 F.2d 241, 250 (6th Cir.1991).

In *Strickler,* for instance, the Supreme Court studied the state court record and found that "the record provides strong support for the conclusion that petitioner would have been convicted of capital murder and sentenced to death, even if [a

significant prosecution witness] had been severely impeached" by the suppressed evidence. *Id.*, 119 S.Ct. at 1954. Thus, while the petitioner in *Strickler* demonstrated that the prosecution suppressed exculpatory evidence, the petitioner failed to show a reasonable probability that his conviction or sentence would have been different had the evidence been disclosed. *Id.* at 1955. In contrast, the Supreme Court held that a reasonable probability of a different result existed for the petitioner in *Kyles* after finding that the small amount of physical evidence left unaffected by the suppressed *Brady* evidence in *Kyles* would not have been overwhelming proof of the petitioner's guilt. *Id.*, 514 U.S. at 451, 115 S.Ct. 1555.

Likewise, Petitioner argues here that the evidence suppressed by the prosecution would have been used by Petitioner's trial counsel to undermine an already weak case against Petitioner. When asked to recall his role as a prosecutor in Petitioner's trial, Mr. Reif conceded in a deposition that "I know we didn't have a real strong case in this case" (doc. 85, Vol. 2, Reif Dep. at 20). Mr. Reif also stated that "it was not the easiest case to try" (*Id.*). Petitioner asserts that the prosecution relied upon at trial: (1) the testimony of Co–Defendant Howell, who stated that he was present at the scene of the crime with Petitioner as an accomplice and that he heard Petitioner injure the victim; (2) a shoe print from a popular brand athletic shoe lifted from the scene of the Central Bar robbery/homicide and matched in size and type with a shoe Petitioner was wearing when arrested for the Gold Star Chili robbery; and (3) testimony concerning so-called similar robberies allegedly committed by Petitioner.

The jury deliberated a day and a half on the question of Petitioner's guilt or innocence and two days on the question of the death penalty. Petitioner contends that there is a reasonable probability that his conviction or sentence would have been different had the suppressed evidence discussed in the foregoing sections been disclosed. Without theorizing whether a different result would have been probable, Mr. Piepmeier testified during the July 7–9, 1999 Hearing that he would have turned the following evidence over to the defense as exculpatory *Brady* material had he known the evidence existed prior to or during Petitioner's 1985 trial:

- An investigatory summary indicating that a witness named Greg Mapp saw a man running from the Central Bar with a brass pipe (1999 Hearing Tr. at 258, Ex. 12). The man described by Mr. Mapp did not match Petitioner (*Id.*).

- A photograph picked out of a line-up by James Suggs as a look alike of one of the suspects he saw fleeing the bar (1999 Hearing Tr. at 261, Ex. 24).

- A photograph chosen by Mr. Suggs as the shorter of the two suspects he saw fleeing the bar (*Id.* at 265, Ex. 30).

- An offense report stating that JoAnne Davidson, a prosecution witness at the trial, had originally been unable to identify Petitioner or any other suspect at the time of the Sav–All Drugstore Robbery (1999 Hearing Tr. at 267. Ex. 2).

(*see* 1999 Hearing Tr. at 258–71, 279–80).

Petitioner argues generally that disclosure of the suppressed evidence would have made a different result reasonably probable because the evidence shows how consistently the eyewitnesses of the Central Bar robbery/homicide described two assailants, neither of which descriptions matched Petitioner, and how the description of one assailant in a straw hat creates a credible suspect in Mr. Anthony. Petitioner asserts that the observations of Mr. Mapp also contradict the prosecution's theory, and Mr. Howell's testimony, that Petitioner stomped the victim with his shoes. In addition, Petitioner maintains that the suppressed evidence would have allowed his trial counsel to impeach the damaging testimony of the witnesses of the so-called similar robberies. In the end, Petitioner

contends, there is a reasonable probability that the jury would have doubted Petitioner's participation, or level of participation, in this crime enough to find him not guilty of capital murder or undeserving of the death penalty.

Respondent disputes the materiality of the suppressed evidence, arguing the evidence amounts to cumulative impeachment evidence that would have had no bearing on the jury's determinations during the guilt or sentencing phases of Petitioner's trial. According to Respondent, the defense thoroughly impeached Mr. Howell's testimony even without the use of Mr. Howell's prior statements or Mr. Mapp's eyewitness description of a brass pipe as a possible murder weapon. Likewise, Respondent asserts that the suppressed evidence fails to add any substance to the impeachment of the witnesses called to testify about the so-called similar robberies.

■ The task of deciding whether Petitioner establishes the materiality of the favorable evidence suppressed during his 1985 trial is not an easy one for this Court. Nonetheless, after considering the overall effect of the favorable evidence, we conclude for the following reasons that this evidence can reasonably be taken to put Petitioner's case in such a different light as to undermine our confidence in the jury's finding of guilt and recommendation of the death penalty. *See Strickler,* 119 S.Ct. at 1952 (quoting *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555).

To begin, the Court observes that Petitioner's defense strategy appeared to be twofold. His counsel sought to raise doubts among the jurors as to (1) whether Petitioner was present at all during the robbery at the Central Bar on August 1, 1984; and (2) if he was present, whether he was the principal offender of the robbery and homicide. These are viable defenses, especially given the scant physical evidence tying Petitioner to the scene of the crime and the fact that the prosecution relied upon the testimony of an alleged

accomplice as well as a string of so-called similar robberies to prove Petitioner's level of participation in the crime. In addition, we note that the record indicates that the jury placed a degree of significance on the testimony of Mr. Howell and Mr. Suggs. Before the jury returned with a verdict after a day and a half of deliberation, the trial court granted the jury's request to hear the testimony of these two witnesses read back to them (Tr. at 2592, 2600–2602).

In general, the Court finds that the suppression of the favorable evidence made it difficult for Petitioner's trial counsel to effectively contradict much of the circumstantial evidence used by the prosecution to build its case against Petitioner. During the trial, the defense attempted without much evidence to point to other possible suspects. However, the evidence relating to the straw hat and to Mr. Anthony would have more convincingly inserted an element of doubt into the trial. In *Miller v. Angliker,* 848 F.2d 1312, 1323 (2d Cir.1988), the Second Circuit held that information withheld by the prosecution relating to another suspect constituted material evidence under the *Brady* rule given the persuasiveness of the information. In this case, the sheer number of eyewitnesses who described both the straw hat and the distinctive differences in height between the two assailants could have persuaded the jury that indeed a man shorter than Petitioner committed the crime.

Notably, Mr. Mapp appears to indicate that the shorter of the two assailants carried the brass pipe. If the jury accepted that Mr. Howell was the shorter of the two assailants, there is a reasonable probability that the jury would have concluded that Petitioner did not commit an act of violence against Mr. Mitchell and accordingly would not have convicted Petitioner of capital murder. Furthermore, two eyewitnesses, Ms. Hall and Mr. Suggs, told the police that the taller suspect was lighter-complected, and the defense would have noted to the jury that this description does

not match Petitioner. Additionally, the defense would have pointed out that Mr. Suggs chose two photographs from a line-up and told police that the assailants resembled the individuals in the photographs. Neither photograph represented Petitioner's image. As Petitioner asserts, the straw hat evidence also could have been used to show that Petitioner, unlike another suspect, had never been observed wearing such a "signature piece of clothing" (*see* 1999 Hearing Tr. at 39–41).

Furthermore, had the State turned over the suppressed evidence related to other suspects, the defense could have raised the question of whether police should have followed up more thoroughly on other suspects, or on Mr. Howell's involvement in the Central Bar robbery/homicide. *See Kyles*, at 446, 115 S.Ct. 1555; *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir.1985); *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir.1986). The defense would have examined how intently the C.P.D. questioned suspects Mr. Jordan and Mr. Tait, two men who lived near the Central Bar and who more closely fit the eyewitness descriptions. And the defense would have explored the evidence suggesting that police officers took Mr. Suggs to local hat shops. The defense would have raised issues about the credibility of Officer Davis by showing that Mr. Suggs had in fact identified two individuals who looked like the assailants Mr. Suggs saw run from the Central Bar.

The Supreme Court also recognizes the importance of impeachment evidence and considers this type of evidence subject to the *Brady* rule. In *Giglio*, the Supreme Court held that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Id.*, 405 U.S. at 154, 92 S.Ct. 763 (quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)); *see also Presser*, 844 F.2d at 1281 (observing that "the *Brady* doctrine, in its purest form, is the rule of law that

the Due Process Clause is violated when the government achieves a conviction through the use of perjured testimony").

Impeachment of the witnesses who came forward to identify Petitioner as the assailant in the so-called similar robberies became vital to the defense. Mr. Flax refers to Ms. Davidson's identification of Petitioner as the man who viciously kicked in one of her facial bones during the Sav–All Drug Store robbery as "the single most damaging moment in the trial" (1999 Hearing Tr. at 54). The Court agrees with Petitioner that the fact Ms. Davidson could not identify anyone in the days following the robbery would have been important impeachment evidence. In *Kyles*, the Supreme Court noted that changes over time in an eyewitness's description of a suspect "can be fatal to its reliability". *Id.*, 514 U.S. at 444, 115 S.Ct. 1555 (internal citations omitted). The Supreme Court found, therefore, that the in-court identifications of Mr. Kyles by two eyewitnesses would have been undermined by use in cross-examination of their differing and suppressed pretrial statements. *Id.*

Here, when the suppressed evidence relating to Ms. Davidson's identification is considered along with the impeachment evidence used by the defense at trial to cross-exam Officer Luken, the police officer who investigated the Sav–All Drug Store robbery, about the fingerprint allegedly found at the crime scene and matched to that of Petitioner, the Court finds that there is a reasonable probability that the jury would have discounted Ms. Davidson's identification of Petitioner. Moreover, other suppressed evidence indicated that Mr. Howell, Mr. Rachel, or Mr. Anthony, who was found with a wallet from the robbery, could have been the assailants in the Sav–All Drug Store robbery.

The jury would have likely reconsidered the soundness of the identification made by Mr. West in court as well. No physical evidence tied Petitioner directly to the scene of the Metropolitan Gallery robbery. Instead, the police found jewelry belonging

to Mr. West in possession of Petitioner when he was arrested for the Gold Star Chili robbery. The suppressed evidence indicates that Mr. West originally described an assailant much shorter than Petitioner and that he only identified Petitioner after the police showed him that they had recovered his jewelry. In addition, given the fact that three African American males described a Caucasian suspect to police following the Metropolitan Gallery robbery, the defense could have easily raised the issue of cross-racial identification in relation to Mr. West's testimony. At trial, Mr. West used a racist epithet in describing his assailant. If three other people saw a Caucasian suspect, Mr. West's description of his assailant becomes even more sullied with racist implications.

The prejudicial impact of other-acts evidence was clearly on the mind of the trial judge who carefully charted out the similarities between the so-called similar robberies prior to trial. As the Ohio Supreme Court observed, the trial judge found that "eyewitnesses, fingerprints and other identification established that [Petitioner] committed all these robberies." *State v. Jamison,* 49 Ohio St.3d 182, 187, 552 N.E.2d 180, 185 (1990). The Ohio Supreme Court itself concluded that "the state established the probative value of the other-acts evidence by the strong quality of its proof." *Id.* However, had the above suppressed evidence been disclosed, there is a reasonable probability that the trial judge would have excluded more of the so-called similar robberies from the trial. The identification evidence from the Metropolitan Gallery and Sav–All Drug Store robberies becomes more tenuous when the above suppressed evidence is considered.

Moreover, when the above suppressed evidence is considered, the similarities between (1) the robberies at Sav–All Drug Store and Metropolitan Gallery and (2) the robberies at Kings News, Curve Cafe, and Gold Star Chili are diminished. The witnesses of the Kings News, Curve Cafe,

and Gold Star Chili robberies, who identified Petitioner more positively than the witnesses of the Sav–All Drug Store and Metropolitan Gallery, did not suffer any serious head injuries. In addition, the assailant in the Kings News, Curve Cafe, and Gold Star Chili robberies acted alone. The assailant fled on a bicycle from the Kings News and Gold Star Chili robbery. There is a reasonable probability that the trial judge would not have allowed the prosecution to attempt to establish identity with this other-acts evidence given the lack of similarity in the crimes. This, too, adds to our conclusion that there is a reasonable probability that the jury would have found Petitioner not guilty of capital murder.

Beyond the context of the other-acts evidence, the Court must also consider whether a reasonable probability exists that the jury would have disregarded the damaging testimony of Co–Defendant Howell altogether had the suppressed evidence been disclosed. As we observed earlier, the trial court allowed the testimony of Mr. Howell to be read back to the jury at the jury's request during its day and a half of deliberation (Tr. at 2592, 2600–2602).

Respondent refers to the suppressed evidence as cumulative impeachment evidence and argues that it is not enough to establish a reasonable probability of a different result. *See United States v. Phibbs,* 999 F.2d 1053, 1087–88 (6th Cir.1993) (holding that the suppression of the "suspected" wrongdoing of a witness did not affect the outcome of the trial as the evidence was cumulative impeachment evidence); *see also Tankleff v. Senkowski,* 135 F.3d 235, 251 (2d Cir.1998) ("When a witness's credibility has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim."); *United States v. Ellis,* 121 F.3d 908, 917–18 (4th Cir.1997) (finding that the cumulative effect of additional

impeachment of a witness in relation to consistencies between her pretrial and trial statements was not material); *United States v. Graham*, 83 F.3d 1466, 1474 (D.C.Cir.1996) (rejecting a *Brady* claim where additional impeachment of a witness would not have "significantly altered the quantum of proof" in a defendant's favor). *United States v. Cuffie*, 80 F.3d 514, 518 (D.C.Cir.1996) (concluding that impeachment evidence is cumulative "only if the witness was already impeached at trial by the same kind of evidence").

However, the Court finds that Petitioner's case can be distinguished from the above cases dismissing *Brady* claims based on a finding of cumulative impeachment evidence. Here, as in *Giglio*, the prosecution's case rested heavily on the testimony of an accomplice who was "vigorously" cross-examined by the defense. *See Id.*, 405 U.S. at 154–55, 92 S.Ct. 763. Additionally, in *Spicer v. Roxbury Correctional Inst.*, 194 F.3d 547, 560 (4th Cir.1999), the Fourth Circuit found that the state court failed to realize how important the disclosure of a witness's earlier statement was in light of the lack of any physical evidence linking the petitioner to the offense. The Fourth Circuit stated that "we recognize that the materiality inquiry is a context-specific determination." *Id.* Similarly, in this case, when the impeachment evidence relevant to Mr. Howell's testimony is considered together with the other evidence suppressed in Petitioner's case, the evidence becomes more than just cumulative impeachment evidence.

To the contrary, the suppressed evidence would have told Petitioner's defense counsel more than they already knew. *Cf. United States v. Dierling*, 131 F.3d 722, 735 (8th Cir.1997) (finding that the evidence allegedly suppressed was not material because it added little, if anything, to what the defense already knew). Furthermore, the evidence related to more than collateral matters. *Cf. Presser*, 844 F.2d at 1278 (concluding that proof of an inconsistency as to a collateral matter cannot establish materiality under *Brady*). After reviewing the state record, the Court is not convinced that Petitioner's defense counsel covered all of the relevant portions of Mr. Howell's testimony extensively and ably on cross-examination.

During cross-examination, Petitioner's defense counsel alerted the jury that: (1) Mr. Howell was testifying as a cooperating witness; (2) Mr. Howell had an incentive to place responsibility for the homicide on someone else; and (3) Mr. Howell had been inconsistent in his testimony. However, Petitioner's counsel did not address the extent to which Mr. Howell embellished on his story over time or how all of specific contradictions between his trial testimony and earlier testimony drew attention to Petitioner's alleged involvement and away from his own. For instance, the defense lacked any evidence with which they could have impeached Mr. Howell's inflammatory story that the victim cried for mercy. By referring directly to the suppressed pretrial statements of Mr. Howell, though, the defense could have shown how the story about the cries of mercy developed, suspiciously, over time. As we noted earlier, Mr. Howell's memory of the victim's pleas for life was first expressed to the grand jury, after he had spoken with police at least four times. Moreover, the defense would have compared Mr. Howell's memory of the event with that of the eyewitness who described a very different murder weapon and who may have been able to show that Mr. Howell carried that weapon from the crime scene.

In sum, when compared to the relatively weak case the prosecution had against Petitioner, the collective effect of the suppressed evidence in this case undermines our confidence in Petitioner's conviction and sentence. The suppressed evidence raises doubts as to whether Petitioner was present at the Central Bar on August 1, 1984, and the suppressed evidence raises doubt as to whether Petitioner was the principal offender in the Central Bar rob-

bery/homicide. Here, unlike in *Strickler*, the record does not provide "strong support for the conclusion that petitioner would have been convicted of capital murder and sentenced to death." *Id.*, 119 S.Ct. at 1954. Petitioner has shown that there is a reasonable probability that his conviction or his sentence would have been different had these materials been disclosed. Thus, he can show materiality under *Brady* and prejudice from his failure to raise the *Brady* claim earlier.

Accordingly, the Court holds that Petitioner must be granted a writ of habeas corpus due to the State of Ohio's violation of his constitutional rights. As Judge Merritt wrote in his concurring opinion in *O'Guinn*, 88 F.3d at 1414, "regardless of [the petitioner's] guilt or innocence, he is entitled to a fair trial and vigilant protection of his constitutional rights."

## CLAIM SIX

**The prosecutor's use of peremptory challenges in a racially discriminatory manner during voir dire violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.**

 Respondent argues that this Claim is procedurally defaulted. Petitioner did not raise this Claim at trial, on direct appeal, in post-conviction, or in his Application for Delayed Reconsideration of his Direct Appeal.

This Claim concerns the improper use of peremptory challenges at the Central Bar robbery/homicide trial to strike African–Americans from the jury during voir dire. *See Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (holding that the Equal Protection Clause of the Fourteenth Amendment forbids the prosecution from exercising its peremptory challenges to strike prospective jurors solely on account of their race). The State had a total of fourteen peremptory challenges (Tr. at 336–641). The State exercised ten of the fourteen challenges to strike African–Americans (*Id.*). Of the remaining four challenges, the State used one to strike a potential juror of undetermined racial background,[12] two against Caucasian potential jurors, and it waived the fourth challenge (*Id.*). Additionally, the State had two peremptory challenges for use in selecting alternate jurors (Tr. at 723–740). It used both challenges to strike African–American jurors (*Id.*). Neither Assistant Prosecutor Mark E. Piepmeier nor Assistant Prosecutor R. Daniel Reif remembers why the State exercised its peremptory challenges (doc. 85, Vol. 2, Piepmeier Dep. at 64–67, 71; Reif Dep. at 59–62, 68). Although they now deny any racial motive, they are unable to articulate any race-neutral reason for excusing the African–Americans from the jury (*Id.*, Piepmeier Dep. at 64–65; Reif Dep. at 59–60).

 As distressing as these facts are to the Court, we reluctantly find this claim has been waived. First, even if this Court construes defense counsel's comments[13]

12. It is likely this person was African–American as well. Based on the transcript and the sequence of challenges, one can infer the race of this juror, Joseph Colvard: at one point during the voir dire, the defense counsel states "[t]hat makes five out of six. I think we see a pattern here. . . . Five out of six of their peremptory challenges have been Negroes, and the only white peremptory challenge was someone who was a former communist" (Tr. at 491). By the time defense counsel made this statement during voir dire, Mr. Colvard had already been struck by the prosecution by a peremptory challenge. Mr. Colvard was not the potential juror who was

a former communist, so more than likely he was African–American.

13. On two occasions, defense counsel raised his concerns about the voir dire. First, after the prosecution used its fourth peremptory challenge to exclude a prospective African–American juror, defense counsel stated, "[m]ay I inquire whether the prosecution is symptomatically [sic] going to exclude Negroes from this jury[?]" (Tr. at 433–34). The prosecution responded, "I will not dignify that with a reply. That's uncalled for, and there's no evidence before this court that's being done" (*Id.*). The judge told the attorneys: "Let's move on" (*Id.*).

during the voir dire as contemporaneous objections at trial, the issue was not raised again during direct appeal or on post-conviction. The Supreme Court decided *Batson* four months before Petitioner filed his direct appeal in August of 1986, and Petitioner's counsel should have been aware of the decision; nonetheless, this claim was not raised by appellate counsel or post-conviction counsel. Secondly, Petitioner concedes that the claim is procedurally defaulted. Although Petitioner makes this concession, he maintains that the ineffective assistance of his appellate counsel is the cause for his failure to raise the *Batson* claim on direct appeal (doc. 100). However, after a careful examination, we conclude that Petitioner cannot avail himself of this argument for cause.

▪ Generally, ineffective assistance of counsel, either appellate or trial counsel, as defined by *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), may satisfy the standard for cause in an attempt to excuse a procedural default. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). In *Murray*, the Supreme Court explained that the doctrine of exhaustion "requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Id.*, 477 U.S. at 488–89, 106 S.Ct. 2639; *see Jones v. Toombs*, 125 F.3d 945, 947 (6th Cir.1997) (rejecting petitioner's argument that ineffective assis-

tance provides cause for his procedural default because he never raised it as an independent issue in state court); *see also Clemmons v. Delo*, 124 F.3d 944, 953 (8th Cir.1997) (finding that a petitioner's failure to assert at the state level ineffective assistance of counsel as cause for not raising a Confrontation Clause claim on direct appeal would preclude federal habeas review of the same claim of cause).

▪ Contrary to Petitioner's assertion, merely raising ineffective assistance of counsel in the state court, although satisfying the exhaustion doctrine, does not satisfy the *Murray* restriction unless the ineffective assistance of counsel claim is also not procedurally defaulted. In other words, "a petitioner may not bring an ineffective assistance of counsel claim as cause for a default when that ineffective assistance of counsel claim itself is procedurally barred." *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir.1997); *see also Harris v. Norris*, 864 F.Supp. 96, 99 (E.D.Ark.1994) (holding that a petitioner must not procedurally default ineffective assistance of counsel claim in order to use it as a cause argument and citing cases with similar holdings in the Fourth, Seventh, and Eighth Circuits). Requiring a petitioner to not procedurally default an ineffective assistance of counsel claim in order to use it as cause for another procedural default advances the traditional concerns of comity and federalism. *Harris*, 864 F.Supp. at 99; *see also Coleman*, 501 U.S. at 731–32, 111 S.Ct. 2546 (stating the concerns for the principles of comity associated with the exhaustion requirement apply to federal

---

Secondly, after the prosecution challenged its sixth prospective juror, defense counsel stated to the judge: "[t]hat makes five out of six. I think we see a pattern here ... Five out of six of their peremptory challenges have been Negroes, and the only white peremptory challenge was someone who was a former Communist" (Tr. at 491). The prosecution stated, "[o]nce again, I will not dignify that with a reply. If Mr. Flax sees a pattern, he sees a pattern. He may have a problem. I don't know. It's not coming from us" (*Id.*). The judge continued with the voir dire with-

out examining whether the defense counsel's concerns were meritorious (*Id.*).

Later, while the jury deliberated on a sentencing recommendation, the prosecutor sought to put in the record the racial composition of Petitioner's jury (Tr. at 2771–73). At that time, Mr. Flax objected "on the basis of relevance," and stated "we certainly never indicated any kind of affirmative action theory" (*Id.* at 2772). Nonetheless, the trial court took judicial notice of the fact that Petitioner's jury was made up of eight Caucasians and four African–Americans (*Id.* at 2772–73).

claims that have been procedurally defaulted in state court as well). The court in *Harris* gave this explanation for the rule:

In the overwhelming number of cases, exhaustion is not an issue because the time for pursuing additional avenues in state court has long since passed. Were the Court to .... restrict the *Murray* rule to those cases involving the exhaustion issue, the federal courts would be placed in a position of having to consider any claim raised for the first time in federal court and about which a litigant offered as cause the ineffectiveness of his attorney. It is a better rule of law because it does not construct an artificial distinction between a default in the exhaustion context and that in the procedural bar context.

*Id.* Thus, our reading of *Murray*, as informed by *Harris*, ensures that the state court has the first opportunity to hear the ineffective assistance of counsel claim before it can be used to excuse a procedural default on another claim.

Petitioner did not include the failure to raise the *Batson* claim as one of the examples of ineffective assistance of appellate counsel in his Application for Delayed Reconsideration of his Direct Appeal. Therefore, Petitioner did not raise the ineffective assistance of appellate counsel claim based on this issue independently for the state court to review first and cannot now avail himself of this argument.

 In another argument against waiver, Petitioner contends the *Perry* Rule cannot be applied to procedurally bar the *Batson* claim because the State has no legitimate interest in promoting racial discrimination. The *Perry* Rule states that all claims that were raised at trial or that could have been raised at trial must be presented on direct appeal, and the Ohio court's final decision on direct appeal is *res judicata*, barring further consideration by the Ohio courts in a post-conviction proceeding. *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967). According to the Supreme Court, a procedural default in a state proceeding does not prevent vindication of a federal right "unless the State's insistence on compliance with its procedural rule serves a legitimate state interest." *Henry v. Mississippi*, 379 U.S. 443, 447–448, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965) (finding that the Mississippi rule requiring contemporaneous objection to the introduction of illegal evidence serves a legitimate state interest by giving the court the opportunity to conduct the trial without using tainted evidence). Petitioner's application of *Henry* in this instance is incorrect. In excusing a state procedural default on this ground, the proper inquiry for the federal court is whether the *enforcement* of the procedural rule promotes a legitimate state interest. *See Henry*, 379 U.S. at 448, 85 S.Ct. 564 (focusing on whether the purpose of the contemporaneous objection rule, enforced against the petitioner by the Mississippi Supreme Court, served a legitimate state interest).

Here, the *Perry* Rule was never enforced by the state court because the *Batson* claim was never raised in the post-conviction petition. The state procedural rules barring the *Batson* claim in this case include the requirement to raise a claim in the proper state court forum at the first opportunity. Although not argued to the contrary by Petitioner, we note generally that these state procedural rules do promote legitimate state interests, even in the context of a *Batson* violation. It is important to raise the *Batson* claim in the state courts as soon as possible in order to preserve the facts of the jury selection and the prosecutor's memory and to save judicial resources. Finally, contrary to Petitioner's interpretation, *Henry* did not hold that the federal court must excuse a state procedural default where the conviction is based on grounds that do not promote a legitimate state interest. As stated above, *Henry*'s focus is on the enforcement of the procedural rule, not whether the claim allegedly procedurally defaulted has merit. *See Henry*, 379 U.S. at 448, 85 S.Ct. 564.

Petitioner has not made any other argument as to cause, nor has Petitioner demonstrated that a fundamental miscarriage of justice will occur if the Court refuses to hear this Claim. Accordingly, we reluctantly find that this Claim is waived due to Petitioner's procedural default.

## CLAIM SEVEN

**Petitioner was denied his rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution by the trial court's improper exclusion of one juror and failure to adequately question two biased jurors during voir dire.**

Petitioner contends that the trial court improperly excluded a potential juror, Alfreda Emily Mueller, because she expressed reservations about the death penalty (*see* Tr. at 605–607). In addition, Petitioner asserts that the trial court inadequately questioned jurors Julie Ann Martin and Pamela Timme, who were both victims of violent crime (*see id.* at 509–12). Pursuant to our holding in the December 21, 1998 Order (doc. 143), this Court must now determine whether Petitioner can show prejudice for his procedural default of the portion of Claim Seven involving the alleged improper exclusion of Ms. Mueller. The other portion of Claim Seven relating to the alleged inadequate questioning of jurors Martin and Timme is addressed within the merits of Claim Seventeen, Ineffective Assistance of Appellate Counsel, *infra.*

Petitioner demonstrated cause for not raising the issue about Ms. Mueller in the state court until post-conviction because he had the same trial and appellate counsel (*see id.*). Now Petitioner must establish actual prejudice based on his constitutional claim. *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Maupin v. Smith,* 785 F.2d 135, 139 (6th Cir.1986). In analyzing a petitioner's contention of prejudice under the *Maupin* standard, a federal court initially assumes that the petitioner states a meritorious claim. *Id.,* 785 F.2d at 138–39.

The Court here assumes that the trial court failed to ensure that the jurors in Petitioner's case would be fair and impartial, a cognizable constitutional claim. *See id.* at 139–40. Given this assumption, the Court finds Petitioner would have been prejudiced by such a constitutional violation. Thus, Petitioner may properly raise this Claim. *Id.* We now examine the merits of Petitioner's Claim to determine whether a constitutional violation actually occurred. *See id.* at 140.

The United States Constitution guarantees a state criminal defendant a right to a fair trial by a panel of impartial jurors. *Wainwright v. Witt,* 469 U.S. 412, 418, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (noting that every state guarantees a criminal defendant a right to a jury trial and that this right encompasses the right to an impartial jury); *see also Tinsley v. Borg,* 895 F.2d 520, 523 (9th Cir.1990). Therefore, when a petitioner asks a federal court on habeas corpus review to examine his voir dire, the focus is on whether the decisions reached by the trial court during the voir dire prevented the empaneling of an impartial jury. *See Hill v. Brigano,* 199 F.3d 833, 844 (1999); *see also Wainwright,* 469 U.S. at 423, 105 S.Ct. 844.

The voir dire requires a trial judge to determine juror bias based on a prospective juror's demeanor, inflection, and responses to a particular flow of questioning. *Tinsley v. Borg,* 895 F.2d 520, 525 (9th Cir.1990); *see also McQueen v. Scroggy,* 99 F.3d 1302, 1321 (6th Cir.1996). Because the trial court's credibility decisions become "historical fact[s]", these decisions are subject to the presumption of correctness found in Title 28 U.S.C. § 2254(d), *Wainwright,* 469 U.S. at 429–30, 105 S.Ct. 844, and "may 'be overturned only for "manifest error" ' ". *Hill,* 199 F.3d at 843 (quoting *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (citing *Irvin,* 366 U.S. at 723, 81

S.Ct. 1639)); *see also Dennis v. Mitchell,* 68 F.Supp.2d 863, 888 (N.D.Ohio 1999) (discussing *Reynolds v. United States,* 98 U.S. 145, 156, 25 L.Ed. 244 (1878)).

■ Accordingly, in examining the merits of Petitioner's Claim Seven, this Court must be "guided by the traditionally broad discretion afforded the trial judge in conducting voir dire." *Hill,* 199 F.3d at 843 (citing *Mu'Min v. Virginia,* 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991); *Ham v. South Carolina,* 409 U.S. 524, 528, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973)); *Dennis,* 68 F.Supp.2d at 890. The burden of showing that "a juror was unable to set aside any preconceived notions or opinions and render a verdict based solely upon the evidence presented in court" rests with Petitioner. *Hammer v. Bowlen,* 934 F.Supp. 911, 916 (M.D.Tenn. 1996) (citing *Irvin,* 366 U.S. at 723–24, 81 S.Ct. 1639).

■ Petitioner argues that the trial court improperly excused Ms. Mueller, a prospective juror who expressed reservations about her ability to recommend the death penalty. When a trial court's decision to dismiss a prospective juror for cause based on the person's opinion of capital punishment is challenged, the standard is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright,* 469 U.S. at 424, 105 S.Ct. 844 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). The juror's bias, though, need not be proven with "'unmistakable clarity.'" *Id.*

In applying this standard to Claim Seven, the Court must examine the questioning of Ms. Mueller that took place during the voir dire of Petitioner's trial. The following colloquy focused on her views of capital punishment:

**Prosecutor:** Ma'am, I believe ... you indicated you may have a problem passing judgment on another person, is that correct?

**Ms. Mueller:** Yes, sir.

**Prosecutor:** And what do you mean by that or how do you feel?

**Ms. Mueller:** Well, if it was something other than his life, I mean, if you just say he stole this or he stole that and they can prove he done it, I can go along with that, but when it comes to somebody's life, I just don't feel like I'm God. I just don't like to say he dies. I don't know if I could.

**Prosecutor:** Have you felt this way a long time or have you just thought about this since coming to court?

**Ms. Mueller:** Well, life is pretty precious to me, and I put a lot of value on it. I just don't like to brush it off.

(Tr. at 602–603).

\* \* \* \* \* \*

**Prosecutor:** (3)27 Do you think ... you could properly and fairly consider all these options, and if the law says the death penalty is the proper verdict, could you put your name on that line knowing it might mean death in the electric chair? You think you could do that?

**Ms. Mueller:** It would be awful tough.

**Prosecutor:** Do you feel that under no circumstances could you do something like that?

**Ms. Mueller:** If they could prove it one hundred—you know, without a doubt at all.

**Prosecutor:** And the law doesn't require that, ma'am.... you have [to] follow the law on the jury, but if you can't do it, we can accept that and we understand it.

**Ms. Mueller:** I really don't think I could, really.

(*Id.* at 604–605). After this discussion, the prosecution challenged Ms. Mueller for cause (*Id.* at 605). Before dismissing Ms. Mueller for cause, however, the trial court permitted further questioning by the defense. A portion of the trial transcript detailing this discussion is below:

**Defense Counsel:** And you don't have any firm commitment against capital punishment, against applying the law in capital punishment, is that right?

**Ms. Mueller:** That's right.

**Defense Counsel:** Could you agree to follow the law in good faith as His Honor gives it to you?

**Ms. Mueller:** Yes, sir.

The Court then sought to clarify Ms. Mueller's responses, asking:

**The Court:** Let's get to the bottom line, ma'am.

... If [the jury] found him guilty and you go on to decide the penalty phase, will you be able—If the State proves beyond a reasonable doubt that he deserves it under the law, will you sign a recommendation of the death penalty?

**Ms. Mueller:** I really don't think I could toy with somebody's life like that.

**The Court:** All right, she'll be excused for cause.

(*Id.* at 606–607).

As the above colloquy shows, the trial court took the time to determine the extent of Ms. Mueller's reservations about the death penalty. While Ms. Mueller did not firmly commit to a belief that the death penalty should never be imposed, she clearly indicated that she probably would not be able herself to impose the death penalty on a criminal defendant. Her views may not have been presented with "unmistakable clarity", but certainly her views would have substantially impaired her duty to impose the death penalty pursuant to Ohio Revised Code § 2929.03. Thus, the Court finds that the exclusion of this prospective juror for cause did not violate Petitioner's constitutional rights.

Therefore, we conclude that Petitioner's Claim Seven is without merit. Furthermore, the Court concludes that Petitioner fails to overcome his procedural default of Claim Seven as he does not demonstrate that the alleged error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady,* 456 U.S. at 170, 102 S.Ct. 1584.

### *CLAIM NINE*

**The trial court's numerous errors in the admission of gruesome photographs and shoe print evidence during trial denied Petitioner his rights to a fair trial and due process of law as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.**

This Claim focuses on the admission of (1) a shoe print lifted from the counter at the Central Bar; (2) photographs of murder victim Gary Mitchell and the Central Bar crime scene as well as photographs of the victims and crime scenes from the other so-called similar robberies; and (3) hearsay testimony. As the State of Ohio addressed Petitioner's assertions related to the shoe print evidence, the Court may reach the merits of this portion of Claim Nine. However, because Petitioner procedurally defaulted the portion of Claim Nine related to the admission of hearsay testimony and because Petitioner is now asserting ineffective assistance of appellate counsel as cause for overcoming his procedural default, the hearsay testimony is addressed in our discussion of the merits of Claim 17, Ineffective Assistance of Appellate Counsel, *infra.*

As for the photographic evidence, pursuant to our holding in the December 21, 1998 Order, this Court must now determine whether Petitioner can show prejudice for his procedural default of his claim that the trial court erroneously admitted numerous gruesome photographs (doc. 143). Petitioner demonstrated cause for not raising the issue about the photographs in the state courts because he had the same trial and appellate counsel (*Id.*). Now Petitioner must establish actual prejudice based on his constitutional claim. *United States v. Frady,* 456 U.S. 152, 170,

102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir.1986). In analyzing a petitioner's contention of prejudice under the *Maupin* standard, a federal court initially assumes that the petitioner states a meritorious claim. *Id.*, 785 F.2d at 138–39. The Court here assumes that the trial court's evidentiary rulings violated Petitioner's due process rights, a cognizable constitutional claim. *See id.* at 139–40. Given this assumption, the Court finds Petitioner would have been prejudiced by such a constitutional violation. Thus, Petitioner may properly raise this Claim. *Id.* We now examine the merits of Petitioner's Claim to determine whether a constitutional violation actually occurred. *See id.* at 140.

■■■ A federal court's review of state court evidentiary rulings on a petition for habeas corpus " 'is limited to a determination of whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial.' " *Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989) (quoting *Osborne v. Wainwright*, 720 F.2d 1237, 1238 (11th Cir.1983)) (quoting *Nettles v. Wainwright*, 677 F.2d 410, 414 (5th Cir.1982)). Since "federal habeas corpus relief does not lie for errors of state law", *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), erroneous evidentiary rulings do not violate the United States Constitution in and of themselves. *Dennis v. Mitchell*, 68 F.Supp.2d 863, 892 (N.D.Ohio 1999). Instead, the evidence "must be inflammatory or gruesome, and so critical that its introduction denied petitioner a fundamentally fair trial." *Futch*, 874 F.2d at 1487. Therefore, the critical issue is "whether the claimed error was so egregious as to have nullified the legitimacy of the properly admitted substantive evidence of the [petitioner's] guilt." *Dennis*, 68 F.Supp.2d. at 892–93 (citing *Lewis*, 497 U.S. at 780, 110 S.Ct. 3092; *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Lundy*

*v. Campbell*, 888 F.2d 467, 473 (6th Cir. 1989)).

The following subsections address the shoe print and photographic evidence Petitioner alleges the trial court erroneously admitted to determine whether the admission violated Petitioner's right to a fair trial under the Due Process Clause of the Fourteenth Amendment.

### I. Shoe Print Evidence

■■■ Upon arrival at the scene of the Central Bar homicide on August 1, 1984, police discovered a shoe print on top of the bar counter. The police photographed and then lifted the print from the surface of the bar counter using two pieces of tape (Tr. at 982–85; 1213–14). Later determined to have been made from a Pony athletic shoe, the shoe print became the only physical evidence to emerge from the scene of the Central Bar homicide (Tr. at 868, 979; 1999 Hearing Tr., Ex. 52). Following Petitioner's October 12, 1984 arrest for the Gold Star Chili robbery, police compared the print to the Pony athletic shoes being worn by Petitioner at the time of his arrest (*Id.* at 870, 874; 1210–11). Petitioner's shoes matched the print in size and type, but not in tread wear (*Id.* at 1203). During the trial, the State's witnesses testified that, while they could not be certain that one of Petitioner's shoes made the print at the Central Bar, they also could not exclude the possibility it did (*Id.* at 1205, 1211).

On behalf of the defense, W.W. "Buck" Barney, a local distributor of Pony athletic shoes testified that at least 50 different Pony shoe styles shared the same print style as the print from the Central Bar. The local distributor also stated that other manufacturers copied Pony's sole design (*Id.* at 2105) and he estimated that about 25,000 other pairs of Pony shoes with the same sole print had been distributed in the Greater Cincinnati area prior to the Central Bar homicide (*Id.* at 2089). Another witness, Larry Dehus, testified for the defense that the photograph taken of the

print was faulty because of the camera angle. Mr. Dehus testified that his examination of the evidence indicated variances in the tread of the print and Petitioner's shoe existed (*Id.* at 1213; 2392–97). The defense further contended during trial that the lifting of the print was done improperly, obscuring the heel portion of the print (*Id.* at 1213).

Petitioner now asserts that the trial court's admission of the shoe print evidence violated Petitioner's due process rights because of the allegedly angled photography of the print, the allegedly faulty lifting of the print, and the fact that the State's witnesses could not testify with certainty that Petitioner's shoes made the print at the Central Bar. Petitioner's appellate counsel in the state court raised similar issues on direct appeal related to the shoe print evidence. The Ohio Supreme Court discussed the shoe-print evidence during its discussion of the sufficiency of the evidence, writing that:

> Appellant's Pony gym shoe, recovered in October, made a print consistent with the shoe print found on the Central Bar counter on August 1. The two shoe prints corresponded in both design and dimension. Appellant's shoe could not be excluded as having caused the Central Bar print simply because of the time lapse (August to October) and some wear marks on the shoe recovered in October which were not on the earlier August 1 print. Approximately twenty-five thousand pairs of Pony gym shoes with that design were sold in the greater Cincinnati–Northern Kentucky area. However, that includes all sizes, not just a size that would make the print in question.

*Jamison,* 49 Ohio St.3d at 191–92, 552 N.E.2d at 189–90.

After reviewing this matter, the Court concludes that, while the shoe print evidence was significant in possibly tying Petitioner to the scene of the crime and in bolstering Mr. Howell's testimony that Petitioner was the principal offender of the

aggravated robbery and murder, the trial court's admission of the evidence, even if in error, did not nullify the legitimacy of the other evidence of his guilt. The evidence was not inflammatory or gruesome. Moreover, the defense counteracted the inculpatory impact of this evidence by providing testimony of the existence of thousands of other pairs of similar Pony shoes, the possibly faulty gathering of the evidence, and the variances in tread wear between the print and Petitioner's shoe. This impeachment evidence, however, did not show that the shoe print evidence was so defective that its admission violated Petitioner's due process rights. Thus, the alleged error was not of such magnitude as to deny Petitioner a fundamentally fair trial.

## II. Photographic Evidence

■ The trial court admitted numerous photographs of the murder victim, Gary Mitchell, as well as photographs depicting the injuries of some victims of the so-called similar robberies (Tr. at 837, 898, 901, 952, 976). Petitioner argues that the photographs were not relevant to the issue in dispute at trial: the identity of Gary Mitchell's assailant (doc. 188). Therefore, Petitioner contends, the danger of unfair prejudice to Petitioner more than outweighed any probative value of the photographs. Furthermore, Petitioner asserts that the unfair prejudice arising from the photographs carried over into the penalty phase of Petitioner's trial.

■ First, with regard to the photographs admitted in Petitioner's trial depicting the Central Bar crime scene and including a view of Mr. Mitchell lying unconscious on the floor of the bar, the Court finds that these photographs are not so gruesome and inflammatory to have nullified the legitimacy of the other evidence of guilt. The Court finds that, generally, "the introduction of photographic evidence of a crime victim does not violate a defendant's right to a fair trial." *Futch,* 874 F.2d at 1487. This holds true whether the

admission of the evidence comes pursuant to state or federal law. *See United States v. Brady,* 595 F.2d 359, 361–62 (6th Cir. 1979) (upholding admissibility under Federal Rule of Evidence 403 of photographs that depicted bank robbery victims lying in pools of their own blood); *see also United States v. Boise,* 916 F.2d 497, 504 (9th Cir.1990) (finding that the admission of the autopsy photograph of a murdered child was not an abuse of discretion); *Jones v. Butler,* 864 F.2d 348, 368 (5th Cir.1988) (concluding that the photographs of a rape-murder victim's bloody genitals were not so inflammatory as to deny due process). Therefore, the admission of the photographs of Mr. Mitchell or of the Central Bar crime scene did not violate Petitioner's right to a fundamentally fair trial.

■■■■ Secondly, with regard to the photographs displaying the injuries suffered by the victims of the other so-called similar robberies, the Court reminds Petitioner that "the balancing of relevance and prejudice is generally a state evidentiary issue which federal courts do not review." *Jones,* 864 F.2d at 368. Nonetheless, the Court finds that, even if these photographs could be considered inflammatory, any inflammatory tendency of these photographs failed to exceed their evidentiary value in showing identity and intent to such an extent that a violation of Petitioner's due process rights occurred. *See id.* Thus, this Court concludes that the trial court's admission of the photographs did not deny Petitioner a fundamentally fair trial.

Having reviewed the portions of Claim Nine addressing the shoe print evidence and the photographic evidence, we conclude that the admission of the evidence did not violate Petitioner's right to a fair trial as guaranteed by the Due Process Clause of the Fourteenth Amendment. Thus, Claim Nine with relation to the shoe print evidence is without merit. Furthermore, Petitioner fails to overcome his procedural default of the portion of Claim Nine related to the admission of the photographic evidence as he does not demon-

strate that the alleged error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady,* 456 U.S. at 170, 102 S.Ct. 1584.

## CLAIM TEN

**Petitioner's convictions were obtained in violation of the Due Process Clause of the Fourteenth Amendment because the verdicts were not supported by the evidence.**

## CLAIM FIFTEEN

**The death sentence imposed on Petitioner violated his rights of due process and prohibition against cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution because there was insufficient evidence to prove that the aggravating circumstances outweighed the mitigating factors by proof beyond a reasonable doubt.**

In our December 21, 1998 Order, the Court found that Petitioner's claims related to the sufficiency of the evidence are properly before us on federal habeas corpus review. The Court addresses Claims Ten and Fifteen together as these claims rely on the same theory of law.

■■■■ The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be based on proof beyond a reasonable doubt as to every fact necessary to constitute the crime for which the state defendant was charged. *Harris v. Marshall,* 687 F.Supp. 1166, 1168 (S.D.Ohio 1987) (citing *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). When a state prisoner challenges his conviction in a federal habeas corpus proceeding on the ground that the jury's verdict was not supported by the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781 (citing *Johnson v. Louisiana,* 406 U.S. 356, 362, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972)). The same standard is applied to claims of insufficient evidence related to eligibility for the death penalty and capital sentencing. *See Lewis v. Jeffers,* 497 U.S. 764, 780–83, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *Scott v. Anderson,* 58 F.Supp.2d 767, 803 (1998) (rev'd on other grounds, *Scott v. Mitchell,* 209 F.3d 854 (6th Cir.2000)).

The inquiry expected by this standard is narrow. *Jackson,* 443 U.S. at 313, 99 S.Ct. 2781. Importantly, the issue for the reviewing court is not whether the reviewing court itself believes the evidence adduced at trial established guilt or culpability beyond a reasonable doubt or whether the instructions given the jury were proper. *Id.* at 318–19, 99 S.Ct. 2781. Instead, the reviewing court examines the record evidence in a light most favorable to the prosecution, drawing every inference arising from the evidence in favor of the prosecution, to "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Id.; see also Johnson,* 406 U.S. at 362, 92 S.Ct. 1620; *cf. Woodby v. Immigration & Naturalization Serv.,* 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). In conducting an inquiry into the record evidence, the court applies an understanding of "reasonable doubt" as doubt based upon reason and arising either from the evidence or a lack thereof. *Jackson,* 443 U.S. at 317 n. 9, 99 S.Ct. 2781; *Johnson,* 406 U.S. at 360, 92 S.Ct. 1620.

Nonetheless, the record evidence need not be absolute in convincing the trier of fact of the defendant's guilt or culpability beyond a reasonable doubt. *Walker v. Engle,* 703 F.2d 959, 969 (6th Cir.1983). A conviction may rest on circumstantial evidence, and a federal habeas corpus court need not rule out all possible interpretations of the circumstantial evidence. *Harris,* 687 F.Supp. at 1168 (citing *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir.1986); *United States v. Stone,* 748 F.2d 361, 363 (6th Cir.1984) (indicating that circumstantial evidence alone may be sufficient to sustain a conviction, and that such evidence need not remove every reasonable hypothesis except that of guilt)); *see also Delk v. Atkinson,* 665 F.2d 90, 100 (6th Cir.1981). In addition, as the Sixth Circuit observed, "credibility is not a matter of review for a federal habeas corpus court." *Walker,* 703 F.2d at 969–70 (citing *Pigford v. United States,* 518 F.2d 831, 836 (4th Cir.1975)). The trier of fact at the state court level alone bears the responsibility to choose which testimony or evidence to believe. *See Scott v. Perini,* 662 F.2d 428, 434 (6th Cir.1981).

Having reviewed the narrow standard set by the Supreme Court for a claim of insufficient evidence, the Court now examines the state court record before us. The Court emphasizes that this examination focuses solely on the evidence as adduced at Petitioner's trial. We do not consider here the possible impact of the undisclosed *Brady* evidence. The question here is whether the jury in October of 1985 considered evidence sufficient to determine beyond a reasonable doubt Petitioner's guilt under Ohio Revised Code § 2903.01(B) and Petitioner's culpability as a principal offender eligible for the death penalty under Ohio Revised Code § 2929.04(A)(7). *See Jackson,* 443 U.S. at 324, 99 S.Ct. 2781; *Fuller v. Anderson,* 662 F.2d 420, 423 (6th Cir.1981) (concluding that federal courts must review sufficiency in light of state criminal law).

An Ohio criminal defendant becomes eligible for the death penalty if the defendant is convicted of aggravated murder as well as at least one of the aggravating circumstances set forth in Ohio Revised Code § 2929.04. *See* Ohio Rev.Code § 2929.03(C)(2). To obtain Petitioner's conviction for aggravated murder, Ohio

Revised Code § 2903.01(B) [14] required the State of Ohio to prove beyond a reasonable doubt that Petitioner caused the death of Mr. Mitchell while or immediately after robbing the Central Bar. For death-eligibility, Ohio Revised Code § 2929.04(A)(7) [15] required the State of Ohio to prove an aggravating circumstance, namely here that Petitioner committed the aggravated murder while or immediately after robbing the Central Bar *and* that Petitioner was the principal offender in the commission of the aggravated murder. *See also State v. Taylor*, 66 Ohio St.3d 295, 308, 612 N.E.2d 316, 325–26 (1993); *State v. Waddy*, 63 Ohio St.3d 424, 446, 588 N.E.2d 819, 836 (1992); *State v. Penix*, 32 Ohio St.3d 369, 371, 513 N.E.2d 744, 746 (1987).

The jury in Petitioner's case returned its verdict on October 12, 1985. The text of the verdict read:

State of Ohio versus Derrick Jamison, Court of Common Pleas, Hamilton County, Ohio, Case No. B–850379, regarding Count Two, we the jury in the issue joined find the defendant Derrick Jamison guilty of aggravated robbery, Section 2911.01 Ohio Revised Code in Count Two. We further do find that at the time of the aggravated robbery that Derrick Jamison had previously been convicted of robbery, Case No. B–792580 on December the 5th, 1979, Hamilton County, Ohio, Common Pleas Court.

Regarding Count One, we the jury in the issue joined find the defendant Der-

rick Jamison guilty of aggravated murder, Section 2903.01 Ohio Revised Code. We further do find that the aggravated murder was committed while Derrick Jamison was committing or fleeing immediately after committing the offense of aggravated robbery. We further do find that Derrick Jamison was the principal offender in the commission of the aggravated robbery.

(Tr. at 2605–2606).

In support of his federal claim, Petitioner points to the circumstantial nature of the evidence against him and he alleges that this evidence failed to support the verdict and sentence recommendation reached by the jury in October of 1985. According to Petitioner, the prosecution relied upon: (1) the testimony of Charles Howell, who stated that he was present at the scene of the crime with Petitioner as an accomplice and that he heard Petitioner injure the victim; (2) a shoe print from a popular brand athletic shoe lifted from the scene of the crime and matched in size and type with a shoe Petitioner was wearing when arrested for the Gold Star Chili robbery; and (3) testimony concerning so-called similar robberies allegedly committed by Petitioner. Petitioner complains that Mr. Howell's testimony lacked credibility and that the shoe print matched 25,000 other pairs of shoes. Furthermore, Petitioner asserts, the so-called similar robberies failed to indicate any unique modus operandi. Petitioner contends that this evidence was insufficient to prove beyond a reasonable doubt that (1) Petitioner was in fact the person who caused the

---

**14.** Ohio Rev.Code § 2903.01(B), "Aggravated Murder", states, in pertinent part:

No person shall purposely cause the death of another ... while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnaping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary, or escape.

*Id.*

**15.** Ohio Rev.Code § 2929.04(A)(7), "Criteria ·for Imposing Death or Imprisonment for a Capital Offense," states, in pertinent part:

The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing, or attempting to commit kidnaping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder, or if not the principal offender, committed the aggravated murder with prior calculation and design.

*Id.*

death of Gary Mitchell; and (2) Petitioner was the principal offender in the Central Bar homicide. Therefore, Petitioner argues, he is being held in custody by the State of Ohio in violation of his Fourteenth Amendment rights.

In contrast, Respondent argues that the evidence adduced at trial fully supported the jury's verdict. Respondent draws the Court's attention to the Ohio Supreme Court's discussion of the evidence from Petitioner's direct appeal. *See State v. Jamison*, 49 Ohio St.3d 182, 191–92, 552 N.E.2d 180, 189–90 (1990). Respondent asserts that the facts, as found by the Ohio Supreme Court, are supported by the record and are entitled to a presumption of correctness. Title 28 U.S.C. § 2254(d)(1)-(8). Further, Respondent argues that, based on these facts, this Court must, as the Ohio Supreme Court did, reject Petitioner's claim of insufficient evidence.

■ While the Ohio Supreme Court's rejection of Petitioner's claim on direct appeal may be accorded deference, *Jackson*, 443 U.S. at 323, 99 S.Ct. 2781, this Court is required to make an independent determination of the sufficiency of the evidence underlying Petitioner's conviction and sentence. *Delk*, 665 F.2d at 94. With this cautionary rule in mind, the Court inserts below the findings and conclusions of the Ohio Supreme Court regarding the sufficiency of the evidence against Petitioner:

"A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt."

Under that test, ample evidence supported all elements of the offenses. Appellant was implicated in the robbery and murder chiefly by Howell's testimony. The trial judge fully advised the jury to exercise caution in weighing accomplice Howell's testimony.

Appellant did challenge Howell's credibility. Howell had prior felony convictions for forgery and receiving stolen property. Howell displayed some inconsistencies in pretrial statements. Prosecutors promised Howell he would not be tried for murder if he testified before the grand jury and at appellant's trial. According to another jail inmate, Howell said "he was going to get some juice on his case by flipping on Derrick." Yet the jury, knowing these facts, could still choose to accept Howell's testimony.

In addition, there was other evidence which supported Howell's testimony. A bystander described two men in their mid-twenties running in the vicinity of the Central Bar. His description of one fit appellant. Appellant's Pony gym shoe, recovered in October, made a print consistent with the shoe print found on the Central Bar counter on August 1. The two shoe prints corresponded in both design and dimension. Appellant's shoe could not be excluded as having caused the Central Bar print simply because of the time lapse (August to October) and some wear marks on the shoe recovered in October which were not on the earlier August 1 print. Approximately twenty-five thousand pairs of Pony gym shoes with that design were sold in the greater Cincinnati–Northern Kentucky area. However, that includes all sizes, not just a size that would make the print in question.

Finally, the other-acts evidence, previously discussed, supports appellant's identity and other vital elements of Howell's testimony. Specifically, the other-acts evidence established appellant's particular characteristics in robbing victims in small businesses during afternoon hours, leaping over counters, knocking down or forcing victims to the floor, physically opening registers, taking money from registers, and engaging in violence to victims' heads. The other robberies and the robbery at the Central Bar shared those common characteristics, indicating appellate's scheme, plan or system. They also supported identity

of a common perpetrator, appellant. We find sufficient evidence to support the jury's verdict. Appellant's proposition of law is without merit.

*Jamison,* 49 Ohio St.3d at 191–92, 552 N.E.2d at 189–90.

In addressing the disparity of the sentences received by Petitioner and Mr. Howell, the Ohio Supreme Court also noted that, "[a]ccording to Howell's testimony, appellant suggested the crime, picked the location, fatally injured the bartender, and took the money from the register." *Id.* at 190–91, 552 N.E.2d at 188–89. Then, in the Ohio Supreme Court's independent review of whether the aggravating circumstance outweighed the mitigating facts in Petitioner's case, the Court wrote, "[t]he aggravating circumstance was appellant's role as the principal offender in an aggravated robbery and murder. We find this circumstance established by competent evidence beyond a reasonable doubt." *Id.* at 192, 552 N.E.2d at 190.

In conducting our own independent review of this Claim, the Court carefully examined the transcript of the state court proceedings in Petitioner's case. Although Petitioner's case was admittedly a close circumstantial one, the Court notes that we are required to resolve all conflicts in the inferences arising from such circumstantial evidence in favor of the prosecution. *Delk,* 665 F.2d at 100. In Petitioner's case, the jury was required to weigh the credibility of circumstantial shoe print evidence as well as the testimony of an accomplice and of witnesses who attested that Petitioner perpetrated other so-called similar crimes against them. Based upon our review of the evidence in a light most favorable to the prosecution, we are satisfied that a rational factfinder could have found the Petitioner guilty beyond a reasonable doubt of aggravated murder and eligible for the death penalty under Ohio law.

Specifically, after weighing the impeachment evidence developed against Mr. Howell, the shoe print evidence, and the witnesses to the other so-called similar robberies, the jury could have reasonably found that Petitioner alone went behind the bar counter, attacked the murder victim, and robbed the cash register. Mr. Howell's testimony placed Petitioner at the scene, as did evidence that the shoe print found on top of the bar counter matched in size and type to a shoe worn by Petitioner. The fact that other witnesses provided descriptions of two men fleeing from the Central Bar, one of which generally fit Petitioner, also supports a finding that Petitioner was at the scene of the crime. Furthermore, Mr. Howell, with his testimony about how Petitioner suggested the robbery and how Petitioner ignored the victim's pleas for mercy, could have reasonably convinced the jury that Petitioner was the principal offender of the murder. This Court cannot now determine, as a matter of law, that Mr. Howell was lying because the credibility of his testimony rested solely with the trier of fact. *See Harris,* 687 F.Supp. at 1169. In addition, the in-court identifications of Petitioner by the victims of the so-called similar robberies reasonably indicated to the jury that Petitioner had inflicted head injuries on victims during robberies arguably similar to that of the Central Bar. Based on these facts, the Court concludes that a rational factfinder could have found beyond a reasonable doubt that Petitioner caused the death of Gary Mitchell during a robbery he principally encouraged and led at the Central Bar on August 1, 1984.

■■■ With regard to the penalty phase of the trial, the Court reviews the following evidence raised by Petitioner in mitigation:

(1) Petitioner's father was an alcoholic who abandoned his family when Petitioner was five years old (Tr. at 2643–81);

(2) Petitioner's mother suffered from a long illness that limited her parenting abilities (*Id.* at 2644);

(3) As a child, Petitioner was a loner who only spoke when spoken to and who had difficulty interacting with other children (*Id.* at 2665); He was often the object of ridicule (*Id.* at 2622, 2645, 2656–57, 2673);

(4) Family members and friends testified that Petitioner was a "slow learner" who was easily confused and who was often influenced by others (*Id.* at 2622–25, 2629, 2660);

(5) Dr. Nancy Schmidtgoessling testified that Petitioner's I.Q. score put him in a below-average intelligence range (*Id.* at 2643, 2649); that Petitioner began stealing as a child .(*Id.* at 2651); that Petitioner appreciated the criminality of his actions (*Id.* at 2652); and that he was competent and sane (*Id.* at 2651–53). She also testified about his substance abuse (*Id.* at 2646);

(6) Friends of the Jamison family testified that Petitioner cared about his family (*Id.* at 2669), and that he could be respectful of others (*Id.* at 2675);

(7) Parole officer Charles Houston testified that, while Petitioner completed a training program during parole, he also generally lacked self-initiative (*Id.* at 2628, 2634, 2675);

(8) Petitioner testified on his own behalf, confirming much of the above, admitting to the so-called similar robberies at Gold Star Chili, Curve Café, Kings News, Rensler Portrait Studio, and denying any involvement in the robberies at the Sav–All Discount Drug Store, Metropolitan Gallery, Acres of Books, and Central Bar. Petitioner also stated that he needed money to support a drug habit (*Id.* at 2678–2720).

(*See* Return of Writ, Ex. N).

Following the jury's recommendation of the death penalty, the trial court judge entered his findings related to sentencing on the record. In pertinent part, the judge stated:

> It is not so simple … that guilt having been determined, the Court automatically impose a predetermined sentence. Aggravating and mitigating factors must be properly balanced to determine the penalty. In such balancing the Court must not follow some purely personal criteria but must seek to follow the intentions of the legislature as well as such intentions can be divined. The legislature is guided to the extent that it is declared that the death penalty must be imposed unless the mitigating factors outweigh the aggravating circumstances.

> In brief summation, the mitigating factors discussed above or evident from the testimony involve the defendant's past history, the lack of a father figure in the family, his slowness and failure to work or achieve to his potential, the need of his mother for support. However, these and all other mitigating factors combined do not even begin to balance the scales which are weighed down on the other side by his persistent criminality, abuse of drugs and gratuitous viciousness.

(Tr. at 2798).

\*　　\*　　\*　　\*　　\*　　\*

> Upon full, careful and complete scrutiny of all the mitigating factors set forth in the statute or called to the Court's attention by defense counsel in any manner and after considering fully the aggravating circumstance which exists and has been proven beyond a reasonable doubt, the Court concludes that the aggravating circumstance has been proven by the prosecution beyond a reasonable doubt to outweigh all the mitigating factors advanced by the defendant.

(*Id.* at 2800–2801). Like the trial judge, the Ohio Supreme Court found that Petitioner's "limited intelligence, deprived childhood, drug habit, and supportive friends and family" could be considered as mitigating factors under Ohio Revised

Code § 2929.04(B)(7). *Jamison,* 49 Ohio St.3d at 192–93, 552 N.E.2d at 190. However, the Ohio Court of Appeals, which also independently reviewed the weighing of the aggravating circumstance and the mitigating factors in Petitioner's case, concluded "in sum that nothing of a mitigating nature can be said to stand out as a result of this otherwise brutal and senseless murder." *State v. Jamison,* No. C–850753, 1988 WL 17121, at \*10 (Ohio App. 1 Dist. Feb.17, 1988).

After reviewing the facts alleged by defense witnesses during the penalty phase, the Court concludes that a rational factfinder could have found the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt. Petitioner's defense counsel focused on his limited intelligence and tendency to be a "loner" and a "follower", apparently attempting to show either that Petitioner was innocent or that Petitioner could not have been the principal offender in the murder of Mr. Mitchell. Regardless of tactics, though, defense counsel raised only minimal mitigating evidence falling under § 2929.04(B)(7). Based on this evidence, a rational factfinder could have found that the aggravating circumstance involving Petitioner's alleged principal role in the murder and robbery at the Central Bar outweighed beyond a reasonable doubt his limited intelligence, troubled and lonely childhood, drug habit, and supportive family and friends.

Thus, having reviewed the record evidence, the Court concludes that sufficient evidence existed in October of 1985 from which the jury could find Petitioner guilty of aggravated murder and could ultimately recommend the death penalty. Moreover, sufficient evidence existed to prove beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating factors. Accordingly, Claims Ten and Fifteen are without merit.

### CLAIM ELEVEN

**Prosecutorial misconduct during all phases of the trial denied Petitioner his rights to a fair trial, due process of law, and freedom from cruel and unusual punishment as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.**

In Claim Eleven, Petitioner asserts that certain comments made by the prosecution during the voir dire, guilt phase, and penalty phase of his trial constituted prosecutorial misconduct and a denial of his constitutional rights. The Court held in our December 21, 1998 Order (doc. 143) that Petitioner can demonstrate cause for the procedural default of this Claim because he had the same counsel at trial and on appeal. Now Petitioner must establish actual prejudice based on his constitutional claim. *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Maupin v. Smith,* 785 F.2d 135, 139 (6th Cir.1986). In analyzing a petitioner's contention of prejudice under the *Maupin* standard, a federal court initially assumes that the petitioner states a meritorious claim. *Id.,* 785 F.2d at 138–39. The Court here assumes that prosecutorial misconduct prevented Petitioner from receiving a fair trial, a cognizable constitutional claim. *See id.* at 139–40. Given this assumption, the Court finds Petitioner would have been prejudiced by such a constitutional violation. Thus, Petitioner may properly raise this Claim. *Id.* We now examine the merits of Petitioner's Claim to determine whether a constitutional violation actually occurred. *See id.* at 140.

For prosecutorial misconduct to rise to the level of a constitutional violation, a court must determine that the prosecutor's statements " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Hill v. Brigano,* 199 F.3d 833, 847 (6th Cir. 1999) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)); *see also Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct.

2464, 91 L.Ed.2d 144 (1986). When analyzing a claim of prosecutorial misconduct, the Sixth Circuit requires a district court to initially decide whether the challenged statements were improper. *Boyle v. Million,* 201 F.3d 711, 717 (6th Cir.2000). If improper, the district court next examines whether the statements were so flagrant as to constitute a denial of due process and thereby warrant the granting of a writ. *Id.* Flagrancy is discerned by considering: " '1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused.' " *Id.* (quoting *United States v. Francis,* 170 F.3d 546, 549–50 (6th Cir.1999)); *see also Hill,* 199 F.3d at 847; *Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir.1982).

 As indicated by the above inquiry, allegations of prosecutorial misconduct must be considered in light of the entire trial record. *See, e.g., Lundy v. Campbell,* 888 F.2d 467, 472 (6th Cir.1989) (observing that the entire record "refers to all that occurred from the empanelment of the jury to the return of the verdict"); *Beam v. Foltz,* 832 F.2d 1401, 1408 (6th Cir.1987). The actions and reactions of the trial court and the defense become important to this review. In *Donnelly,* for instance, the Supreme Court rejected a prosecutorial misconduct claim after finding that the trial judge gave a strong curative instruction to the jury. *Id.,* 416 U.S. at 644–645, 94 S.Ct. 1868. The Supreme Court wrote in *Donnelly* that the "prosecutor's remark, here, admittedly an ambiguous one, was but one moment in an extended trial and was followed by specific disapproving instructions." *Id.* at 645, 94 S.Ct. 1868. Likewise, in *Darden,* the Supreme Court found that trial court lessened the impact of the prosecutor's improper statements by instructing the jurors that they could not base their decision on the arguments of counsel. *Id.,* 477 U.S. at 181–82, 106 S.Ct. 2464. The Court additionally observed that many of the prosecutor's improper statements in *Darden* came in response to comments made by the defense, again diminishing their effect on the trial as a whole. *Id.* at 182, 106 S.Ct. 2464. However, in *Caldwell,* the Supreme Court held that the prosecutor's argument, with which the trial court had openly agreed, violated the Eighth Amendment as it minimized the jury's sense of responsibility for determining the appropriateness of the death penalty. *Id.,* 472 U.S. at 340–41, 105 S.Ct. 2633.

In this federal habeas action, Petitioner alleges that the prosecution committed misconduct during each stage of his trial. According to Petitioner, this alleged misconduct constituted a denial of his constitutional rights. In the following subsections, the Court examines Petitioner's allegations as well as the state court record.

### I. *Voir Dire*

Petitioner initially points to comments made by the prosecution to prospective jurors during the voir dire. These comments came during the separated questioning of each individual juror (*see* Tr. at 166–68). Moreover, these comments came after the trial court instructed the entire prospective juror panel on the presumption of innocence, the fact that the State must prove its case beyond a reasonable doubt, and the fact that nothing the court nor attorneys said during voir dire could be considered by the jurors as evidence (*see* Tr. at 14–17). The trial court also explained the jury's role in recommending the death penalty, stating:

> The Judge will consider your recommendation, whatever it is. He can accept your recommendation or impose a lesser of the three sentences if such a lesser is available. However, you must consider in making your recommendation your recommendation will carry great weight with the Court, and you

should never allow yourself to impose a greater sentence than is deserved with the thought that the Judge will lessen the sentence nor impose a lesser sentence than is deserved with the thought that the Judge will increase the penalty. Since, as I've already told you, the Court cannot increase the sentence, the sentence imposed by you must be the correct and proper one, and you should recommend it as though your recommendation will in fact be carried out.

(Tr. at 115–16).

Despite these instructions, Petitioner asserts that the following comments violated state law and denied him his right to a fundamentally fair trial. Specifically, Petitioner argues that the prosecutors misinformed prospective jurors about Ohio Revised Code § 2929.03, which precludes a jury instruction on the penalty that may follow a guilty or not guilty verdict on any charge or aggravating circumstance and sets forth the standard to be applied in the weighing of aggravating circumstances and mitigating factors. *See* § 2929.03(B) & (D). Furthermore, Petitioner contends that the prosecutors improperly informed prospective jurors that a death verdict would function only as a recommendation. According to Petitioner:

(1) Prosecutors told individual jurors that the jury would have to find Petitioner death-eligible before reaching the sentencing phase of the trial (*see* Tr. at 219, 233, 308, 356, 575; *see also* 1999 Hearing Tr. at 379–84).

(2) Prosecutors failed to explain that the standard of proof to be applied in *weighing* an aggravating circumstance and mitigating factors is beyond a reasonable doubt (*see* Tr. at 175–76, 234–35, 277, 309, 393, 424, 454–56, 575–76).

(3) Prosecutors reversed the weighing required under Ohio law when they explained that a life sentence could only be imposed if the mitigating factors outweighed the aggravating

circumstance (*see id.* at 234, 277, 309, 340, 356, 393, 424, 457, 575; *see also* 1999 Hearing Tr. at 379–84).

(4) Prosecutors repeatedly informed prospective jurors that a jury must weigh aggravating circumstances against mitigating factors (*see* Tr. at 234–35, 286, 308–10, 356–57, 392–93, 424, 456, 575–76, 633; *see also* 1999 Hearing Tr. at 379–84).

(5) Prosecutors repeatedly told prospective jurors that a jury's death verdict would be a recommendation for the trial court (*see* Tr. at 175–76, 220, 266, 275, 286, 297, 307, 310, 340, 357, 374, 376, 393, 406–407, 423–25, 456–57, 575–76, 603, 635, 679, 695, 705, 722, 723; *see also* 1999 Hearing Tr. at 379–84).

## II. Guilt Phase

Petitioner next focuses on comments made by the prosecution during closing arguments. Petitioner asserts that the prosecution's comments relating to the murder victim only served to inflame the jury's passions. In addition, Petitioner argues that the prosecution attempted to prejudice the jury against him by implying the system provided him more protection than his alleged victim and by hinting that his counsel hid the truth from the jury. According to Petitioner:

(1) Prosecutors interjected statements about the murder victim's cystic fibrosis and suffering in the hospital after the attack in the Central Bar, and prosecutors discussed their sympathy for the victim (*see* Tr. at 2473–74, 2556, 2558, 2563, 2565; *see also* 1999 Hearing Tr. at 379–84).

(2) Prosecutors compared Petitioner's rights to those held by the murder victim and the State of Ohio (*see* Tr. at 2472–73).

(3) Prosecutors commented that defense counsel were only doing their jobs (*Id.* at 2474).

(4) Prosecutors argued facts not supported by the record during closing arguments:

 (a) Prosecutors argued that, although Bernice McMannis could not identify Petitioner as the assailant of the Sav–All Discount Drug Store during Petitioner's Central Bar trial, she did identify him during an earlier trial (Tr. at 2463; 1999 Hearing Tr. at 381).

 (b) Prosecutors argued that Charles Howell's testimony was supported by James Suggs's identifications (Tr. at 2057, 2465), even though Mr. Suggs testified that he could not identify Petitioner.

 (c) Prosecutors argued that the total number of robberies in Cincinnati had declined since Petitioner had been in custody (*Id.* at 2468), a fact Petitioner contends is untrue given the police files on numerous other robberies occurring in Downtown Cincinnati that contained no links to Petitioner (1999 Hearing Tr. at 381).

After reviewing the prosecutor's closing argument, the Court believes further clarification is necessary for our analysis of whether these comments violated Petitioner's constitutional rights. First, the trial court continued to remind jurors that closing arguments could not be considered evidence (*see* Tr. at 2457, 2464). The trial court also admonished jurors that "the law and your oath as jurors require you to disregard sympathy and antipathy" (*Id.* at 2573). Secondly, the prosecutor in fact told the jury that both Petitioner and the murder victim deserved "a fair trial" (*Id.* at 2473–74). The prosecutor described the jury's role as a "search for the truth", and he stated that "the defense has tried to raise doubts, and that's their job" (*Id.* at 2474). The prosecutor also brought up many sympathetic facts relating to the murder victim. However, the Court observes that most of these statements came in response to defense counsel's long-winded discussion about how defense counsel's own sense of justice had been offended in this case.

Thirdly, Petitioner fails to convince us that the prosecutor misstated or manipulated evidence in his discussion of the testimony by Mrs. McMannis and Mr. Suggs. With regard to Mrs. McMannis, who was a defense witness, the trial record shows that she did in fact testify that she identified Petitioner at an earlier trial (*Id.* at 2239, 2531). Therefore, in relation to Mrs. McMannis's testimony, the prosecutor's argument did not contain facts unsupported by the record. As for Mr. Suggs, also a defense witness, the record shows that he testified about the heights of the alleged assailants as well as the direction in which they fled the Central Bar (*Id.* at 1259–60, 2060, 2062). The prosecutor referred to this portion of Mr. Suggs's testimony in arguing that Mr. Suggs corroborated Mr. Howell's testimony (*Id.* at 2465). Thus, the Court finds that the record also factually supports this portion of the prosecutor's argument.

### III. Penalty Phase

Finally, Petitioner draws the Court's attention to comments made by the prosecution during the penalty phase of Petitioner's trial. Petitioner again contends that the prosecution misstated applicable law by discussing mitigating factors not mentioned by the defense as well as aggravating circumstances not contained in the indictment or Ohio Revised Code § 2929.04(A), such as compassion for the victim and the facts of the offense. Petitioner also emphasizes that no legal authority exists for the prosecution's implication that the "catch-all" mitigating factor, found in Ohio Revised Code § 2929.03(B)(7), is less important than the other factors listed in the statute. In addition, Petitioner asserts that the prosecution engaged in "name-calling." According to Petitioner:

(1) Prosecutors sympathized with the murder victim (*see* Tr. at 2736, 2739; 1999 Hearing Tr. at 379–90).

(2) Prosecutors encouraged the jurors to consider the nature and circumstances of the offense (*see* Tr. at 2734–35; 1999 Hearing Tr. at 379–90).

(3) Prosecutors reminded the jurors of mitigating factors not raised by Petitioner (*see* Tr. at 2734–38; 1999 Hearing Tr. at 379–87).

(4) Prosecutors told the jurors that they need not consider the mitigating factors set forth in Ohio Revised Code § 2929.04(B)(3) because Petitioner "knew it was wrong" (*see* Tr. at 2737; 1999 Hearing Tr. at 379–87).

(5) Prosecutors asserted that Ohio Revised Code § 2929.04(B)(7), under which most of Petitioner's mitigating evidence was introduced, was "just a catch-all" (*see* Tr. at 2738; 1999 Hearing Tr. at 389).

(6) Prosecutors urged the jurors to disregard the testimony of Petitioner's mother (*see* Tr. at 2759–60; 1999 Hearing Tr. at 390).

(7) Prosecutors misstated the weighing process to be used during the penalty phase, stating that "If the aggravating circumstances outweigh those mitigating factors even by a fraction, even by a drop, then it's your duty to recommend death in the electric chair" (Tr. at 2734; 1999 Hearing Tr. at 387–90).

(8) Prosecutors called Petitioner "evil and dishonest" (Tr. at 2732–33; 1999 Hearing Tr. at 387–90).

Again, further clarification is necessary before we examine whether these comments were so flagrant as to constitute a denial of Petitioner's due process rights. First, in regard to Petitioner's allegation that the prosecutor sympathized with the victim, the prosecution actually told jurors that:

At this point in the case it might be easy for you to go back to the jury room and say the defendant is evil and the defendant is dishonest or the defendant is violent and as a result of those feelings decide that he deserves the death penalty. Although I believe that decision would be proper, the State does not want you to reach your decision at this point in the case just based on the feeling you might have about that individual. We're going to ask you at this time to make your decision just like you did in the first part of the case, and that's by following the law.

(*Id.* at 2732–33; *see id.* at 2740). A reading of the prosecutor's actual statement negates Petitioner's allegation of misconduct as to "name-calling," and thus the Court will not review this portion of Claim Eleven further. Secondly, while the prosecutor misstated the standard of proof to be used in weighing the aggravating circumstance against the mitigating factors (*Id.* at 2734), the trial court soon thereafter instructed the jurors as to the proper standard from Ohio Revised Code § 2929.03 (*Id.* at 2760–61), and the trial court described specific mitigating factors enumerated in Ohio Revised Code § 2929.04. The trial court informed jurors that:

The fact that one or more mitigating factors is present does not preclude the recommendation of the death sentence if you find beyond a reasonable doubt that the aggravating circumstance still outweighs the mitigating factors. The fact that any particular mitigating factor is not present does not preclude the recommendation of a life sentence if the aggravating circumstance does not outweigh whatever mitigating factors you find do exist.

(*Id.* at 2764–65). Thirdly, with regard to the death penalty recommendation, the trial court interrupted the prosecution at one point during the penalty phase to tell the jurors once again to "act as though your recommendation will be followed. Do not

transfer your responsibility to anybody else" (*Id.* at 2755). Fourthly, the trial court also repeated that jurors could not consider any arguments by counsel as evidence (*Id.* at 2766).

## IV. Whether Comments Amounted to Denial of Due Process

██ Based on the foregoing, Petitioner's assertions of prosecutorial misconduct may be summarized into four categories (1) alleged misstatements of the law; (2) allegedly improper expressions of sympathy for the victim; (3) alleged denigration of Petitioner's right to present a vigorous defense; and (4) arguments based allegedly on facts not supported by the record. A recent Sixth Circuit case emphasizes that a petitioner's burden of showing a denial of due process because of prosecutorial misconduct "is quite a substantial one" on habeas review. *Byrd v. Collins,* 209 F.3d 486, 527–28 (6th Cir.2000). To meet this burden, the prosecutorial misconduct must be of an "extreme nature." *Id.* at 528 (quoting *Angel,* 682 F.2d at 609).

██ With regard to the prosecutorial comments in this case that allegedly misstated Ohio law, the Court finds that the prosecution improperly described the standard of proof to be used by the jury in weighing an aggravating circumstance against mitigating factors. Rather than discuss the weighing in reasonable doubt terms, the prosecutor stated that "[i]f the aggravating circumstances outweigh those mitigating factors even by a fraction, even by a drop, then it's your duty to recommend death in the electric chair" (Tr. at 2734). Moreover, the prosecution pluralized the term "aggravating circumstance" even though only one aggravating circumstance existed for the jury to consider in Petitioner's case. The prosecution's characterization of § 2929.04(B)(7) as "just a catch-all" for mitigating factors also found no basis in the law, and the prosecutor incorrectly highlighted mitigating factors Petitioner did not raise. *See State v. De-Pew,* 38 Ohio St.3d 275, 289, 528 N.E.2d

542, 557 (1988). However, the prosecutor's statement that the jury decides whether to recommend the death penalty was a correct expression of § 2929.03(D)(2). *Mapes v. Coyle,* 171 F.3d 408, 415 (6th Cir.1999); *cf. Kordenbrock v. Scroggy,* 919 F.2d 1091, 1101 (6th Cir. 1990) (finding that Kentucky law also divides sentencing responsibility between the jury and the judge).

██ Secondly, the Court finds that the prosecutor's overzealous remarks about the victim, the victim's suffering prior to death, and the victim's right to a fair trial were inappropriate. Nonetheless, "there is no per se bar to the introduction of victim impact evidence and argument." *Byrd,* at 531 (citing *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). Thirdly, the prosecutor improperly drew attention to Petitioner's defense counsel, implying their job required them to raise doubts about Petitioner's guilt even where none existed. This kind of statement is not condoned by the Sixth Circuit, which observed in *Sizemore v. Fletcher,* 921 F.2d 667, 671 (6th Cir.1990), that "[n]o prosecutor may employ language which denigrates the right of a criminal defendant to retain the counsel of his choice, or otherwise limits the fundamental due process right of an accused to present a vigorous defense." Fourthly, the prosecution went beyond facts in evidence when he stated that "[t]hings took a deep and a sharp cut once the defendant was arrested." In contrast, as noted in the preceding subsections, the prosecutor's comments about Mrs. McMannis and Mr. Suggs did in fact find support in the record.

██ Next, the Court must decide whether these improper remarks were so flagrant as to constitute a denial of Petitioner's due process rights. We initially observe that the evidence against Petitioner was far from overwhelming. Nevertheless, on the whole, the challenged comments appeared limited in scope, isolated, and unplanned. Importantly, curative in-

structions from the trial court also tended to ameliorate the overall effect of the improper comments, helping to ensure that the comments did not adversely affect the jury's ability to evaluate evidence fairly. We now examine the challenged comments more closely.

Each misstatement of the law, standing alone, tended to mislead the jury as to an aspect of trial process or as to the evidence to consider in reaching a verdict or a sentence recommendation. The prosecutor's discussion during the penalty phase of the statutory mitigating factors not raised by Petitioner trouble this Court the most. Nonetheless, the record does not indicate that the prosecutor acted deliberately to misstate the law, and the defense did not object to any of the misstatements during the trial. Notably, the Ohio Supreme Court decided *DePew*, which held that factors not raised by a defendant in mitigation may not be commented upon by the prosecution or trial court, three years after Petitioner's trial. *Id.*, 38 Ohio St.3d at 289, 528 N.E.2d at 557. The trial court also remedied the effect of these misstatement with curative instructions that came before the trial began, during trial, and prior to releasing the jury at the end of the guilt and penalty phases of the trial. *See Darden*, 477 U.S. at 181–82, 106 S.Ct. 2464; *Donnelly*, 416 U.S. at 644–45, 94 S.Ct. 1868. Moreover, the Court finds that the prosecutor made the statements at isolated times set aside for arguments by counsel, and the trial court clearly warned the jury several times that such arguments could not be considered evidence.

In addition, many of the prosecution's remarks concerning the victim came in response to defense counsel's statement that his sense of justice had been "injured", "wounded", "inflamed", and "festered" (Tr. at 2491). Furthermore, the Court notes that the defense also expressed sympathy for the victim in its closing, turning the prosecution's argument against them by asserting that the jury does "nothing to honor the memory of Gary Mitchell in a case if [it] convict[s] somebody of the murder of Gary Mitchell who never landed a hand on Gary Mitchell" (*Id.* at 2502). Here, the fact that the prosecutor's statements of sympathy came mostly in "invited reply" to the defense's closing lessened the effect the statements had on the jury's ability to evaluate the evidence fairly. *See Darden*, 477 U.S. at 182, 106 S.Ct. 2464 (citing *United States v. Young*, 470 U.S. 1, 13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)); *United States v. Smith*, 561 F.2d 8, 13 (6th Cir.1977); *cf. United States v. Payne*, 2 F.3d 706, 712, 715 (6th Cir.1993). Moreover, the trial court again cautioned the jury to not let sympathy enter into their decisionmaking (Tr. at 2573).

The Court also finds that the prosecutor's statement regarding the role of defense counsel could have misled the jury. Nonetheless, the record indicates that this statement was isolated and brief. In comparison, the Sixth Circuit in *Sizemore* found that the prosecutor made frequent and deliberate remarks about the defendant's hiring of attorneys. *Id.*, 921 F.2d at 671. The prosecutor suggested that Mr. Sizemore hired an attorney to generate an alibi, and she appealed to class prejudice by pointing out Mr. Sizemore's expensive exhibits and multiple attorneys. *Id.* According to our review of the case law in this area, the facts of Petitioner's case fall more closely in line with *Lundy*, 888 F.2d at 474, in which the Sixth Circuit concluded that the prosecutor's improper questioning of defense counsel's integrity did not rise to a denial of the defendant's due process rights.

Finally, while the prosecutor's comment about the fact that the crime rate in the area declined after Petitioner's arrest could have misled the jury, the comment was isolated (Tr. at 2468). The comment likely came in response to the defense's attempt to show that similar robberies continued after Petitioner's arrest on October 12, 1984 (*see id.* at 2129–72). More-

over, the prosecutor followed his comment with a statement encouraging jurors to heed the trial court's instruction on how to consider the so-called similar robberies (*Id.* at 2468–69). This drew the jury's attention back to the question of whether Petitioner committed the so-called similar robberies and the issue of whether these robberies could be evidence of Petitioner's involvement in the Central Bar homicide (*see id.*). Again, the defense did not object to the prosecutor's comment.

In conclusion, after reviewing each misstatement of law and improper remark separately as well as considering the effect of all the remarks as a whole, the Court holds that these remarks by the prosecution did not deprive Petitioner of a fair trial. Accordingly, Petitioner's Claim Eleven is without merit. Furthermore, Petitioner fails to overcome his procedural default of Claim Eleven as he does not demonstrate that the alleged error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170, 102 S.Ct. 1584.

**CLAIM TWELVE**

**The trial court denied Petitioner his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to properly instruct the jury at the conclusion of the guilt phase of Petitioner's trial.**

■ Our December 21, 1998 Order (doc. 143) determined that this Claim is waived with the exception of the portion concerning the trial court's alleged failure to instruct the jury as to the lesser included offense of murder and the court's alleged improper instruction as to the definition of reasonable doubt. Petitioner shows cause for the procedural default of the portion of this Claim concerning the alleged failure to instruct the jury on the lesser included offense of murder because he had the same counsel at trial and on appeal. Therefore, this Court must now examine whether Petitioner can demonstrate actual prejudice. *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir.1986). In analyzing a petitioner's contention of prejudice under the *Maupin* standard, a federal court initially assumes that the petitioner states a meritorious claim. *Id.*, 785 F.2d at 138–39. The Court here assumes that the trial court's jury instructions denied Petitioner his right to a fair trial, a cognizable constitutional claim. *See id.* at 139–40. Given this assumption, the Court finds Petitioner would have been prejudiced by such a constitutional violation. Thus, Petitioner may properly raise this Claim. *Id.* We now examine the merits of Petitioner's Claim to determine whether a constitutional violation actually occurred. *See id.* at 140.

■ Petitioner assails the trial court's failure to instruct the jury on the lesser included offense of murder, arguing that the omission so diminished the reliability of the jury's verdict that his death sentence cannot now be constitutionally imposed. The trial court only instructed the jury on the lesser included offense of involuntary manslaughter (*see* Tr. at 2578–79), and defense counsel did not request an instruction on the lesser included offense of murder. In support of his argument that an instruction on the lesser included offense of murder was warranted nonetheless, Petitioner cites *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and *State v. Wilkins*, 64 Ohio St.2d 382, 415 N.E.2d 303 (1980). The Supreme Court announced in *Beck* that the Constitution requires a lesser included offense instruction if the evidence adduced at trial would support such a verdict. *Id.*, 447 U.S. at 637–38, 100 S.Ct. 2382. In *Wilkins*, the Ohio Supreme Court likewise held that "[i]f under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense, the instruction on the lesser included offense must be given." *Id.*, 64

Ohio St.2d at 388, 415 N.E.2d at 308; *see also State v. Thomas,* 40 Ohio St.3d 213, 214, 533 N.E.2d 286, 288 (1988).

The Supreme Court found that this safeguard is important in capital cases because "[t]he absence of a lesser included offense instruction increases the risk that the jury will convict, not because it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free." *Spaziano v. Florida,* 468 U.S. 447, 455, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). Petitioner argues that, in his case, the "jurors may have assumed that a guilty verdict on the much less serious offense of involuntary manslaughter was the equivalent of letting the 'defendant go free'" (doc. 188). Petitioner asserts that, in order to protect Petitioner from such an arbitrary finding, the trial court should have instructed the jury on the lesser included offense of murder.

However, the trial court at the conclusion of the guilt phase apparently concluded that no reasonable view of the evidence could have led the jury to find Petitioner guilty of the lesser included offense of murder as the trial court only instructed the jury on the lesser included offense of involuntary manslaughter. Later, on postconviction, the Hamilton County Court of Common Pleas agreed with the trial court. Before holding that the doctrine of res judicata barred a claim similar to this one in the state courts, the Hamilton County Court of Common Pleas recited this "finding of fact":

> The undisputed evidence that the bartender was found fatally beaten and kicked behind a bar with the cash register open and the money missing demonstrates that the crime committed was an aggravated murder and there was no reasonable basis in the record to conclude that the underlying felony was not committed by petitioner but the murder was committed by him. (T.p. 833, 834, 849, 1255)

*State v. Jamison,* No. B850379 (Sept. 9, 1991) (Return of Writ, Ex. N, at 22).

In addressing this portion of Claim Twelve, the Court must examine (1) Ohio Revised Code § 2903.02, "Murder"; (2) Ohio Revised Code § 2903.04, "Involuntary Manslaughter"; and (3) Ohio Revised Code § 2903.01(B), "Aggravated Murder." First, Ohio Revised Code § 2903.02(A) defines murder simply as a purposeful killing, stating, in pertinent part, that "[n]o person shall purposely cause the death of another." Secondly, Ohio Revised Code § 2903.04, "Involuntary Manslaughter", provides, in pertinent part, that "[n]o person shall cause the death of another ... as a proximate result of the offender's committing or attempting to commit a felony." Thirdly, Ohio Revised Code § 2903.01(B), "Aggravated Murder", states, in pertinent part, that "[n]o person shall purposely cause the death of another ... while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit ... aggravated robbery or robbery."

The statutory provisions of § 2903.02 "Murder" and § 2903.04 "Involuntary Manslaughter" define offenses that can be, under the right set of facts, lesser included offenses of § 2903.01(B) "Aggravated Murder." *See, e.g., Morris v. Mathews,* 475 U.S. 237, 241–42, 106 S.Ct. 1032, 89 L.Ed.2d 187 (1986); *State v. Williams,* 74 Ohio St.3d 569, 574, 660 N.E.2d 724, 730 (1996); *State v. Solomon,* 66 Ohio St.2d 214, 219–20, 421 N.E.2d 139, 142–43 (1981) (citing *Wilkins,* 64 Ohio St.2d at 384, 415 N.E.2d at 306). Nevertheless, having reviewed the entire trial record, the Court finds that the facts of Petitioner's case would not require an instruction on the lesser included offense of murder. The evidence adduced during Petitioner's trial essentially precluded such an instruction because no reasonable view of the evidence could lead to a conclusion that a robbery did not take place at the Central Bar on August 1, 1984. *See Spaziano,* 468 U.S. at 455–56, 104 S.Ct. 3154 ("Requiring that the jury be instructed on lesser included offenses for which the defendant may not be

convicted ... would simply introduce another type of distortion into the factfinding process."). For instance, witnesses to the scene of the crime testified that they saw an open, and empty, cash register; they found the bar owner unconscious on the floor near where the cash register stood (*see* Tr. at 833–34, 852–53, 879, 881–82).

Moreover, Petitioner's defense sought to raise doubts among the jurors as to (1) whether Petitioner was present at all during the robbery at the Central Bar on August 1, 1984; and (2) if he was present, whether he was the principal offender of the robbery and physical violence. Besides a brief statement during closing arguments (*Id.* at 2490–91), the defense did not focus in any detail on whether a robbery actually took place at the Central Bar. With respect to Petitioner's culpability, then, the issues became whether Petitioner took part in the Central Bar robbery, and, if he did participate, whether he purposely or proximately caused the victim's death. Thus, the trial court properly gave the jury a choice between a specific intent crime, aggravated murder, and a proximate causation crime, involuntary manslaughter. However, because reasonable minds could not differ as to whether a robbery took place that day at the Central Bar, a conviction under Ohio Revised Code § 2903.02, "Murder", could not stand. Accordingly, this Court concludes that the trial court's failure to instruct the jury on the lesser included offense of murder did not deny Petitioner a fundamentally fair trial.

 Petitioner further contends that the trial court erred when the court allegedly instructed the jury that it had to first determine unanimously that Petitioner was not guilty of aggravated murder before it could consider the lesser included offense of involuntary manslaughter (*see* Tr. at 2581–82). The trial court's instruction read, in pertinent part:

Method of deliberation as to aggravated murder. If, after considering all the evidence, you find that the prosecution

has proved all the essential elements of aggravated murder, Count One, you will sign the appropriate verdicts and also determine whether the prosecution has proved the specifications beyond a reasonable doubt.

If you find as to Count One that the prosecution has failed to prove any one of the essential elements of aggravated murder, you will then proceed to consider the lesser included offense of involuntary manslaughter.

(*Id.*). The Ohio Supreme Court dealt with a similar instruction in *Thomas,* 40 Ohio St.3d at 220, 533 N.E.2d at 293, and found that the instruction had "negligible coercive potential because it [spoke] to the jury's inability to find, whether unanimously or not, a certain element of the greater offense." *Id.*

The instruction in Petitioner's case also did not expressly require a unanimous acquittal on the charged offense. *Cf. Mapes v. Coyle,* 171 F.3d 408, 416–17 (6th Cir. 1999) (concluding that the trial court erred in the penalty phase by specifically requiring the jury to unanimously reject the death penalty before considering a life sentence); *State v. Brooks,* 75 Ohio St.3d 148, 661 N.E.2d 1030, 1041 (1996) (holding that an acquittal-first instruction violates the Eighth and Fourteenth Amendments). While the Ohio Supreme Court now prefers instructions telling a jury that if it is unable to unanimously agree on the charged offense, it may move on to consider a lesser included offense, *Thomas,* 40 Ohio St.3d at 220–21, 533 N.E.2d at 293, this Court concludes that the instruction provided by the trial court in Petitioner's case did not deny him a fundamentally fair trial. *See Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

Accordingly, the portion of Claim Twelve addressing the failure of the trial court to instruct the jury on the lesser included offense of murder is without merit. Furthermore, Petitioner fails to over-

come his procedural default of this portion of Claim Twelve as he does not demonstrate that the alleged error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170, 102 S.Ct. 1584.

### CLAIM SIXTEEN

**The trial court denied Petitioner his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the U.S. Constitution by failing to give proper sentencing instructions in the sentencing phase.**

▆ Petitioner asserts that the trial court failed to properly charge the jury with respect to parole eligibility, reasonable doubt, and mitigating factors, thereby denying Petitioner his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments. Petitioner argues that the trial court's errors led to an arbitrary and capricious imposition of death. The Court determined in our December 21, 1998 Order (doc. 143) that Petitioner shows cause for the procedural default of the portion of this Claim involving the trial court's parole eligibility instruction because he had the same counsel at trial and on appeal. Therefore, this Court must now examine whether Petitioner can demonstrate actual prejudice. *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir.1986). We note that the portions of this Claims addressing the instructions on reasonable doubt and mitigating factors are dealt with within the merits of Claim Seventeen, Ineffective Assistance of Appellate Counsel.

In analyzing a petitioner's contention of prejudice under the *Maupin* standard, a federal court initially assumes that the petitioner states a meritorious claim. *Id.*, 785 F.2d at 138–39. The Court here assumes that the trial court's jury instructions denied Petitioner his right to a fair trial, a cognizable constitutional claim. *See id.* at 139–40. Given this assumption, the Court finds Petitioner would have been prejudiced by such a constitutional violation. Thus, Petitioner may properly raise this Claim. *Id.* We now examine the merits of Petitioner's Claim to determine whether a constitutional violation actually occurred. *See id.* at 140.

In addressing constitutional concerns arising out of capital punishment, the Supreme Court distinguishes between the "eligibility decision" and the "selection decision." *Tuilaepa v. California*, 512 U.S. 967, 971, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). The jury's eligibility decision involves the question of whether a defendant is eligible for the death penalty. *Id.* In a homicide case such as Petitioner's, for instance, the jury must convict the defendant of murder and find one " 'aggravating circumstance' " during the guilt or penalty phase for the defendant to be eligible for the death penalty. *Id.* at 972, 114 S.Ct. 2630. In the eligibility decision, the Supreme Court emphasizes the "need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition". *Buchanan v. Angelone*, 522 U.S. 269, 275–76, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998).

With regard to the selection decision, the Supreme Court broadens the inquiry to include "all relevant mitigating evidence to allow an individualized determination" on the basis of the defendant's character and the actual facts of the crime. *Id.* at 276, 118 S.Ct. 757; *see also Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (concluding that "an individualized decision is essential in capital cases"); *Woodson v. North Carolina*, 428 U.S. 280, 303–304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (plurality opinion). The Supreme Court requires the sentencer making the selection decision to consider "any constitutionally relevant mitigating evidence," and the Court allows a state to "shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any

relevant mitigating evidence." *Buchanan,* at 276. In fact, the Supreme Court decisions dealing with the selection decision "suggest that complete jury discretion is constitutionally permissible." *Id.* at 276–77, 118 S.Ct. 757 (citing *Tuilaepa,* 512 U.S. at 978–79, 114 S.Ct. 2630; *Zant v. Stephens,* 462 U.S. 862, 875, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)).

■ Thus, in determining whether a state court's jury instructions satisfy constitutional principles as to the selection decision, a federal court asks "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); *see also Estelle v. McGuire,* 502 U.S. 62, 72–73, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Supreme Court cautions that, irrespective of the distinguishing features of the eligibility decision and the selection decision, one principle is common to both: "The State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Tuilaepa,* 512 U.S. at 973, 114 S.Ct. 2630 (citing *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (finding that capital procedures must "minimize the risk of wholly arbitrary and capricious action")); *see also Furman v. Georgia,* 408 U.S. 238, 257, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (plurality opinion).

■ Having discussed generally the standards involved in addressing the issues brought by Petitioner in Claim 16, the Court now addresses the challenged instruction on parole eligibility to decide whether the instruction prevented the jury's consideration of constitutionally relevant evidence. *Boyde,* 494 U.S. at 380, 110 S.Ct. 1190. In our analysis, we take into consideration the fact that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*

*v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973) (citing *Boyd v. United States,* 271 U.S. 104, 107, 46 S.Ct. 442, 70 L.Ed. 857 (1926)).

In instructing the jury on its sentencing duty, the trial court explained that:

> If you find that the prosecutor has proved beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factors, then you must recommend the death penalty to the Court. If you find that the prosecution has failed to prove beyond a reasonable doubt that the aggravating circumstance outweighes [sic] the mitigating factors, then you must recommend a life sentence to the Court, and you must further recommend either a 30–year parole eligibility or a 20–year parole eligibility.

(Tr. at 2760–61). Petitioner asserts that the trial court failed to instruct the jury that Petitioner would only be eligible for parole after serving the full thirty or twenty years. *See also* Ohio Rev.Code § 2929.03. According to Petitioner, this infringed on his constitutional rights as set forth in *Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), and *Simmons v. South Carolina,* 512 U.S. 154, 161, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), because the jury did not receive accurate information regarding the law upon which it was to base its recommended sentence.

In *Simmons,* the Supreme Court held that, because the prosecution had suggested that the defendant would pose a future danger to society if he were not executed, the trial court's refusal to instruct the jury that life imprisonment of the defendant would carry no possibility of parole violated the defendant's Fourteenth Amendment due process rights. *Id.,* 512 U.S. at 161–62, 114 S.Ct. 2187 (reaching no opinion on whether the Eighth Amendment required the same result). The Supreme Court wrote that this "had the effect of creating a false choice between sentencing [the defendant] to death and sentencing him to a

limited period of incarceration." *Id.* at 161, 114 S.Ct. 2187. The trial judge essentially concealed "the true meaning of [the state's] noncapital sentencing alternative, namely, that life imprisonment meant life without parole." *Id.* at 162, 114 S.Ct. 2187.

Petitioner's case, however, is distinguishable. The trial court did not conceal the "true meaning" of Ohio's noncapital sentencing alternative simply by failing to describe that Petitioner would be required to serve at least twenty to thirty years prior to parole. Arguably without clarity, the trial court's instruction indicates that the jury could decide in the alternative to recommend release after twenty or thirty years of imprisonment. This left the jury the ability to weigh Petitioner's future dangerousness with the idea that Petitioner could be eligible years later for parole. Thus, the challenged instruction did not prevent the consideration of any constitutionally relevant evidence or unconstitutionally create bias in sentencing.

Accordingly, the portion of Claim Sixteen addressing the trial court's instruction on parole eligibility is without merit. Furthermore, Petitioner fails to overcome his procedural default of this portion of Claim Sixteen as he does not demonstrate that the alleged error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170, 102 S.Ct. 1584.

### CLAIM FOUR

**The actions of trial counsel deprived Petitioner of the right to the effective assistance of counsel during the innocence-guilt phase of his case in violation of his Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

### CLAIM THIRTEEN

**Petitioner was denied the effective assistance of counsel during the mitigation phase of his trial as guaranteed by the Fifth, Sixth, Eighth and Four-teenth Amendments to the United States Constitution.**

The Court held in the December 21, 1998 Order that we may reach the merits of Claim Four because Petitioner established that the procedural default rule enforced by the state courts is inadequate to bar federal habeas review (doc. 143). Claim Thirteen escapes procedural default as the state courts addressed the issue of ineffective assistance of counsel in the penalty phase on the merits during post-conviction review. Specifically as to Claim Four, we held that no clearly established precedent required Petitioner to raise an ineffective assistance of trial counsel claim on direct appeal where one of his trial attorneys also served as one of his appellate counsel (*Id.*). Alternatively, the Court held that, even assuming the procedural default rule is adequate, we can reach the merits of these claims (1) because the conflict created by the fact that one of his trial counsel served as one of his appellate counsel demonstrates cause for Petitioner's procedural default; or, (2) depending on whether Petitioner's Claim Seventeen is meritorious, because ineffective assistance of appellate counsel may demonstrate cause for Petitioner's procedural default.

Under this alternative theory, Petitioner bears the burden of showing prejudice sufficient to overcome an adequate state procedural default rule. *See United States v. Frady*, 456 U.S. 152, 169, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir. 1986). The Sixth Circuit in *Maupin* instructs us that, in analyzing a contention of prejudice, we should assume that the petitioner states a meritorious constitutional claim and then ask whether petitioner would have been prejudiced by the alleged error. *Id.*, 785 F.2d at 139. Here, the Court assumes that Petitioner states a meritorious ineffective assistance of counsel claim, a cognizable constitutional claim. Given this assumption, we conclude that Petitioner would have been prejudiced by

such a constitutional violation. *See id.* at 139–40. Accordingly, the Court now reaches the merits of Claim Four. Because Claim Four and Claim Thirteen rely on essentially the same theory of law and involve the same attorneys, we address these claims together.

### I. The Strickland Standard

■ The Sixth Amendment provides, in pertinent part, that, "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is " 'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.' " *Gideon v. Wainwright,* 372 U.S. 335, 340, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (quoting *Betts v. Brady,* 316 U.S. 455, 465, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *see also Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

According to the Supreme Court, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052; *Combs v. Coyle,* 205 F.3d 269, 277 (6th Cir.2000) (quoting same). A two-prong test directs a court's evaluation of a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that

counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *see also Combs,* 205 F.3d at 277; *Tucker v. Prelesnik,* 181 F.3d 747, 754 (6th Cir.1999); *Chandler v. Jones,* 813 F.2d 773, 781 (6th Cir.1987).

■ The performance prong of the *Strickland* test requires a petitioner raising a claim of ineffectiveness on habeas review to show that the counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052; *see also Kimmelman v. Morrison,* 477 U.S. 365, 386, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). As the Sixth Circuit noted, "[j]udicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.' " *Combs,* 205 F.3d at 278 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). The Supreme Court cautions against a determination of ineffectiveness based on the tactical choices of an attorney, emphasizing that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052; *see also Kimmelman,* 477 U.S. at 384–85, 106 S.Ct. 2574; *Combs,* 205 F.3d at 278 (quoting same); *Meeks v. Bergen,* 749 F.2d 322, 328 (6th Cir.1984).

■ If the petitioner shows that the counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strick-*

*land* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The Supreme Court explained that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (citing *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052); *see also Combs,* 205 F.3d at 278 (quoting same); *Tucker,* 181 F.3d at 754–55; *Chandler,* 813 F.2d at 781–82.

In this case, Petitioner asserts he was denied effective assistance of counsel during both the guilt and penalty phases of his capital trial. The Court examines each claim separately below.

## II. Claim Four: Assistance of Counsel in Guilt Phase

In early 1985, Judge Thomas H. Crush of the Hamilton County Court of Common Pleas appointed William E. Flax and Calvin W. Prem to represent Petitioner at his capital trial (*see* 1999 Hearing Tr. at 9). Underpinning Petitioner's habeas claim that Mr. Flax and Mr. Prem denied him effective assistance of counsel during the guilt phase of his trial is Petitioner's assertion that his counsel failed to meet these allegedly prevailing norms for capital representation:

- Interview all crucial witnesses;

- Conduct a detailed factual investigation;

- Request appointment of all necessary experts;

- File motions and notices as warranted by the evidence and state criminal law; and

- Raise appropriate objections at trial to preserve issues for appeal in state court and habeas review in federal court.

(doc. 188). Petitioner further contends that his trial counsel, who he alleges were inexperienced in capital litigation, should have sought help from the Ohio Public Defender's Office (hereinafter, the "O.P.D."). According to Petitioner, the O.P.D. could have provided his counsel with investigators, forensic experts, and mitigation specialists as well as education on capital litigation issues, techniques, and practices.

More specifically, Petitioner asserts that his trial counsel were ineffective in 1985 for failing to (1) conduct adequate pretrial factual investigation; (2) engage in meaningful discovery; (3) timely request the appointment of experts or investigators; (4) timely file suppression motions related to witness identification testimony, Petitioner's pretrial statement, and shoe print evidence; · (5) request the prior felony specification be tried to the court; (6) file a notice of alibi; (7) object to the prosecution's misleading statements in voir dire or ask prospective jurors about relevant issues; (8) object during trial to identification testimony, shoe print evidence, hearsay testimony, prosecutorial misconduct, and certain jury instructions; (9) request that the trial court instruct the jury on aspects of parole and sentencing, the lesser included offense of murder, the defense of alibi, and the problems inherent in eyewitness testimony; and (10) realize the error of allowing the listing of statutory mitigating factors to the jury.

In contrast, Respondent contends that an informed strategy supported many of the decisions made by Petitioner's counsel during the trial (doc. 164). With regard to Petitioner's argument that his counsel should have requested that the trial court, rather than the jury, try the prior felony specification, Respondent argues that presenting the convictions to the jury early in the proceedings was a "highly informed tactical decision" because it reduced the

impact of Petitioner's criminal record at sentencing (*Id.*). Respondent also asserts that Petitioner's counsel made a tactical decision not to file a notice of alibi. An element of surprise, Respondent states, allowed the defense to present alibi testimony from an arguably unreliable witness and prevented the prosecution from effectively cross-examining the witness as to the alibi. According to Respondent, Petitioner's counsel also decided not to object when the evidence or testimony actually worked to the advantage of the defense. In addition, Respondent disputes Petitioner's impression that his counsel failed to adequately voir dire prospective jurors. Respondent further maintains that Petitioner's counsel engaged in effective questioning and cross-examination of trial witnesses.

After reviewing the record presented to this Court on habeas review, the Court agrees with Respondent that a reasonable trial strategy informed most of the decisions made by Petitioner's counsel. In addition, for the times in which the Court cannot discern a reasonable tactic or strategy for trial counsel's action or inaction, the Court finds Petitioner was not prejudiced as a result. Therefore, based on the following analysis, this Court finds Claim Four to be without merit.

To begin, the Court observes that Petitioner's defense strategy appeared to be twofold. His counsel sought to raise doubts among the jurors as to (1) whether Petitioner was present at all during the robbery at the Central Bar on August 1, 1984; and (2) if he was present, whether he was the principal offender of the robbery and homicide. These are viable defenses, especially given the scant physical evidence tying Petitioner to the scene of the crime and the fact that the prosecution relied upon the testimony of an alleged accomplice as well as a string of so-called similar robberies to prove Petitioner's level of participation in the crime. Petitioner's counsel repeatedly attempted to keep out the evidence related to the so-called similar robberies by asserting that the robberies failed to fit a pattern sufficient to constitute admissible evidence of identity. After accepting, though, that the trial court would not suppress the testimony about the so-called similar robberies, counsel sought to emphasize Petitioner's involvement in the crimes in which the victims did not suffer head injuries. By so doing, counsel sought to raise doubts among the jurors as to whether the alleged pattern of physical violence could allow them to identify Petitioner as the assailant of the Central Bar robbery/homicide. Petitioner's counsel also brought out the weaknesses in the shoe print evidence, and they attempted to discredit the testimony of the alleged accomplice, Charles Howell.

█ Returning now to Petitioner's claim of ineffective assistance of counsel, we find that Petitioner fails to convince the Court that his counsel did not conduct reasonable pretrial investigation or discovery under the circumstances. *See Futch v. Dugger*, 874 F.2d 1483, 1486 (11th Cir. 1989) (noting that a counsel's pretrial investigation is evaluated by examining reasonableness under the circumstances). Mr. Flax testified during the July 7–9, 1999 Hearing that Petitioner was "relatively incommunicative" (1999 Hearing Tr. at 26), and we do not know what, if anything, Petitioner told his counsel prior to trial about possible defense witnesses or documentary evidence. Certainly, though, Petitioner cannot assert that his counsel did not engage in any pretrial discovery or investigation, and no law in 1985 required his counsel to hire an investigator or contact the O.P.D. for help. Prior to trial, Petitioner's trial counsel hired Larry Dehus, a criminalist. Mr. Dehus interviewed witnesses, took pictures of relevant crime scenes, reconstructed a number of the so-called similar robberies for the defense team to consider, and examined shoe print and fingerprint evidence (*see id.* at 149–50). Mr. Flax explained that he and Mr. Prem attempted to stay within a "fairly

tight budget" in preparing Petitioner's defense, and Mr. Flax stated that he was never disappointed in the quality or quantity of work done by Mr. Dehus (*Id.* at 149–50, 187–88).

Mr. Flax further testified that, before the trial began, he and Mr. Prem researched relevant legal issues (*see id.* at 165), and they sought more information from the Cincinnati Police Department about the police questioning of alleged accomplice Charles Howell (*see id.* at 204, 207). Along the way, Mr. Flax stated, Petitioner's counsel "were stonewalled" in their efforts (*Id.* at 204). Petitioner asserts that his counsel also should have been investigating a possible alibi defense. During the 1985 trial, Petitioner's counsel told the trial court that they did not investigate or interview the witnesses who sought to offer an alibi defense for Petitioner (Tr. at 2177–80). Nevertheless, Petitioner fails to show the Court how, if Petitioner was "relatively incommunicative", his counsel could have discovered the existence and name of his girlfriend or known that she might have relevant evidence concerning his whereabouts at the time of the Central Bar robbery/homicide. Thus, the Court concludes that Petitioner's counsel generally acted within the range of professionally competent assistance in their preparation for the 1985 capital trial.

 Beyond the pretrial investigation, Petitioner also assails his counsel's examination of prospective jurors during the voir dire. However, after reviewing the transcript, the Court finds that Petitioner's counsel engaged in a meaningful exploration of the prospective panel of jurors. Importantly, Petitioner's counsel sought to ensure that the prospective jurors believed in the presumption of innocence, could decide the facts impartially, and accepted that they had to follow the law as provided them by the trial court judge. Therefore, we concluded that Petitioner's counsel did not render ineffective representation during the voir dire.

 Moreover, with the understanding that resources and time are not limitless, the Court finds that Petitioner's counsel acted objectively reasonably by deciding to demonstrate the weaknesses of the shoe print evidence to the jury rather than to prepare a suppression motion. In addition, because Petitioner fails to demonstrate that he did not orally waive his right to remain silent, this Court finds that Petitioner's counsel acted objectively reasonably in not filing a motion to suppress Petitioner's pretrial statement. Petitioner also does not convince this Court that his counsel's decision not to seek a bifurcation of the prior felony conviction amounted to ineffective representation. As Respondent pointed out, Petitioner's counsel may have sought to reduce the possible impact of the prior conviction on sentencing. Petitioner's counsel may have also wanted to give the jury the sense that Petitioner did not seek to hide from his criminal violations, hoping perhaps the jury would accordingly put more trust in Petitioner's denial of any involvement in the robberies and episodes of physical violence at the Central Bar, Acres of Books, Metropolitan Gallery, and Sav–All Discount Drug Store.

 The failure of Petitioner's counsel to file a timely motion to suppress certain identification testimony is a more difficult issue for the Court. Petitioner's counsel moved to strike the identification testimony of the so-called similar robbery witnesses and victims after listening to June Rensler, a victim of the Rensler Portrait Studio robbery, discuss before the jury the line-up procedures employed by the Cincinnati Police Department on October 15, 1984 (Tr. at 1669–71, 1677) (*see also, infra,* our discussion of Claim Three). Attempting to explain why the defense did not seek to suppress the information earlier, Mr. Flax told the trial court that:

[O]ur position is that—to file a motion on a line-up that took place in another case and had nothing do with this case before the trial of this case, because of some speculation on what they might do

on the same and similar thing, is not required of the defense by the rules. We're entitled to respond to what comes in evidence at the time we feel it's tainted.

(Tr. at 1678).

Nonetheless, before moving to strike the identification testimony, Petitioner's counsel asserted to the trial court that Petitioner should be granted a mistrial (*Id.* at 1661–69) because the evidence related to the so-called similar robberies at the Rensler Portrait Studio and Acres of Books did not adequately resemble the crime allegedly committed at the Central Bar (*Id.* at 1663–64). Once the trial court denied this motion, Petitioner's counsel reminded the trial court of an in-chambers discussion of the line-up issue and then moved to strike any testimony related to the line-up (*Id.* at 1669–71). The timing of these motions indicates to the Court that Petitioner's counsel may have brought up the line-up issue in order to bolster their arguments related to the suppression of the so-called similar robbery evidence—a last ditch effort of sorts. Nothing in this strategy, however, indicates to this Court the strength of the convictions of Petitioner's counsel related to the line-up issue.

If, alternatively, as Petitioner contends, his counsel failed to discover the allegedly improper line-up procedures prior to trial, then the Court agrees with Petitioner that this failure falls below minimum standards of professional competence. An objectively reasonable attorney would have looked into the circumstances of a recent line-up of a client charged with a capital offense and brought any relevant and meritorious legal issues before the trial court in a timely manner. Nevertheless, because our examination in Claim Seventeen, *infra*, of the allegedly improper identification procedures (Claim Three) leads us to find that pretrial identifications bear indicia of reliability, we conclude that Petitioner cannot meet the prejudice prong of the *Strickland* test with relation to this evidence. In short, our confidence in the result of the guilt phase of Petitioner's trial is not undermined due to his counsel's failure to seek the suppression of the identification testimony.

With regard to the failure of Petitioner's counsel to object to certain evidence, misstatements of law, and jury instructions, the Court must ask "whether the use of the statement was constitutionally defective such that any reasonable counsel would have objected under the circumstances." *Combs,* 205 F.3d at 279. In Claim Eleven, *supra*, we find that the prosecution misstated Ohio law during the voir dire and closing arguments; we also find that the trial court correctly instructed the jury on the law and admonished the jury not to consider the attorneys' arguments as law. The trial court's curative instructions ensured that the misstatements did not become violations of constitutional proportions, but without any help from Petitioner's counsel. The Court cannot conceive of any reasonable tactic that would lead Petitioner's counsel to be silent as to the misstatements of law by the prosecution during voir dire and closing arguments, and we find the failure to object to be unreasonable. Nonetheless, because we hold in Claim Eleven, *supra*, that this prosecutorial misconduct did not deny Petitioner a fundamentally fair trial, we conclude here that Petitioner cannot satisfy the prejudice prong of the *Strickland* test with regard to his counsel's failure to object to the prosecution's misstatements of law.

Moreover, even if we accept Petitioner's characterization of certain evidence as inadmissible under state evidentiary rules and Petitioner's counsel as ineffective for failing to object to these evidentiary errors, the Court's confidence in the result of the guilt phase of Petitioner's trial is not so undermined due to this ineffectiveness that we can find the prejudice prong of the *Strickland* test satisfied. We hold in preceding sections that Claim Twelve,

concerning the failure of the trial court to instruct the jury on the lesser included offense of murder, and Claim Nine, involving the admission of photographic and shoe print evidence, fail to state meritorious constitutional violations. If the very things that Petitioner argues his counsel should have objected to, or asked for, do not reach violations of constitutional proportions, then his counsel's failure to object to, or ask for, these things did not prejudice Petitioner. Our examination in Claim Seventeen, *infra*, of Claim Five, regarding the trial court's exclusion of alibi testimony, Claim Nine, addressing the allegedly improper admission of hearsay testimony, and Claim Twelve, concerning the trial court's instructions on reasonable doubt and mitigating factors, does not leave us with lingering doubts as to whether the alleged failures of Petitioner's counsel related to this evidence led to a fundamentally unfair result in the guilt phase of his trial.

Accordingly, in sum, the Court holds that Claim Four, alleging ineffective assistance of trial counsel in the guilt phase, is without merit.

### III. Claim Thirteen: Assistance of Counsel in Penalty Phase

The responsibility of trial counsel to ensure that a capital defendant receives legal assistance sufficient to protect his or her right to a fair trial continues into the sentencing, or penalty phase, of a capital trial. According to the Supreme Court, a capital sentencing proceeding "is sufficiently like a trial in its adversarial format and in the existence of standards for decision ... that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Strickland,* 466 U.S. at 686–87, 104 S.Ct. 2052 (citations omitted). Moreover, as the Seventh Circuit observed, the importance of effective assistance of counsel during

the penalty phase should not be underestimated because, "in some cases, this may be the stage of the proceedings where counsel can do his or her client the most good." *Kubat v. Thieret,* 867 F.2d 351, 369 (7th Cir.1989).

As with a claim of ineffective assistance of counsel in the guilt phase, a petitioner alleging ineffective assistance in the penalty phase must satisfy the two-prong test set forth in *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. This test requires the petitioner to demonstrate that the counsel's performance fell below an objective standard of reasonableness and that the deficient performance rendered the result of the sentencing proceeding unreliable or fundamentally unfair. *Id.; see Lockhart,* 506 U.S. at 372, 113 S.Ct. 838; *see also Glenn v. Tate,* 71 F.3d 1204, 1206 (6th Cir.1995); *Scott v. Anderson,* 58 F.Supp.2d 767, 810–11 (N.D.Ohio 1998) (rev'd on other grounds *Scott v. Mitchell,* 209 F.3d 854, 879–80 (6th Cir.2000)). In reviewing the assistance of counsel at a capital sentencing proceeding, a district court should approach the analysis of the performance prong with a view toward the fact that the "Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner." *Boyde v. California,* 494 U.S. 370, 377–78, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); *see Scott,* 58 F.Supp.2d. at 810–11 (quoting same); *see also Williams v. Taylor,* —— U.S. ——, ——, 120 S.Ct. 1495, 1513, 146 L.Ed.2d 389 (2000) (finding that the petitioner had an undisputed, constitutionally-protected right "to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer").

In Ohio, a jury considers the facts and circumstances of the crime and the character and background of the capital defendant during the penalty phase. This phase allows a defendant to present "evidence of any factors in mitigation of the imposition of the sentence of death." Ohio Rev.Code § 2929.03(D)(1). If this

mitigation evidence is insufficient, the jury is required to recommend to the trial court that the defendant receive a death sentence. Ohio Rev.Code § 2929.03(D)(2). Therefore, the investigation and presentation of mitigation evidence "is literally of life and death importance." *O'Guinn v. Dutton,* 88 F.3d 1409, 1424 (6th Cir.1996) (Merritt, C.J., concurring). In addition, the failure of counsel to investigate or present mitigating evidence may constitute ineffective assistance of counsel. *See Williams,* ― U.S. at ――, 120 S.Ct. at 1516 (concluding that the petitioner was denied effective assistance of counsel when his counsel failed to investigate or present substantial mitigating evidence during the sentencing proceeding); *Byrd v. Collins,* 209 F.3d 486, 525 (6th Cir.2000); *Austin v. Bell,* 126 F.3d 843, 848–49 (6th Cir.1997) (finding counsel who failed to investigate or present mitigating evidence despite its availability ineffective); *Glenn,* 71 F.3d at 1207–08 (holding that counsel acted objectively unreasonably when they waited until after the verdict to prepare for the sentencing phase and then conducted inadequate investigation into mitigation evidence).

■■■ Moderating this inquiry into the reasonable preparation for the penalty phase of a capital trial is the understanding that resources may be limited and that attorneys must accordingly make informed, tactical decisions about the pursuit and presentation of mitigation evidence. *Scott,* 58 F.Supp.2d at 811; *see also Smith v. Collins,* 977 F.2d 951, 960 (5th Cir.1992). For instance, trial counsel may decide to forego the presentation of some mitigation evidence "because the evidence carries with it the danger of negatively influencing the jury." *Scott,* 58 F.Supp.2d at 811; (citing *Gerlaugh v. Stewart,* 129 F.3d 1027, 1033 (9th Cir.1997) (finding that counsel made a reasonable decision not to introduce evidence that the defendant cared for a friend's pets "because it could indicate that although [he] was capable of compassion, he reserved it for animals, not human

beings"); *Meeks v. Bergen,* 749 F.2d 322, 328 (6th Cir.1984) (finding that counsel made a reasonable strategic decision based on the facts of the case to assert self-defense rather than a battered wife defense)). Nonetheless, "a failure by trial counsel to actually investigate his options regarding presentation of mitigating circumstances, and the failure to make a thoughtful, strategic choice, is objectively unreasonable." *Scott,* 58 F.Supp.2d at 811.

If a petitioner proves that his counsel acted objectively unreasonably in their investigation and presentation of mitigating evidence during the penalty phase of his trial, a petitioner must next demonstrate that his counsel's ineffectiveness prejudiced him *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052. The prejudice prong of the *Strickland* test requires a petitioner to show a "reasonable probability" that, "but for his counsel's unprofessional errors," the results would have been different. *Id.* According to the Sixth Circuit, a court must ask " 'whether counsel's conduct so undermined the proper functioning of the adversarial system that the trial [a term that includes capital sentencing proceedings] cannot be relied upon as having produced a just result.' " *Glenn,* 71 F.3d at 1210–11 (quoting *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052) (citations omitted) (brackets in original).

The penalty phase of Petitioner's trial began October 15, 1985, three days after the jury announced its verdicts in the guilt phase (*see* Tr. at 2609, 2615). Because the three days fell over the Columbus Day holiday, Petitioner's counsel lacked even one business day between the guilt and penalty phases of the trial. Petitioner asserts that his trial counsel failed to meet the following alleged prevailing norms for the practice of an attorney during the penalty phase of a capital trial:

● Conduct pretrial investigation of penalty phase witnesses, issues, and mitigating factors;

● Gather all relevant records;

• Seek the assistance of a mitigation specialist to interview all family members, school teachers, relatives, and friends;

• Request the appointment of a psychologist;

• Develop a penalty phase strategy prior to voir dire; and

• Prepare all witnesses regarding the goal of mitigation.

(doc. 205). Petitioner contends that his counsel's representation fell below these minimum standards, alleging that they (1) failed to conduct a mitigation investigation; (2) failed to voir dire jurors on mitigation factors; (3) failed to identify, interview, or prepare witnesses for the penalty phase; and (4) failed to seek the assistance of a psychologist and mitigation specialist.

Petitioner draws the Court's attention to the statements of Dr. Susan Shorr, a mitigation specialist who testified on behalf of Petitioner at a hearing before this Court on January 11, 2000. Dr. Shorr stated that she believed a defense attorney needs a minimum of three months to prepare for the penalty phase of a capital trial (see doc. 205). Dr. Shorr further asserted on January 11, 2000 that a mitigation specialist, whom Petitioner's counsel did not hire, is an essential member of a capital defense team who helps develop a coordinated strategy for the guilt phase and penalty phase of a capital trial. Petitioner assails his counsel's failure to engage such a specialist, and he argues that he was prejudiced because his counsel failed to consider issues related to mitigation until the holiday weekend preceding the penalty phase of his trial. In fact, Petitioner alleges, the preparation for the penalty phase of his capital trial began as an afterthought and ended after only three days.

In his affidavit, Mr. Flax states that he asked Petitioner's sister the day the jury announced its verdicts to locate witnesses who would voluntarily come forward and testify during the penalty phase (doc. 103, Vol. 1, Flax Aff. at ¶¶ 15–17). The record indicates that neither Mr. Flax nor Mr.

Prem met with any of the character witnesses prior to their testimony during the penalty phase. To wit, Mr. Flax introduced himself to each witness and made a point of indicating on the record that he had not spoken previously with the witnesses (Tr. at 2620, 2624, 2668, 2671–72, 2674). Moreover, the prosecution, and not the defense, brought up the subject of a mental examination of Petitioner following the reading of the jury's verdicts (Id. at 2610). At this last minute, Petitioner's counsel decided to seek such an examination pursuant to Ohio Revised Code § 2929.03(D)(1), a statutory provision that requires the appointed psychologist to disclose the written results of the examination to the prosecution, jury, and trial court (Id. at 2610–12).

Nonetheless, this case is not one in which the inaction of trial counsel amounted to a total "abdication of advocacy." Austin, 126 F.3d at 849 (finding that trial counsel failed to conduct an adequate investigation and failed to present any mitigation evidence). During the penalty phase of Petitioner's trial, Petitioner's counsel questioned nine character witnesses, one psychiatrist, and the Petitioner himself. According to the findings of the Hamilton County Court of Common Pleas on post-conviction review, the witnesses presented the following evidence in mitigation:

(1) Petitioner's father was an alcoholic who abandoned his family when Petitioner was five years old (Tr. at 2643–81);

(2) Petitioner's mother suffered from a long illness that limited her parenting abilities (Id. at 2644);

(3) As a child, Petitioner was a loner who only spoke when spoken to and who had difficulty interacting with other children (Id. at 2665); he was often the object of ridicule (Id. at 2622, 2645, 2656–57, 2673);

(4) Family members and friends testified that Petitioner was a "slow

learner" who was easily confused and who was often influenced by others (*Id.* at 2622–25, 2629, 2660);

(5) Dr. Nancy Schmidtgoessling testified that Petitioner's I.Q. score put him in a below–average intelligence range (*Id.* at 2643, 2649); that Petitioner began stealing as a child (*Id.* at 2651); that Petitioner appreciated the criminality of his actions (*Id.* at 2652); and that he was competent and sane (*Id.* at 2651–53). She also testified about his substance abuse (*Id.* at 2646);

(6) Friends of the Jamison family testified that Petitioner cared about his family (*Id.* at 2669), and that he could be respectful to others;

(7) Parole officer Charles Houston testified that, while Petitioner completed a training program during parole, he also generally lacked self–initiative (*Id.* at 2628, 2634, 2675);

(8) Petitioner testified on his own behalf, confirming much of the above, admitting to the so–called similiar robberies at Gold Star Chili, Curve Café, Kings News, Rensler Portrait Studio, and denying any involvement in the robberies at the Sav–All Discount Drug Store, Metropolitan Gallery, Acres of Books, and Central Bar. Petitioner also stated that he needed money to support a drug habit (*Id.* at 2678–2720).

(*See* Return of Writ, Ex. N).

Missing from this presentation, Petitioner contends, is evidence of Petitioner's alleged organic brain disorder and severe substance abuse problem (*see* doc. 205). Petitioner asserts that Dr. Schmidtgoessling lacked the time and resources necessary for a reasonable mental examination due to the ineffectiveness of his counsel in requesting the examination of Petitioner only three non-business days before the penalty phase began (*see* doc. 85, Vol. 1, Schmidtgoessling Dep. at 26–27, 133–34, 144–45). Thus, Petitioner argues, Dr. Schmidtgoessling failed to complete a comprehensive mental examination. Moreover, Petitioner alleges that Dr. Schmidtgoessling did not have the capability of conducting a neuropsychological examination in 1985 (*see* Schmidtgoessling Dep. at 122).

Now on habeas review, Dr. Michael M. Gelbort, Ph.D., attests that Petitioner suffers from an organic brain disorder that causes significant cognitive dysfunction (*see* doc. 62, Ex. B, Gelbort Aff. ¶¶ 13–22). Dr. Gelbort, who Petitioner alleges is experienced in neuropsychology, avers that Petitioner's brain disorder impairs his reasoning, problem-solving skills, and ability to exercise normal judgment (*Id.*). In addition, Dr. Robert L. Smith, Ph.D., a licensed psychologist who specializes in substance abuse disorders, attests that Petitioner suffered physical abuse at the hands of his mother and father and that Petitioner began abusing drugs and alcohol at an early age (doc. 62, Ex. C, Smith Aff. ¶¶ 22–48). Dr. Smith concludes that Petitioner's substance abuse problems led to difficulties in school, an inability to develop personal relationships, and the need to commit illegal acts (*Id.*)

Respondent maintains, however, that, regardless of the length of their preparation, Petitioner's counsel presented facts in mitigation consistent with a defense theory that they had offered to the jury during the guilt phase. Respondent quotes the following finding of fact from the Hamilton County Court of Common, which denied Petitioner's claim on post-conviction review:

> At the mitigation hearing, the defense strategy used was to focus on the fact that petitioner had a low I.Q., that he could not initiate anything (not even a conversation) and that he could not have been the leader in the Gary Mitchell aggravated murder-aggravated robbery and that the leader had to have been complicitor Howell who received a light sentence in exchange for his testimony.

(Return of Writ, Ex. N; *see also* doc. 206). Respondent argues that Petitioner's trial counsel essentially presented all of the mitigation evidence that Petitioner now asserts the jury did not hear. Furthermore, Respondent asserts that a more detailed presentation of an alleged brain disorder and substance abuse could have undercut the defense's theory that Petitioner was incapable of autonomous and violent criminal outbursts. Additionally, Respondent contends that the presentation of the alleged abuse suffered by Petitioner as a child would have reduced any sympathy the jury had for Petitioner's mother, sympathy that Petitioner's counsel likely hoped would carry over to Petitioner.

▬▬▬ Our evaluation of this Claim leads us to conclude that Petitioner's counsel managed to present meaningful mitigating evidence—if only by accident. In *Glenn,* the Sixth Circuit held that an attorney's representation falls below minimum standards when the attorney waits until after a verdict in a capital case to prepare for the penalty phase, fails to interview any character witnesses, and conducts no research into mitigation. *Id.,* 71 F.3d at 1207–08; *see also Mapes,* 171 F.3d at 426. Here, the record shows that Petitioner's counsel's waited until the last minute to begin preparations for the penalty phase. Petitioner's counsel did not even request a short continuance due to the holiday weekend in order to prepare for the sentencing of their client. In addition, even though Petitioner showed signs of possible mental or substance abuse problems through his inability to communicate with his counsel (1999 Hearing Tr. at 26–27), Petitioner's counsel only secured a mental examination after the prosecution mentioned the need for one. *See Hendricks v. Calderon,* 70 F.3d 1032, 1043 (9th Cir.1995) (holding that, when an attorney is on notice of a possible mental impairment, the failure to investigate a client's mental condition as a mitigating factor constitutes deficient performance).

Petitioner's counsel also gave the task of gathering character witnesses to Petitioner's family, and then did not interview the witnesses. By not interviewing the witnesses, counsel did not know whether the witnesses would actually provide mitigating evidence. They took a chance at a moment in Petitioner's life where planning was vital. Petitioner's counsel appeared to entirely cast aside their duty to conduct a reasonable investigation into mitigating evidence. *Baxter v. Thomas,* 45 F.3d 1501, 1513 (11th Cir.1995) (noting that the failure to conduct a reasonable investigation may constitute ineffective assistance). We find that, based on these facts, the performance of Petitioner's counsel in preparing for the penalty phase fell below constitutionally acceptable standards. Therefore, we conclude that Petitioner satisfies the performance prong of the *Strickland* test as to Claim Thirteen. We do not factor into this analysis any consideration of whether Petitioner's counsel should have hired a mitigation specialist because we do not find any indication that the law required such an undertaking in 1985.

▬▬▬ In the end, though, due to few of their own efforts, Petitioner's counsel managed to present meaningful mitigation evidence. With nine character witnesses, one psychiatrist, and testimony from Petitioner, counsel conducted a meaningful adversarial challenge to the imposition of the death penalty. As the Ohio Supreme Court noted, mitigation hearings, like trials, need not be perfect: "[W]hen, as here, counsel has presented a meaningful concept of mitigation, the existence of alternate or additional mitigation theories does not establish ineffective assistance." *State v. Combs,* 100 Ohio App.3d 90, 105, 652 N.E.2d 205, 214 (1994). In this case, as the Hamilton County Court of Common Pleas found on post-conviction review, Petitioner's counsel carried through, again perhaps through happenstance, the defense strategy from trial of casting doubt on Petitioner's level of participation in the Central Bar robbery/homi-

cide. Though they did not interview most if not all of the character witnesses, they must have hoped these witnesses would confirm their theory that Petitioner's low intelligence and lack of self-initiative prevented him from being the principal offender in the Central Bar robbery/homicide.

This "residual doubt" theory, which attempted to take advantage of any lingering doubt the jury may have had regarding Petitioner's level of participation in the crime, was reasonable under the circumstances. *See Scott*, 58 F.Supp.2d at 812. Considering this theory, even if we accept that, after a reasonable investigation, competent counsel would have discovered that Petitioner suffers from an organic brain disorder and severe substance abuse, this new evidence does not build significantly onto the information already before the jury. *Cf. Williams*, —— U.S. at ——, 120 S.Ct. at 1516. Nor does the evidence provide the jury with an additional statutory mitigating factor to consider. *Cf. Antwine v. Delo*, 54 F.3d 1357, 1368 (8th Cir.1995) (finding prejudice where evidence of the defendant's mental impairment would have allowed the jury to consider another statutory mitigating factor).

In Petitioner's 1985 trial, the jury heard testimony falling within § 2929.04(B)(7). This testimony included statements from Dr. Schmidtgoessling about Petitioner's low intelligence and susceptibility to stronger-willed individuals. The jury also heard that Petitioner appreciated the criminality of his conduct, negating any possible application of the § 2929.04(B)(3) mitigating factor. Petitioner himself distinguished between robberies he admitted to committing and ones he denied. The new evidence of an organic brain disorder that allegedly causes Petitioner significant cognitive dysfunction does not alter, or add substantially to, the above testimony. For instance, the new evidence does not indicate that Petitioner lacked substantial capacity to appreciate the criminality of

his alleged conduct or to conform his conduct to the requirements of the law.

Furthermore, the jury heard from the Petitioner himself that his need for drugs compelled his criminal activities. Dr. Schmidtgoessling also commented about Petitioner's substance abuse. The new evidence related to substance abuse fails to add significantly to this 1985 testimony. Finally, with regard to the evidence of child abuse, the Court agrees with Respondent that Petitioner's counsel likely would have wanted to preserve any sympathy the jury may have had for Petitioner's mother; thus, they could have reasonably declined to introduce this evidence even if they had discovered it after a reasonable investigation.

After a comprehensive review of the penalty phase, we conclude that the evidence presented to this Court on habeas fails to raise " 'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of" this evidence. *Williams*, —— U.S. at ——, 120 S.Ct. at 1516 (quoting a lower court decision in the same case). The evidence presented at the penalty phase does not differ markedly from the new evidence presented before this Court on habeas review, and no certainty exists that the new evidence would have fit within trial counsel's reasonable theory of the case. *Cf. Loyd v. Whitley*, 977 F.2d 149, 152 (5th Cir.1992). Most importantly, the new evidence would not have enabled the jury to consider and give effect to more relevant mitigating evidence. *See Boyde*, 494 U.S. at 377–78, 110 S.Ct. 1190. Therefore, Claim Thirteen fails on the prejudice prong of the *Strickland* test and is, accordingly, without merit.

### CLAIM SEVENTEEN

**Petitioner was deprived of his right to the effective assistance of counsel at the appellate stage in violation of his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amend-**

ments to the United States Constitution.

Petitioner asserts that the actions of his appellate counsel deprived him of his right to effective assistance of counsel during the direct appeals of his sentence and conviction in violation of the United States Constitution. In our December 21, 1998 Order, the Court held that this Claim could be heard on the merits. Furthermore, the Court held that, if Petitioner succeeds on this Claim, Petitioner could assert ineffective assistance of appellate counsel as cause for his procedural default of certain issues found in Claims Three, Four, Five, Seven, Nine, Eleven, Twelve, Sixteen, and Eighteen. The Court held a hearing on the merits of this Claim on July 7–8, 1999.

## I. The Right to Effective Assistance of Counsel on the First Appeal as of Right

When a state guarantees criminal defendants the right to appellate review, the right to effective assistance of counsel extends beyond the state court trial to the first appeal as of right in accordance with the Due Process and Equal Protection Clauses of the United States Constitution. *Evitts v. Lucey,* 469 U.S. 387, 392–93, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (citing *Griffin v. Illinois,* 351 U.S. 12, 18–20, 76 S.Ct. 585, 100 L.Ed. 891 (1956); *Douglas v. California,* 372 U.S. 353, 356–57, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963)). The State of Ohio affords criminal defendants appeals of right to the Ohio appellate courts and the Ohio Supreme Court. Failure of the State of Ohio, then, to also provide effective assistance of counsel on direct appeal represents a violation of the United States Constitution. To prevail on a claim of ineffective assistance of appellate counsel, Petitioner must of course satisfy the two-prong test set forth in *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. This test requires the petitioner to demonstrate that the attorney's performance fell below an objective standard of reasonableness and that the deficient performance rendered the result of the sentencing proceeding unreliable or fundamentally unfair. *Id.; see Lockhart,* 506 U.S. at 372, 113 S.Ct. 838;

According to the Sixth Circuit, a district court should also consider the answers to the following questions in determining whether an attorney on direct appeal performed reasonably competently:

(1) Were the omitted issues "significant and obvious"?

(2) Was there arguably contrary authority on the omitted issues?

(3) Were the omitted issues clearly stronger than those presented?

(4) Were the omitted issues objected to at trial?

(5) Were the trial court's rulings subject to deference on appeal?

(6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

(7) What was appellate counsel's level of experience and expertise?

(8) Did the petitioner and appellate counsel meet and go over the possible issues?

(9) Is there evidence that counsel reviewed all the facts?

(10) Were the omitted issues dealt with in other assignments of error?

(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle,* 171 F.3d 408, 427–28 (6th Cir.1999) (remanding for an evidentiary hearing on the ineffective assistance of appellate counsel claim).

## II. Whether Petitioner's Counsel Rendered Ineffective Assistance of Counsel by Not Raising All Nonfrivolous Issues on Appeal and by Not Referencing Them to Both State and Federal Law

Petitioner asserts that his appellate counsel failed to read crucial portions of

the trial transcript, failed to raise numerous meritorious issues, failed to properly preserve issues for federal review, and failed to recognize a conflict of interest. Petitioner argues that, due to these errors and omissions, his counsel's representation fell below a reasonable standard and the outcome of his appeal was fundamentally unfair. *See Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). William E. Flax, one of Petitioner's trial counsel, and Albert J. Rodenberg, Jr. served as Petitioner's counsel on direct appeal to the Court of Appeals. Mr. Flax and Peter Pandilidis represented Petitioner on direct appeal to the Ohio Supreme Court.

In broad terms, Petitioner contends that his counsel did not comply with the prevailing norms for the practice of defense attorneys in capital cases. Petitioner asserts that these norms include:

- Ensuring the entire record is before the reviewing court;
- Interviewing all trial counsel as well as the defendant;
- Reviewing the record for issue identification;
- Preparing a checklist of capital litigation issues;
- Seeking to resurrect issues possibly waived by trial counsel;
- Raising all arguable issues on direct appeal; and
- Properly preserving issues for federal review.

(1999 Hearing Tr. at 302–303, 421–23, Ex. 52; Doughten Aff. ¶¶ 19–23).

During the July 7–9, 1999 Hearing, both Mr. Flax and Mr. Rodenberg testified that they lacked special training or education in dealing with capital cases (1999 Hearing Tr. at 85, 492–93). Moreover, while Mr. Flax had helped prepare a capital appeal in *State v. Steffen* prior to Petitioner's case, Mr. Rodenberg testified that he had never prepared an appeal for a capital case prior to Petitioner's case (*Id.* at 488–89; *see also* Hearing Ex. 50). *See State v.*

*Steffen,* Nos. C–830445, B–824004, 1985 WL 4301 (Ohio App. 1 Dist. Dec.11, 1985) (aff'd. *State v. Steffen,* 31 Ohio St.3d 111, 509 N.E.2d 383 (1987)). According to Petitioner, itemized fee statements from each of Petitioner's appellate counsel indicate they did not prepare thoroughly. While Mr. Flax and Mr. Rodenberg initially testified that they read the trial transcript, Petitioner maintains that neither Mr. Flax nor Mr. Rodenberg could have read the entire transcript in the time for which they billed the state (*Id.* at 158–59, 480, 511–12; Ex. 38). In addition, Petitioner argues that billing records and Mr. Rodenberg's own notes indicate that Mr. Rodenberg did not read the portions of the transcript concerning the voir dire or the penalty phase (*see id.* at 513, 515). Citing *Penson v. Ohio,* 488 U.S. 75, 85, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988), and *McCoy v. Court of Appeals,* 486 U.S. 429, 438, 108 S.Ct. 1895, 100 L.Ed.2d 440 (1988), Petitioner argues that his appellate attorney's failure to read crucial portions of the trial transcript, including the voir dire and mitigation phase, constituted denial of the right to counsel. *See Penson,* 488 U.S. at 85, 109 S.Ct. 346 (observing that criminal defense attorneys must engage in "careful advocacy"); *McCoy,* 486 U.S. at 438, 108 S.Ct. 1895 (noting that an appellate attorney must "master the trial record").

Petitioner further asserts that defense attorneys such as Mr. Flax and Mr. Rodenberg could have turned to resources developed by the Death Penalty Unit of the Ohio Public Defender's Office for help in capital cases (*Id.* at 93–106; Ex. 53), but they failed to do so. According to testimony by David Stebbins, the Chief Death Penalty Counsel for the Ohio Public Defender's Office from 1982–1992, the Death Penalty Unit enabled the Public Defender's office to provide assistance to attorneys working on capital cases statewide (*Id.* at 93, 99–100, 126). The Death Penalty Unit also developed a Motions Manual prior to 1982 to highlight issues that should be raised by defense attorneys at

trial and on appeal, and the Death Penalty Unit assisted attorneys by conducting seminars and recommending investigators and mitigation specialists (*Id.* at 112–15, 96–103; Ex. 54).

Petitioner next alleges that the prevailing knowledge on capital defense litigation in the early 1980s indicated that the best chance for relief in capital cases would come from the federal courts. Petitioner points to *Freeman v. Lane,* 962 F.2d 1252, 1259 (7th Cir.1992), in support of his argument that counsel should preserve issues for federal review. *Id.,* 962 F.2d at 1258–59 (holding that appellate counsel's failure to raise a meritorious Fifth Amendment claim on direct state court appeal constituted ineffective assistance of counsel). Despite this, Petitioner asserts, his appellate counsel raised only five claims on direct appeal and failed to cite the United States Constitution in reference to these claims (State Court App., Vol. II, Tab 9, Vol. III; 1999 Hearing Ex. 52). The alleged errors raised on direct appeal by Mr. Flax and Mr. Rodenberg were:

(1) The introduction of other acts evidence;

(2) The failure of the trial court to allow into evidence alibi testimony;

(3) The failure of the trial court to allow the assistance of a polygraph examiner;

(4) The validity of the death sentence itself based upon the evidence; and

(5) Sufficiency of the evidence.

(*Id.*).

Petitioner also draws the Court's attention to the appellate briefs filed in *State v. Steffen* and argues that these briefs show that Mr. Flax, as one of Mr. Steffen's counsel on appeal, knew that practicing capital litigators believed in raising all arguable issues on direct appeal and properly preserving the issues for federal review (1999 Hearing Tr. at 141, 169, 186–87, 313–14, 338–42, 345; Ex. 50). *See Steffen,* Nos. C–830445, B–824004, 1985 WL 4301 (Ohio App. 1 Dist. Dec.11, 1985). Mr. Flax testified, though, that he "disagreed with how [his former co-counsel H. Fred Hoefle] handled the *Steffen* appeal, because he did raise every conceivable federal issue and I think blunted the very serious real issues" (*Id.* at 168). Instead, Mr. Flax used a "winnowing" strategy in his preparation of Petitioner's appeal (*Id.* at 223–24). Mr. Rodenberg also testified at the hearing that his appellate strategy focused on simplicity in that he did not want to clutter the appeal with what he viewed as unpersuasive claims (*Id.* at 475–76).

Petitioner contends that both Mr. Flax and Mr. Rodenberg continue to reject the practice discussed in the Commentary to Guidelines proposed by the American Bar Association (*see* 1999 Hearing Tr. at 169, 222–23, 476). Commentary to Guideline 11.9.2 of the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases states, in pertinent part:

> Traditional theories of appellate practice notwithstanding, appellate counsel in a capital case should *not* raise only the best of several potential issues. Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. When a client will be killed if the case is lost, counsel (and the courts) should not let any possible ground for relief go unexplored or unexploited.

*Id.* (footnotes omitted) (1989). Petitioner notes that Mr. Flax testified that, not only did he not discuss his "winnowing" strategy with Petitioner, he had no contact with Petitioner at all during the appeal (1999 Hearing Tr. at 188, 223–24), and Mr. Rodenberg stated that he had not met Petitioner until the July 7–9, 1999 Hearing before this Court. Moreover, Petitioner notes, his appellate counsel filed his notice of appeal late and failed to file reply briefs during the direct appeal. In 1986, Petitioner wrote to the Ohio Supreme Court, asking to be assigned new appellate attorneys (State Court App., Vol. III, Tab K at

App. 17). This request was denied without comment (*Id.*).

Petitioner asserts that, contrary to the prevailing norms of 1985, his appellate counsel failed to raise numerous meritorious issues on appeal, including:

(1) Whether the jury was improperly told its decision as to the death penalty was only a recommendation (1999 Hearing Tr. at 363–64);

(2) Whether the prosecutor mislead the jury at voir dire about the penalty phase weighing process (*Id.* at 365);

(3) Whether the prosecutor systematically dismissed African–American jurors (*Id.* at 367–68);

(4) Whether the trial court improperly failed to dismiss two prospective jurors (*Id.* at 368–69);

(5) Whether the prosecutor improperly excused jurors based on their hesitancy to invoke the death penalty (*Id.* at 370–71; Tr. at 628, 641);

(6) Whether the trial court improperly excused a juror for her view on the death penalty (1999 Hearing Tr. at 371–72; Tr. at 606);

(7) Whether the trial court improperly refused to allow alibi testimony;

(8) Whether the trial court improperly provided the jury with misleading and inaccurate jury instructions (1999 Hearing Tr. at 373–79);

(9) Whether prosecutorial misconduct occurred during the guilt or penalty phase of the trial (1999 Hearing Tr. at 379–91; Tr. at 2456–57, 2463, 2466, 2468, 2471, 2473, 2556, 2558, 2560, 2565, 2733, 2734–38, 2755–56);

(10) Whether the trial court erred by allowing the shoe print testimony into evidence (1999 Hearing Tr. at 391–99);

(11) Whether the trial court erred in allowing other prejudicial testimony and evidence to come before the jury (*Id.* at 391–402, 639 N.E.2d 67);

(12) Whether the State denied Petitioner his right to counsel during an investigatory line-up procedure (*Id.* at 391–99, 639 N.E.2d 67);

(13) Whether the trial court improperly based its sentence on non-statutory aggravating factors;

(14) Whether Petitioner was denied effective assistance of counsel during the guilt phase of his trial (1999 Hearing Tr. at 404; 408–411; Tr. at 114, 277, 309; 454, 571; 575–76, 2077);

(15) Whether Petitioner was denied effective assistance of counsel during the penalty phase (1999 Hearing Tr. at 405–408);

(16) Whether the death sentence violates the Constitutions of Ohio and the United States.

(*See generally* 1999 Hearing Tr. Ex. 54).

David Doughten, who provided expert testimony at the July 7–9, 1999 Hearing, stated that the failure of Petitioner's appellate counsel to raise these claims evidences ineffective assistance of appellate counsel (*Id.* at 344, 422). Petitioner additionally argues that *United States v. Cook,* 45 F.3d 388, 395 (10th Cir.1995), and *Banks v. Reynolds,* 54 F.3d 1508, 1515 (10th Cir.1995), provide that counsel must raise "dead bang winner" issues on appeal. A "dead bang winner" is an issue that is "obvious on the record and must have leaped out upon a casual reading of the transcript" and "would have resulted in a reversal on appeal." *Cook,* 45 F.3d at 395. Petitioner contends that one such "dead bang winner" in his case was the claim related to the prosecution's alleged use of peremptory challenges in a racially discriminatory manner. Petitioner notes that *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which was decided during Petitioner's direct appeal, held that the Equal Protection Clause of the Fourteenth Amendment precludes the

prosecution from exercising its peremptory challenges to strike prospective jurors solely on account of their race. Another "dead bang winner" according to Petitioner is the fact that the jury in his case may have been led to believe that the responsibility for determining the appropriateness of his death sentence rested with the trial judge. *See Caldwell v. Mississippi*, 472 U.S. 320, 340–41, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (vacating a sentence of death pursuant to the Eighth Amendment after finding that the prosecution minimized the "jury's sense of responsibility for determining the appropriateness of death").

Petitioner asserts that he also had the right to a counsel free of conflict. *See Cuyler*, 446 U.S. at 346, 100 S.Ct. 1708; *Holloway v. Arkansas*, 435 U.S. 475, 482–84, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Despite this, Petitioner contends, Mr. Flax had a conflict of interest in that, since Mr. Flax was Petitioner's trial counsel, Mr. Flax could not raise his own ineffectiveness on direct appeal. This conflict, Petitioner argues, was imputed to his co-counsel Mr. Rodenberg and Mr. Pandilidis. *See State v. Lentz*, 70 Ohio St.3d 527, 529, 639 N.E.2d 784, 785 (1994) (requiring a defendant to prove actual conflict of interest between two attorneys from the same public defender's office who represented the defendant at different stages in his case before he would be allowed to avoid res judicata); *State v. Cole*, 2 Ohio St.3d 112, 112, 443 N.E.2d 169, 170 (1982) (holding that res judicata bars a claim of ineffective assistance of trial counsel only if new counsel represented the defendant on direct appeal); *State v. Carter*, 36 Ohio Misc. 170, 173, 304 N.E.2d 415, 417 (1973) (finding that a defendant is not required to raise ineffective assistance of trial counsel during the trial).

According to Petitioner, Mr. Flax's failure to decline to represent Petitioner on direct appeal constitutes ineffective assistance of counsel. Petitioner contends that,

due to this conflict, his counsel failed to raise the following claims:

(1) Ineffectiveness of trial counsel during the guilt and penalty phases of Petitioner's trial;

(2) Improper admission of pretrial and trial identifications of Petitioner;

(3) Improper exclusion of jurors;

(4) Improper admission of evidence;

(5) Prosecutorial misconduct; and

(6) Erroneous jury instructions during the guilt and penalty phases of Petitioner's trial.

In sum, Petitioner argues that, by failing to read crucial portions of the trial transcript, failing to raise numerous meritorious issues, failing to properly preserve issues for federal review, and failing to recognize a conflict of interest, his appellate counsel rendered deficient performance. Their representation of him, Petitioner insists, fell below an objective standard of reasonableness, thereby satisfying the performance prong of the *Strickland* test. Mr. Doughten testified that "frankly this is maybe the worst appellate representation that I've reviewed in my experience" (1999 Hearing Tr. at 344).

As for the prejudice prong of the *Strickland* test, Petitioner contends that there is a reasonable probability that the result of his appeal would have been different but for his counsel's unprofessional errors and omissions. Petitioner emphasizes that federal courts recognize the importance of raising obvious and significant constitutional claims on appeal, and he argues that the failure of his counsel to raise the issues discussed above related to *Batson* and *Caldwell* clearly prejudiced his chances on appeal. *See Carpenter v. Mohr*, 163 F.3d 938, 947 (6th Cir.1998) (citing *Reed v. Ross*, 468 U.S. 1, 13–14, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984)) (noting that the failure to raise a significant constitutional claim may support a claim of ineffective assistance of counsel); *Clemmons v. Delo*, 124 F.3d 944, 953–54 (8th Cir.1997) (finding

ineffective assistance of counsel where the appellate counsel did not raise an obvious claim on direct appeal); *Reynolds,* 54 F.3d at 1515 (failure to raise "dead bang winner" claim on appeal constituted ineffective assistance of counsel); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994); (noting that a counsel's pursuit of weaker rather than stronger claims on appeal may constitute ineffective assistance of counsel); *Fagan v. Washington,* 942 F.2d 1155, 1157 (7th Cir.1991) (finding ineffective assistance of appellate counsel when the attorney failed to raise a substantial claim but instead raised a weaker one); *Matire v. Wainwright,* 811 F.2d 1430, 1438 (11th Cir.1987) (holding same).

In contrast, Respondent asserts that Petitioner's appellate counsel did in fact raise meritorious and important claims on appeal. Respondent argues that appellate counsel need not raise every conceivable issue on appeal and the fact that they do not fails to support a finding of ineffective assistance of counsel. In support of this argument, Respondent cites *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). In *Jones,* a noncapital case, the Supreme Court held that the Constitution does not require defense counsel to raise every nonfrivolous issue on appeal. *Id.* at 753–54, 103 S.Ct. 3308.

Petitioner distinguishes *Jones* by emphasizing that the case involved a defendant who was convicted of robbery and assault, noncapital offenses. However, the Court observes that the Supreme Court reiterated in a capital case that the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (quoting *Jones,* 463 U.S. at 751–52, 103 S.Ct. 3308). Petitioner nonetheless draws the Court's attention to a footnote from the Commentary to ABA Guideline 11.9.2 that quotes a law review article:

"... Chief Justice Burger argues that '(t)here can hardly be any question about the importance of having the appellate advocate examine the record ... to select (only) the most promising issues for review...' *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 3314, 77 L.Ed.2d 987 (1983). This is truly bad advice in capital cases—at any level. If the past few years teach us anything, it is to *raise 'em all'.* Remember, the Chief Justice also told us that '(t)he signals from this Court have not...been easy to decipher.' *Lockett v. Ohio,* 438 U.S. 586, 603, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)." McNally, *Death is Different: Your Approach to a Capital Case Must be Different, Too,* The Champion (March 1984), p. 8, 12, reprinted in California Attorneys for Criminal Justice & California Public Defenders Association, *CALIFORNIA DEATH PENALTY DEFENSE MANUAL,* Vol. 1, p. A–33 (1986). *THE INDIANA DEATH PENALTY DEFENSE MANUAL* supra note 1, recommends that counsel approach the traditional "winnowing process" with extreme caution, Vol. 111, p. 8–9.

Respondent, though, urges caution in terms of this Court's reliance on any ABA guideline. Respondent points out that the *Strickland* Court emphasized that:

In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable, but they are only guides.... Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

*Id.,* 466 U.S. at 688–89, 104 S.Ct. 2052 (*see also* 1999 Hearing Tr. at 138–39; 429–30). Respondent also argues that the ABA language relied upon by Petitioner derives from commentary written in 1989, years after Petitioner's trial and direct appeal (1999 Hearing Tr. at 303–304). In addition, Respondent notes that the Motions Manuals mentioned by Petitioner state that counsel must tailor the use of the motions to fit the specific needs of the particular case or proceeding (*Id.* at 130–31). In Petitioner's case, Respondent argues, his appellate counsel correctly decided to raise certain meritorious issues on appeal. The fact that the appellate counsel did not federalize every issue is also not grounds for a finding of ineffective assistance of counsel according to Respondent. Respondent alleges that Ohio courts have reversed approximately ten percent of the death penalty convictions and Respondent argues that these reversals demonstrate that hope is not lost for capital defendants at the state level (*Id.* at 432–34).

 Evaluating an ineffective assistance of counsel claim is never an easy task for a court. As noted above, our scrutiny of a counsel's performance must be "highly deferential" and must consider all of the circumstances faced by the counsel. *Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052. In this case, we must also step back in time to a period when the legal profession was adjusting to a new death penalty law in Ohio. Mr. Flax and Mr. Rodenberg, two of Petitioner's appellate counsel, concede that they lacked training or education related to the demands of capital cases. This itself cannot constitute ineffective assistance of counsel since, at the time of their representation of Petitioner, Ohio courts unfortunately did not require that counsel practicing in capital litigation or appeals obtain additional training and education. In examining, however, whether their alleged failure to (1) read portions of the trial transcript; (2) raise numerous allegedly meritorious issues; (3) preserve issues for federal review; or (4) recognize a conflict of interest is ineffective assistance of counsel, the Court takes notice of *Strickland* Court's overview of an objective standard of reasonable representation:

> Representation of a criminal defendant entails basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest. From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.

*Id.,* 466 U.S. at 688, 104 S.Ct. 2052 (citations omitted). After reviewing the circumstances faced by Petitioner's appellate counsel, this Court finds that the key issue here is whether Petitioner's counsel failed in their duty to ensure "a reliable adversarial testing process" by not ensuring that important issues received judicial review at both the state and federal level. *Id.*

 At the 1999 Hearing, Mr. Flax and Mr. Rodenberg testified that they consciously narrowed the list of issues to bring before the Ohio Court of Appeals and the Ohio Supreme Court on appeal (1999 Hearing Tr. at 168; 517–18; 526). As we pointed out above, the Supreme Court continues to hold that this narrowing of issues is the "hallmark of effective appellate advocacy." *Smith,* 477 U.S. at 536, 106 S.Ct. 2661 (citing *Jones,* 463 U.S. at 751–52, 103 S.Ct. 3308). Thus, we agree with Respondent that no requirement to present all nonfrivolous issues on appeal exists, even in the context of a capital case. However, we believe that any "winnowing" or narrowing of issues must be done very cautiously when a person's life is at stake.

See Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ("We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."); Combs, 205 F.3d at 289–90 (quoting ABA Standard 4–1.2(c), which states "[s]ince the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making extraordinary efforts on behalf of the accused"). Clearly, Mr. Flax and Mr. Rodenberg did not approach Petitioner's direct appeal cautiously.

During the 1999 Hearing, Mr. Rodenberg would not state under oath that he read the voir dire or penalty phase portions of the trial transcript during his preparation for the appeal (1999 Hearing Tr. at 512–15). Mr. Rodenberg's notes also skip any reference to the voir dire or the penalty phase. Mr. Flax, who relied on Mr. Rodenberg's notes, stated that he just referred to certain portions of the transcript rather than reading it (Id. at 158). As they "winnowed" down the list of issues to bring on appeal, they failed to stay current on Supreme Court case law (Id. at 517, 170). In McCoy, the Supreme Court wrote that:

> The appellate lawyer must master the trial record, thoroughly research the law, and exercise judgment in identifying the arguments that may be advanced on appeal. In preparing and evaluating the case, and in advising the client as to the prospects for success, counsel must consistently serve the client's interest to the best of his or her ability.

Id., 486 U.S. at 438, 108 S.Ct. 1895 (addressing the right to counsel in an Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), context); see also Penson, 488 U.S. at 84–85, 109 S.Ct. 346 (noting that both the trial and the appeal "require careful advocacy to ensure that rights are not forgone and that substantial legal and factual arguments are not inadvertently passed over").

In this case, Petitioner's appellate counsel passed over viable claims no weaker than the ones they decided to pursue on appeal. Even though they knew or should have known that federal habeas review was likely in a death penalty case, they also failed to federalize any of the claims they brought. And, as is apparent from the above, Petitioner's counsel failed in their duty of careful advocacy and cautious winnowing of issues. Therefore, we conclude that Petitioner's allegations support a finding under the performance prong of the Strickland test that his counsel were ineffective.

However, the real challenge in Petitioner's claim of ineffective assistance of appellate counsel comes in his attempt to satisfy the prejudice prong of the Strickland test. The Tenth Circuit observed that the "question of 'prejudice' in the context of an ineffective assistance claim necessarily requires a reviewing court to look at the merits of the underlying claim." Banks, 54 F.3d at 1516; see also Freeman, 962 F.2d at 1259 (concluding that the appellate counsel's failure to raise a strong Fifth Amendment issue on direct state court appeal constituted ineffective assistance of counsel). In Petitioner's case, while many of the claims passed over by his counsel were obvious on the record and worthy of review, the claims may not have been "dead bang winners." Id. at 1515; Cook, 45 F.3d at 395. As stated above, a "dead bang winner" is an issue that is "obvious on the record and must have leaped out upon a casual reading of the transcript" and "would have resulted in a reversal on appeal." Cook, 45 F.3d at 395.

Petitioner urges the Court to find that the Batson and Caldwell issues detailed above were "dead bang winners." Regretfully, though, the Court finds that, although we are troubled by the prosecutor's use of peremptory challenges during the voir dire, the Court cannot consider the failure to raise a Batson claim as an example of ineffective assistance of counsel because Petitioner did not raise this as an

example in the state court. *Murray.* In fact, Petitioner failed to address the *Batson* issue at any stage in the state court and, thus, no developed trial or appellate record exists on this claim (*see, supra,* Claim Six). The Court further notes that Mr. Flax, who expressed at trial his suspicions about the prosecution's use of peremptory challenges on potential African–American jurors (*see* Trial Tr. at 433–34, 491), testified at the 1999 Hearing that he was actually only "harassing" the Prosecution (1999 Hearing Tr. at 169). Mr. Flax stated that he did not believe Petitioner's case presented a meritorious *Batson* issue, but he also admitted that he has never read *Batson.* Despite the questionable nature of these facts, the Court is nonetheless precluded from reaching the merits of the *Batson* claim in any manner. The Court also cannot address the *Caldwell* issue raised in federal habeas corpus by Petitioner since Petitioner also failed to raise this issue in the state level.

Keeping in mind that the "Constitution entitles a criminal defendant to a fair trial, not a perfect one," *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the following subsections address the merits of the remaining issues Petitioner maintains his counsel should have raised on appeal. The Court addresses these issues in order to determine whether Petitioner can show that his counsel's errors and omissions had an effect on the outcome of his appeal. We note that, in preceding sections, the Court concludes that Claims Four, Six, Seven, Eleven, Twelve, Thirteen and portions of Nine and Sixteen lack merit and therefore they cannot be used to satisfy the prejudice prong of the *Strickland* test with regard to Petitioner's ineffective assistance of appellate counsel claim.

### A. CLAIM THREE:

**The admission of in-courtroom and pretrial identifications of Petitioner by witnesses who identified Petitioner as a result of improper identification procedures denied Petitioner of his rights as guaranteed by the Fourth, Fifth, Sixth and Fourteenth Amendments.**

▅ On October 12, 1984, Petitioner was arrested as he fled the area of Gold Star Chili, a restaurant that had just been robbed. Petitioner participated in a line-up on October 15, 1984 (hereinafter, the "October 15th line-up"). At the time of line-up, Petitioner had been charged with the Gold Star Chili robbery. Petitioner argues that he was denied his right to counsel, as guaranteed him under the Sixth Amendment, at the time of the line-up and that the pretrial identification procedures employed were unduly suggestive so as to violate Petitioner's due process rights.

Unfortunately for the Court, the facts of this Claim are not adequately developed in the state court record. The transcript is unclear as to exactly what happened at this line-up and who was present. That said, the record indicates that several victims and eyewitnesses of the so-called similar robberies gathered at the police station to view the October 15th line-up. Petitioner attacks the validity of the identifications made by Jack West, a witness of the Metropolitan Art Gallery robbery, JoAnne Davidson, a witness of the Save–All Drug Store robbery, and June Rensler, a witness of the Rensler Portrait Studio robbery. These witnesses were all present at the October 15th line-up, and they all made in-courtroom identifications of Petitioner at the Central Bar robbery/homicide trial.

▅ In *United States v. Wade,* 388 U.S. 218, 227, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court held that the Sixth Amendment right to counsel applied to pretrial line-ups. *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), reaffirmed the holding of *Wade,* but held that the right attached only "at or after the initiation of adversary judicial criminal proceedings— whether by way of formal charge, prelimi-

nary hearing, indictment, information, or arraignment." The Sixth Amendment right to counsel, however, is offense-specific; that is, it applies only with respect to the same offense as that on which the suspect has been charged. *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). The Sixth Amendment right "cannot be invoked once for all future prosecutions." *Id.* Therefore, the government does not violate the Sixth Amendment by investigating ongoing or new criminal activity for which the suspect has not been indicted or formally charged in the absence of an attorney. *Id.* at 175–76, 111 S.Ct. 2204.

The Sixth Circuit recognizes an exception to the "offense-specific" rule of the Sixth Amendment under certain conditions: "the Sixth Amendment right to counsel extends to interrogations on new charges where 'the pending charge is so inextricably intertwined with the charge under investigation that the right to counsel for the pending charge cannot constitutionally be isolated from the right to counsel for the uncharged offense.'" *United States v. Doherty,* 126 F.3d 769, 776 (6th Cir.1997) (quoting *United States v. Hines,* 963 F.2d 255, 257 (9th Cir.1992)) (noting further that, although "the question of how 'inextricably intertwined' two offenses must be such that the Sixth Amendment right to counsel attaches simultaneously with respect to both offenses is open to some doubt," and analyzing the two offenses by looking at whether the activities underlying the two offenses were the same).

Petitioner appears to argue that this exception applies to this case. That is, Petitioner asserts that his right to counsel for the Gold Star Chili robbery, which did attach at the time of the line-up because he had been formally charged by then, carries over to the similar robbery offenses, for which he had not yet been charged, and that therefore, his Sixth Amendment was violated at the time of the line-up because counsel was not present. Petitioner cites

to *United States v. Arnold,* 106 F.3d 37 (3d Cir.1997), for support. This case, however, is inapposite. In *Arnold,* the Third Circuit did recognize the same exception to the Sixth Amendment "offense specific" rule: "once the right to counsel attaches with respect to a charged offense, it carries over to 'closely related' but uncharged offenses." *Id.* at 40 (holding that offenses of witness intimidation and attempted murder of the same witness were "closely related").

In analyzing what "closely related" means, the Third Circuit looked at cases that focused on whether the facts underlying the charged and uncharged offenses are closely related. *Id.* at 41. Those courts looked for similarities of time, place, person, and conduct. *Id.* Here, Petitioner cannot rely on the "closely related" exception because the offenses of the Gold Star Chili robbery, the Metropolitan Art Gallery robbery, the Rensler Portrait Studio robbery, and the Sav–All Discount Store robbery occurred on different days, at different places, and involved different people. Accordingly, the right to counsel with respect to Gold Star Chili robbery did not carry over to the other offenses. Therefore, Petitioner's Sixth Amendment right to counsel claim is without merit.

Petitioner also argues that the pretrial identification procedures employed were unduly suggestive and therefore violated his due process right. According to the Sixth Circuit, "[a] conviction based on identification testimony following pretrial identification violates the defendant's constitutional right to due process whenever the pretrial identification procedure is so 'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir.1986) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)).

The Sixth Circuit directs district courts to conduct a two-part analysis in assessing the validity of a pretrial

identification. *Ledbetter v. Edwards,* 35 F.3d 1062, 1071 (6th Cir.1994). First, a court is to consider whether the procedure was unduly suggestive. *Id.* The burden of proving this element remains with the defendant. *Id.* Second, if the court determines that the procedure was unduly suggestive, it then must evaluate the totality of the circumstances to determine whether the identification was nevertheless reliable. *Id.* There are five factors to consider in assessing the reliability of a identification:
(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the defendant; and (5) the length of time between the crime and the confrontation.

*Id.; see also Wade,* 388 U.S. at 241, 87 S.Ct. 1926.

▪ Where the state courts made factual determinations concerning the victim's identification, the district court cannot overturn them unless they are not fairly supported by the record. *Ledbetter,* 35 F.3d at 1071. However, "whether the factors demonstrate reliability in the identification process is a question of law for this court to decide." *Thigpen,* 804 F.2d at 896 (citing *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982)). The state court on post-conviction made findings of fact with regard to Petitioner's cause of action alleging that he was denied effective assistance of trial counsel because of counsel's failure to file a motion to suppress identification testimony of various witnesses (Return of Writ, Ex. N.) Those findings of fact, which this Court presumes to be correct, are:
(3) The line-up attended by witness Rensler did not include any suggestion as to which person should be identified. (T.p. 1650)
(4) Witness Rensler was trained through experience in recognizing and remembering faces, she saw petitioner twice during the robbery, her attention was focused on petitioner as he held a gun 18 inches from her head, and remembered petitioner's face and voice. (T.p. 1639, 1646, 1647, 1650)
(5) The line-up attended by witness Davidson was conducted with instructions that she not discuss anything with other witnesses, no one suggested who witness Davidson should identify and none of the other witnesses indicated to witness Davidson who to select. (T.p. 1696)
(6) Witness Davidson's attention was focused on petitioner as he held the gun on her head and ordered about. Ms. Davidson also could see petitioner during the robbery as he took money from other patrons, searched the cash register and returned to kick Ms. Davidson in the face. (T.p. 1689 through 1692)

\* \* \* \* \* \*

(8) Witness West, immediately prior to the robbery of his store, closely watched petitioner when he entered the store, and spoke to petitioner as he inquired about an item in a display case. (T.p. 1770 to 1771)
(9) Mr. West attended a line-up and at that line-up no one suggested which person should be identified. (T.p. 1776) Mr. West remembered petitioner's distinctive voice. (T.p. 1792)

(Return of Writ, Ex. N.)

Although these factual findings match the transcript, there are a few facts, as evidenced by the transcript, that the state court omitted. For example, Mr. West's pretrial identification occurred approximately four months after the robbery. He testified that there were fifteen people at the line-up and that they viewed the line-up in groups (Tr. at 1775–76). Further, Mr. West made an in-court identification at trial despite the fact that, according to an offense report dated August 4, 1984, which was allegedly not disclosed to Petitioner's counsel prior to trial, Mr. West

had been beaten severely, suffered temporary memory loss and had given various descriptions of the suspect on three occasions (*Id.* at 1772, 1776). Also, Mr. West testified at trial that, before he viewed the line-up, he was shown the jewelry that was stolen from him and told that there was a suspect in the line-up (*Id.* at 1789–90).

In addition, Ms. Davidson viewed the line-up approximately two months after the robbery. The federal habeas record discloses an unreadable offense report bearing her name that states the phrase "cannot ID" in the box marked for suspects; no other information on the offense report is legible. Despite this statement, she gave a confident in-court identification (Tr. at 1684–85, 1688, 1690). She viewed the line-up on October 15 along with at least two other individuals, but she also testified that she was instructed not to talk to other witnesses during the line-up (*Id.* at 1695–97).

Ms. Rensler also made a confident in-court identification of Petitioner (*Id.* at 1637), stating that "Faces are my business, and I don't miss on many faces, plus I saw him twice" (*Id.* at 1647). The crime at the Rensler Portrait Studio occurred on September 5, 1984, approximately one month prior to the line-up. She testified at trial that there were approximately four other individuals viewing the line-up at the same time as she did. Before viewing the line-up, she was told that there was a suspect from the Gold Star Chili robbery in the line-up. She also testified that she was instructed not to talk to other witnesses during the line-up.

Based on these facts, this Court must decide whether the pretrial line-up was unduly suggestive and, if so, whether the identifications by the witnesses are reliable. With respect to the first issue, one could argue that the fact that multiple witnesses viewed the line-up simultaneously, that a police officer told two witnesses (Mr. West and Ms. Rensler) that a suspect was included in the line-up, and that one witness (Mr. West) was shown the property stolen from him prior to the line-up made the line-up unduly suggestive. On the other hand, Ms. Rensler was told that the line-up included a suspect of the Gold Star Chili robbery, not the robbery of her establishment. Further, two witnesses (Ms. Davidson and Ms. Rensler) remember being instructed not to discuss anything with the other witnesses, thereby curing any problem of multiple witnesses viewing the line-up simultaneously.

 After reviewing the facts and arguments underlying Claim Three, the Court finds that the fact that Mr. West was told there was a suspect in the line-up was not unduly suggestive. Because the arranging of a line-up itself gives rise to an inference that a suspect is present, the information provided Mr. West did not create any more of a chance of misidentification than the fact that witnesses were told to come view a line-up. *See Thigpen*, 804 F.2d at 896 ("An individual's appearance in a line-up suggests to a witness that the person is in police custody for some reason.") Similarly, being shown the stolen jewelry merely indicates that the suspect is more likely than not the robber; but just knowing one out of the six people in the line-up is a suspect does not create a substantial likelihood of misidentification.

 The multiple witnesses viewing the line-up is a more difficult issue for the Court. The argument in favor of misidentification is the recognition that humans conform to peer pressure in a group, and there would be a lot of pressure to identify the same person if each witness knew the choice of all the other witnesses. In addition, if there was more than one witness viewing suspect wanted for different crimes, it is likely that the witnesses will succumb to the temptation of reasoning that "if he robbed one person, he must be the one who robbed me too." Nevertheless, the Fifth Circuit holds that "the fact that more than one witness is present during a lineup does not necessarily invalidate the procedure... Everything depends on

the particular circumstances." *United States v. Corgain*, 5 F.3d 5, 9 (1st Cir.1993) (citations omitted); *cf. United States v. Jackman*, 837 F.Supp. 468, 470 (D.Mass. 1993).

Unfortunately, crucial facts are missing that would help the Court determine the suggestiveness of the group viewing. For example, we do not know whether the witnesses stated aloud their identification in front of other witnesses. Further, we do not know whether there were witnesses of the same or different crimes viewing the line-up simultaneously. Given the absence of these facts, and the statements by two witnesses at trial that they were instructed to not talk to the other witnesses, the Court must conclude that the line-up was not unduly suggestive. *See Corgain*, 5 F.3d at 9–10 (upholding identification procedures after finding that the witnesses did not speak to each other and that the identification was by secret ballot).

 Even if the Court were to find that the procedure was unduly suggestive, the totality of the circumstances indicate that the identifications bear indicia of reliability. On the one hand, the fact that two of the three witnesses (Mr. West and Ms. Davidson) could not identify the suspect immediately after the robbery, but could at the line-up and in court casts doubt on the reliability. On the other hand, all three witnesses testified at trial as to the length of time they observed Petitioner and the attention given to him prior to the robbery. *See United States v. O'Neal*, 496 F.2d 368, 372 (6th Cir.1974) (declining to overturn a federal conviction on grounds related to witness identification testimony because the jury considered all relevant evidence with respect to misidentification); *see also Smith v. Perini*, 723 F.2d 478 (6th Cir.1983).

Each witness had an unobstructed opportunity to view, and to speak directly to, the assailant during the daytime robberies. Each witness further indicated that he or she attentively watched the assailant either upon entry to the store or during the robbery. In addition, all of the witnesses viewed the line-up within a relatively short time—between one to four months—after the robberies. *See United States v. Hill*, 967 F.2d 226, 232–33 (6th Cir.1992) (upholding an in-court identification by a witness who had had substantial opportunity to view the robber even though five years had passed between the robbery and the trial). Ms. Rensler and Ms. Davidson also appeared confident in their in-trial identifications of Petitioner.

 Further, the fact that Mr. West suffered short-term memory loss does not preclude his ability to identify his assailant after that short-term memory loss subsided. The fact that he gave varying descriptions of the suspect is important for impeachment purposes and certainly goes to the weight of credibility of his identification. *Hill*, 967 F.2d at 233. This is why the fact is important to our *Brady* discussion; and the fact is especially significant because the statement of varying descriptions was on a document allegedly not disclosed to defense counsel. Nonetheless, the report does not indicate how his descriptions varied, so that we cannot determine how significant they were to the reliability of his identification.

In summary, consideration of the above factors leads us to conclude that the identifications in this case were reliable enough to be admissible. Accordingly, Petitioner fails to show the Court that Claim Three would have been a "dead bang winner" on appeal. Thus, Petitioner cannot satisfy the prejudice prong of the *Strickland* test because of his counsel's failure to raise this Claim on appeal.

### B. CLAIM FIVE

**Petitioner was denied his rights to compulsory process, as guaranteed by the Sixth Amendment, when the trial court precluded him from presenting alibi testimony that he had not committed the crime of aggravated murder for which he was charged.**

Petitioner alleges that the trial court's exclusion of alibi testimony denied him his right to Compulsory Process as guaranteed by the Sixth Amendment. According to Petitioner, the excluded testimony would have demonstrated that Petitioner did not commit the crime of aggravated murder for which he was charged.

As discussed in Claim Four, Petitioner's trial counsel stated during trial that they did not interview potential defense witnesses regarding a possible alibi for Petitioner (Tr. at 2177–80). Trial counsel also did not file a notice of alibi as required by Rule 12.1 of the Ohio Rules of Criminal Procedure. Nonetheless, the first defense witness, Ellen Duncan, testified, without objection, that she was with Petitioner until 2:00 p.m. on the day of the Central Bar homicide. The crime allegedly occurred prior to 2:00 p.m. The prosecution asked the trial court to exclude any further alibi evidence because the defense failed to give them any notice of the defense. The defense maintained that her testimony only allowed them to refute Mr. Howell's claim that he and Petitioner played basketball together on the day of the crime.

The following day, the defense called in witnesses Nina Zanders and Paul Bean to confirm Petitioner was with Ms. Duncan at her home. The prosecution objected. As before, the defense insisted that they were not presenting an alibi defense and that a jury instruction regarding alibi was not necessary. Outside the hearing of the jury, the trial judge discussed the issue with counsel on the record:

**The Court:** Yesterday one witness ... gave some testimony that the defendant may have been somewhere else with that witness at the time the offense occurred. The prosecutor did not ask that be stricken but did point out that that kind of evidence is alibi. They weren't notified of alibi and, therefore, the defendant should not be allowed to put on any evidence that he was somewhere else at the time of the crime.

\* \* \* \* \* \*

I also understand the defendants are requesting the Court not to give an instruction on alibi because they do not believe they're putting an alibi defense on.

**Mr. Flax:** That's correct.

(Tr. at 2176–77).

\* \* \* \* \* \*

Mr. Flax: There's no possibility of an alibi with what we knew in advance. There's a certain vagueness.

(Tr. at 2180).

\* \* \* \* \* \*

**The Court:** You are putting me on the spot.... I'm supposed to enforce the law, and the law is you have to tell them about an alibi; but that isn't even relevant to our discussion because you are asking the Court specifically not to give an alibi instruction and you are telling me you are not claiming alibi.

(Tr. at 2181).

Before allowing Ms. Zanders and Mr. Bean to testify in open court, the trial judge listened to their proposed testimony. Both witnesses, who refused to give the prosecution their addresses or Social Security numbers, stated that they planned to testify that Petitioner was with Ms. Duncan the day of the crime until 2:00 p.m. or 3:00 p.m. The trial judge then told counsel that "I don't know what can be more clearly an alibi than two people both of who say that the defendant was with them at the time the crime was committed" (Tr. at 2193). Mr. Flax again insisted that the defense planned to use the testimony, not as alibi evidence, but to attack Mr. Howell's credibility. Nevertheless, under the urging of the prosecution, the trial judge precluded Ms. Zanders and Mr. Bean from testifying about Petitioner's whereabouts after 1:30 p.m. The defense objected and reluctantly asked to present an alibi defense. This colloquy, in part, followed:

**The Court:** You have told me specifically you are not going to give an alibi and

then tell me I'm wrong for forbidding you to give an alibi.

**Mr. Flax:** All right, I will expand and I will now ask to give an alibi under these strictures under protest . . .

(Tr. at 2200).

\* \* \* \* \* \*

**The Court:** I don't think it's in the interest of justice considering the lateness of the appearance of these witnesses; the fact the time has been testified to now, I don't think it's in the interest of justice.

(Tr. at 2205).

 Petitioner now argues that the trial court abused his discretion by excluding evidence of actual innocence. Moreover, by narrowing the testimony of Ms. Zanders and Mr. Bean to discussion of Petitioner's whereabouts at all times except the time the crime was allegedly committed, Petitioner asserts that the trial court provided the prosecution with a way to cast the testimony of Ms. Zanders and Mr. Bean in an inculpatory light. During closing arguments, the prosecution alleged that the gap in their testimony regarding Petitioner's whereabouts at the time of the crime constituted circumstantial evidence that Petitioner had in fact committed the homicide (Tr. at 2566). In addition, Petitioner contends, the trial court prevented the jury from considering the testimony of Ms. Duncan because it refused to instruct the jury on the defense of alibi (Tr. at 2567–84).

 The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The Supreme Court held in *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948), that:

A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense-a right to his day in court-are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.

*Id.* at 273. *see also Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). A state may not apply its procedural rules in a manner that violates a defendant's right to present a defense. *Id.; see also Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Nonetheless, the Supreme Court allows states to enforce certain procedures, including notice-of-alibi provision, if the enforcement does not infringe on a defendant's constitutional rights. *Taylor v. Illinois,* 484 U.S. 400, 410–12, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *Williams v. Florida,* 399 U.S. 78, 81–82, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). The Ohio Rules of Criminal Procedure require written notice of alibi not less than seven days before trial. Absent notice, a trial court may exclude alibi evidence "unless the court determines that in the interest of justice such evidence should be admitted." Ohio R.Crim. P. 12.1.

 A trial court may exclude an alibi defense on the grounds that the defense failed to file a notice of alibi if the reason for the failure is determined to be "willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence." *Taylor,* 484 U.S. at 415, 108 S.Ct. 646. Petitioner asserts that his counsel did not willfully fail to file a notice of alibi in order to gain a tactical advantage. Instead, Petitioner argues that his counsel failed to conduct an adequate investigation and was simply unaware of the alibi witnesses prior to trial. The trial court's exclusion of alibi testimony, Petitioner contends, precluded his defense from asserting a viable defense and allowed the prosecution to bolster its case against Petitioner.

In contrast, Respondent reminds the Court that the Ohio Supreme Court found that Petitioner's decision not to give alibi

notice was "a clear tactical decision." *State v. Jamison,* 49 Ohio St.3d 182, 189, 552 N.E.2d 180, 187 (1990). The Ohio Supreme Court wrote:

> Defense counsel wanted the benefit of alibi evidence, that is, to create a doubt, without the burdens of giving notice by supplying witnesses' names and an alibi instruction....
>
> ... Appellant offered the evidence only at the eleventh hour, after more than a week of trial and the state had rested. Appellant's excuses for lack of notice were flimsy at best. The testimony was not vague, but certain, contrary to defense representations. Duncan, the first defense witness, had been speaking to appellant during the trial, so she could not have just been discovered as a witness.
>
> The prosecution had no notice of alibi, no opportunity to interview the witnesses, and could have been prejudiced by the tactics of defense counsel as to the alibi issue.... The refusal of the alibi witnesses to give their addresses or Social Security numbers is a further illustration of the evasive nature of this strategy. In sum, appellant displayed bad faith as to the alibi defense. Hence, the trial court did not abuse its discretion since the interest of justice would not require waiver of the alibi-notice requirement based upon the facts of this case.

*Id.,* 49 Ohio St.3d at 189, 552 N.E.2d at 187.

██ The Court finds no reason to dispute the findings of the Ohio Supreme Court with relation to defense counsel's failure to file a notice of alibi. In reviewing the claim under state law, the Ohio Supreme Court considered the same facts relevant to the Sixth Amendment claim now before the Court. Our review of the record in this case also leads us to the conclusion that Petitioner's counsel made a willful, tactical decision not to inform the prosecution of the alibi witnesses. Whether considered under state or federal law,

then, this claim would not have led to a reversal of Petitioner's sentence on appeal. The trial court acted within its discretion to reject the evidence. Even assuming an abuse of discretion, any error was harmless. *See O'Neal v. McAninch,* 513 U.S. 432, 436–37, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The jury heard Ms. Duncan's testimony about Petitioner's whereabouts and the jury could weigh this testimony during its deliberations.

Accordingly, Petitioner fails to demonstrate to the Court that Claim Five would have been a "dead bang winner" on appeal. Thus, Petitioner cannot satisfy the prejudice prong of the *Strickland* test because of his counsel's failure to raise this Claim on appeal.

## C. CLAIM SEVEN

**Petitioner was denied his rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution by the trial court's improper exclusion of one juror and failure to adequately question two biased jurors during voir dire.**

██ Petitioner contends that the trial court inadequately questioned jurors Julie Ann Martin and Pamela Timme, who were both victims of violent crime, and thereby violated his constitutional right to a fair and impartial jury.

The Constitution guarantees a state criminal defendant a right to a fair trial by a panel of impartial jurors. *Wainwright v. Witt,* 469 U.S. 412, 418, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (noting that every state guarantees a criminal defendant a right to a jury trial and that this right encompasses the right to an impartial jury); *see also Tinsley v. Borg,* 895 F.2d 520, 523 (9th Cir.1990). Therefore, when a petitioner asks a federal court on habeas corpus review to examine his voir dire, the focus is on whether the

decisions reached by the trial court during the voir dire prevented the empaneling of an impartial jury. *See Hill v. Brigano,* 199 F.3d 833, 844 (1999); *see also Wainwright,* 469 U.S. at 423, 105 S.Ct. 844.

The voir dire requires a trial judge to determine juror bias based on a prospective juror's demeanor, inflection, and responses to a particular flow of questioning. *Tinsley v. Borg,* 895 F.2d 520, 525 (9th Cir.1990); *see also McQueen v. Scroggy,* 99 F.3d 1302, 1321 (6th Cir.1996). Because the trial court's credibility decisions become "historical fact[s]", these decisions are subject to the presumption of correctness found in Title 28 U.S.C. § 2254(d), *Wainwright,* 469 U.S. at 429–30, 105 S.Ct. 844, and "may 'be overturned only for manifest error.'" *Hill,* 199 F.3d at 843 (quoting *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (citing *Irvin,* 366 U.S. at 723, 81 S.Ct. 1639)); *see also Dennis v. Mitchell,* 68 F.Supp.2d 863, 888 (N.D.Ohio 1999) (discussing *Reynolds v. United States,* 98 U.S. 145, 156, 25 L.Ed. 244 (1878)).

Accordingly, in examining the portion of Claim Seven concerning alleged inadequate questioning by the trial court during voir dire, this Court must be "guided by the traditionally broad discretion afforded the trial judge in conducting voir dire." *Hill,* 199 F.3d at 843 (citing *Mu'Min v. Virginia,* 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991); *Ham v. South Carolina,* 409 U.S. 524, 528, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973)). The burden of showing that "a juror was unable to set aside any preconceived notions or opinions and render a verdict based solely upon the evidence presented in court" rests with Petitioner. *Hammer v. Bowlen,* 934 F.Supp. 911, 916 (M.D.Tenn.1996) (citing *Irvin,* 366 U.S. at 723–24, 81 S.Ct. 1639).

During the voir dire of Petitioner's trial, Ms. Martin informed the trial court that she had been a victim of a violent crime (Tr. at 89). She stated that, about ten years prior to Petitioner's trial, an assailant stole her purse from her at knifepoint (*Id.*). She suffered a slight injury, and her assailant was never caught (*Id.*). The Court asked her: "Is there anything about that incident that would affect your ability to be fair and impartial in this case?" (*Id.*). She answered, "No, I don't think so" (*Id.*). Later, during individual questioning, the prosecution also inquired about a manslaughter charge brought against her husband and later dismissed (*Id.* at 256–57). Ms. Martin responded that the experience would not prejudice her against law enforcement or the judicial system (*Id.* at 257). Ms. Martin further assured the defense that she respected a defendant's right to a presumption of innocence (*Id.* at 256). Following this discussion, neither the prosecution nor the defense challenged Ms. Martin for cause.

In addition, Ms. Timme stated during voir dire that she had been a victim of a bank robbery two years earlier (*Id.* at 90; *see also id.* at 466–67). The robbery occurred while she was working in a bank teller window. Although one of the two assailants of the robbery brandished a gun, no one was injured during the robbery (*Id.*). After gathering the facts of this incident, the trial court asked Ms. Timme, "Is there anything about that incident that would affect your ability to be fair and impartial in this case?" (*Id.* at 90). Ms. Timme answered, "No, Your Honor" (*Id.*) Later, during individual questioning of each prospective juror, the prosecution questioned her again about the incident. Ms. Timme once more stated that she believed she could still serve as a juror in this case despite her exposure to violent crime (*Id.* at 467). Thereafter, the defense asked Ms. Timme whether she could return a verdict of innocent if the prosecution failed to prove beyond a reasonable doubt that Petitioner committed the crime alleged. She answered affirmatively (*Id.* at 478). Defense counsel Cal Prem further verified during the voir dire that he knew Ms. Timme's uncle-in-law (*Id.* at 473). The defense did not challenge Ms. Timme for cause (*Id.* at 480).

After reviewing the questioning of these jurors, the Court concludes that Petitioner fails to demonstrate that the trial court violated his constitutional rights by empaneling a partial and biased jury. Each juror stated she would perform her duties impartially despite any past experience. The trial court, as the ultimate arbitrator of credibility, judged each juror's ability to be fair and impartial and we see no reason why we should not defer to the trial court's findings. Petitioner presents no clear evidence indicating that these jurors were biased. *See Dennis,* 68 F.Supp.2d at 888. Instead, Petitioner only unconvincingly asserts that those with exposure to robberies could not possibly be fair, impartial, or unbiased. The Court notes that Petitioner fails to explain why the same is not true for a juror who watched a spouse deal with a manslaughter charge, as Ms. Martin did, or for a juror who knew a family member was acquainted with the defense counsel, as Ms. Timme did. According to the Sixth Circuit, "it is not enough for a defendant to say 'I would have been better off if …'" He must demonstrate that judicial or prosecutorial action (or inaction) resulted in a constitutional violation, not a tactical or strategic disadvantage." *McQueen,* 99 F.3d at 1320–21. Petitioner here can show, at most, a tactical disadvantage.

Accordingly, the Court does not find that the portion of Claim Seven concerning the alleged inadequate questioning of jurors Martin and Timme would have been a "dead bang winner" on appeal. Thus, Petitioner cannot satisfy the prejudice prong of the *Strickland* test because of his counsel's failure to raise this Claim on appeal.

## D. CLAIM NINE

**The trial court's error in the admission of hearsay evidence during trial denied Petitioner his rights to a fair trial and due process of law as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.**

Petitioner argues that the trial court erred in the admission of hearsay evidence and thereby denied Petitioner of his rights to a fair trial and due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments. Petitioner specifically points to the testimony of the following three witnesses:

(1) Officer Dennis Luken, who testified about the robbery at Acres of Books, stated that he had been informed that the fingerprint lifted from the cash register matched Petitioner's fingerprint (Tr. at 1537, 1606). According to Petitioner, the fingerprint comparison was the only evidence linking Petitioner to the Acres of Books robbery.

(2) JoAnne Davidson, a victim of the Sav–All Discount Drug Store robbery, testified that she remembered being kicked once by her assailant but that she had been told that she must had been kicked three or four times because of the extent of her injuries (Tr. at 1693–94). Petitioner asserts that this testimony was designed to invoke sympathy from the jury.

(3) Wayne Harris, who testified about the Kings News robbery, testified that he was told that the assailant had left the scene on a bicycle (Tr. at 1756, 1763). Petitioner argues that this testimony linked Petitioner to both the Kings News and Gold Star Chili robbery (*see id.* at 1906).

Plaintiff asserts that none of the above testimony fell within a firmly-rooted exception to the hearsay rule and that the admission of the hearsay violated Petitioner's constitutional rights. Without citing any support, Respondent simply asserts that the admission of the above testimony was not in error.

In all criminal prosecutions, the defendant is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution a right "to be confronted with the witnesses against him." U.S.

Const. amend. IV; *see also Pointer v. Texas,* 380 U.S. 400, 403–404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). According to the Supreme Court, "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). This concern is often alleviated through the cross-examination of witnesses against the defense. *See Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."); *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Because hearsay hinders cross-examination, the admission of hearsay can, in some instances, violate the Confrontation Clause.

■■■ In addressing hearsay issues falling within the shadow of the Confrontation Clause, the Supreme Court refers to Professor McCormick's definition of hearsay as "testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of the matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." *Ohio v. Roberts,* 448 U.S. 56, 62 n. 4, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (citing E. Cleary, McCormick on Evidence § 246 (2d ed.1972)). In *Ohio v. Roberts,* 448 U.S. at 65–66, 100 S.Ct. 2531, the Supreme Court announced a two-prong test to determine whether hearsay is admissible under the Confrontation Clause. First, "the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* at 65, 100 S.Ct. 2531. Secondly, if the declarant is shown to be unavailable, "his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without

more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. 2531.

In further delineating the boundaries of this standard, the Supreme Court concluded that, "[t]o demonstrate 'particularized guarantees of trustworthiness', 'hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.' " *Idaho v. Wright,* 497 U.S. 805, 822–23, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). The "particularized guarantees of trustworthiness" must be "drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* at 820, 110 S.Ct. 3139

■■■ Confrontation Clause concerns aside, a writ may be granted on the erroneous admission of hearsay evidence only if the erroneous admission "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *see also Hill v. Brigano,* 199 F.3d 833, 846–47 (6th Cir. 1999) (quoting *Nevers v. Killinger,* 169 F.3d 352, 371 (6th Cir.1999)). Known as the harmless error standard, this standard applies even if a federal court in a habeas corpus case is the first to review the matter. *Gilliam v. Mitchell,* 179 F.3d 990, 995 (6th Cir.1999). In assessing the error, a court should consider the importance of the witness's testimony, whether the testimony was cumulative, the extent of cross-examination, whether corroborating or contradictory evidence existed, and the overall strength of the prosecution's case. *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

In Petitioner's case, the prosecution called Officer Luken, Mr. Harris, and Ms. Davidson to testify about the same and similar crimes allegedly committed by Pe-

titioner. The trial judge determined that the testimony was admissible to show identity, motive, and intent. As Respondent fails to question whether the testimony at issue in this Claim was in fact hearsay, we assume that the testimony at issue was admitted for the truth of the matters asserted therein. Furthermore, the Court notes that the prosecution did not establish the unavailability of the declarants during the trial and the Court finds no particularized guarantees of trustworthiness in the testimony of these witnesses. However, the Court concludes that the admission of the alleged hearsay amounted to harmless error.

First, in reviewing the facts of this Claim, the Court observes that the defense drew out the alleged hearsay uttered by Officer Luken on cross-examination. Officer Luken's comment about the fingerprint became cumulative evidence once the actual declarant—Officer Joseph Schmidt— testified that he compared the fingerprint of Petitioner with the fingerprint allegedly recovered by Officer Luken at the scene of the Acres of Books robbery (Tr. at 1794). In addition, the defense raised during the cross-examination of Officer Luken the possibility that Officer Luken did not properly preserve the fingerprint evidence or that he planted the evidence (*Id.* at 1589, 1598, 1602–03; *see also* 2517–18). Thus, the issue of whether the fingerprints did in fact match was submitted to thorough cross-examination. Therefore, the Court finds that any error related to admission of this alleged hearsay did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710.

Secondly, with regard to the alleged hearsay testimony of Mr. Harris, the Court finds that the defense invited this testimony during cross-examination for tactical reasons. To draw the jury's attention away from the violent robberies at the Metropolitan Gallery, Sav–All Discount Drug Store, and Rensler Portrait Studio, the defense tried to demonstrate that Peti-

tioner actually acted with a more independent and less hostile modus operandi. Both the Kings News robbery and the Gold Star Chili robbery involved one assailant who did not violently attack anyone, and so the defense sought to align Petitioner with these crimes (*see* Tr. at 2512– 14). Although irrelevant to our discussion of the guilt phase of Petitioner's trial, the Court notes that this defense tactic carried over to the penalty phase of the trial when the defense invited Petitioner to confess to the Kings News robbery. Thus, any error related to admission of the testimony about the assailant fleeing on a bicycle did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710.

Thirdly, as illustrated by the following colloquy, the trial court did exclude Ms. Davidson's alleged hearsay testimony:

**Prosecution:** Do you know how many times you were kicked? Were you able to find out after being at the hospital?

**Ms. Davidson:** I only remember once.

**Prosecution:** Do you know how many times you were kicked?

**Ms. Davidson:** Approximately three or four times.

**Prosecution:** Why do you say that?

**Ms. Davidson:** Because they said for the amount of damage that was done.

**Defense:** Judge, I'll object.

**The Court:** Sustained. Jury will ignore that.

Even if the Court determines that the trial judge was not clear in his exclusion of the hearsay and that the trial judge's error led to the admission of evidence lacking any indicia of reliability, the Court finds that the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710. Ms. Davidson had already testified that the injuries she sustained during the Sav–All Discount Drug Store robbery knocked her unconscious

and led to the insertion of a permanent metal plate in her face. The number of times the assailant kicked her amounted to cumulative evidence of the violence directed at her during the robbery.

In summary, the Court finds that the admission of the alleged hearsay was harmless error because it did not have a "substantial or injurious effect" on the outcome of the case. The information contained in the alleged hearsay was either before the jury through other admissible testimony or was actively sought by the defense for tactical purposes. In addition, the prosecution built a case on the testimony of Petitioner's Co–Defendant, shoeprint evidence, and the evidence of the same and similar robberies. The testimony of Officer Luken, Mr. Harris, and Ms. Davidson, while important, was "not the only evidence in the record supportive of a finding of intent." *See Daniels v. Burke,* 83 F.3d 760, 767 (6th Cir.1996); *cf. Carter v. Sowders,* 5 F.3d 975, 982 (6th Cir.1993) (granting petition because trial court's admission of videotaped deposition of paid police informant violated the petitioner's Sixth Amendment rights and the conviction was based on this informant's testimony).

Accordingly, the Court concludes that Petitioner fails to show that the portion of Claim Nine related to hearsay testimony would have been a "dead bang winner" on appeal. Thus, Petitioner cannot satisfy the prejudice prong of the *Strickland* test because of his counsel's failure to raise this Claim on appeal.

### E. CLAIM TWELVE

**The trial court denied Petitioner his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to properly instruct the jury at the conclusion of the guilt phase of Petitioner's trial.**

In this attack on the trial court's jury instructions, Petitioner contends that the trial court's instructions on reasonable doubt violated his due process rights. The trial court's instruction, which contained the language set forth in Ohio Revised Code § 2901.05(D), defined reasonable doubt:

> What is reasonable doubt? Reasonable doubt is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

(Tr. at 2568). With regard to this instruction, Petitioner specifically argues that the "firmly convinced" and "willing to act" language fail to require a degree of proof sufficient to meet the due process standard of *In re Winship,* 397 U.S. 358, 360, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be based on proof beyond a reasonable doubt as to every fact necessary to constitute the crime for which the state defendant was charged. *Harris v. Marshall,* 687 F.Supp. 1166, 1168 (S.D.Ohio 1987) (citing *Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *In re Winship,* 397 U.S. at 364, 90 S.Ct. 1068). The Due Process Clause, though, "neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). The Supreme Court explains that "so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, ... the Constitution does not require that any par-

ticular form of words be used in advising the jury of the government's burden of proof." *Id.* (citations omitted). In examining an alleged erroneous instruction that describes reasonable doubt, a court inquires as to whether a reasonable likelihood exists that the jury understood the instruction to allow a conviction based on proof insufficient to meet the standard required by the Due Process Clause. *Id.* at 6, 114 S.Ct. 1239; *see Estelle v. McGuire,* 502 U.S. 62, 72, & n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

The Supreme Court cautions reviewing courts that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973) (citing *Boyd v. United States,* 271 U.S. 104, 107, 46 S.Ct. 442, 70 L.Ed. 857 (1926)). The Sixth Circuit followed this rule in its review of the language on reasonable doubt in Ohio Revised Code § 2901.05(D). *Thomas v. Arn,* 704 F.2d 865, 868–69 (6th Cir.1983). The Sixth Circuit in *Thomas* specifically disapproved of the "willing to act" language, but it also held that "Ohio's statutory definitions of reasonable doubt and proof beyond a reasonable doubt, when read as a whole and taken in the context in which the instructions are presented here, do not offend due process or any other federally guaranteed constitutional right." *Id.* at 869; *see also Scott v. Mitchell,* 209 F.3d 854, 883 (6th Cir.2000); *Byrd v. Collins,* 209 F.3d 486, 527 (6th Cir.2000).

Because this Court finds the argument underlying Petitioner's Claim Twelve to be the same as that of *Thomas,* the Court follows the Sixth Circuit in upholding the language in Ohio Revised Code § 2901.05(D) and accordingly the trial court's instruction based on § 2901.05(D). As in *Thomas,* the trial court in Petitioner's case advised the jury about the presumption of innocence, and the trial court explained that the jury must acquit Petitioner unless the State of Ohio produced evidence convincing the jurors beyond a reasonable doubt of every essential element of the crime charged (Tr. at 2567). *See Thomas,* 704 F.2d at 869 (noting that the trial court properly instructed the jury on the presumption of innocence and burden of proof). Therefore, the trial court's instructions as a whole did not shift the burden of proof or negate the presumption of innocence. *See Cupp,* 414 U.S. at 148–49, 94 S.Ct. 396. Thus, pursuant to *Thomas* as well as our own review of Petitioner's case, the Court concludes that no reasonable likelihood exists that the jury understood the trial court's instruction to allow a conviction based on proof insufficient to meet the Due Process standard.

Accordingly, the Court concludes that Petitioner fails to show that the portion of Claim Twelve related to the trial court's instruction on reasonable doubt would have been a "dead bang winner" on appeal. Thus, Petitioner cannot satisfy the prejudice prong of the *Strickland* test because of his counsel's failure to raise this Claim on appeal.

## F. CLAIM SIXTEEN

**The trial court denied Petitioner his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the U.S. Constitution by failing to give proper sentencing instructions in the sentencing phase.**

Petitioner asserts that the trial court failed to properly charge the jury with respect to parole eligibility, reasonable doubt, and mitigating factors, thereby denying Petitioner his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments. Petitioner argues that the trial court's errors led to an arbitrary and capricious imposition of death. The Court addressed the portion of Claim Sixteen involving the trial court's instruction on parole eligibility in an earlier section. Here the Court addresses the portions of Claim Sixteen involving the trial court's

instructions on reasonable doubt and mitigating factors.

In addressing constitutional concerns arising out of capital punishment, the Supreme Court distinguishes between the "eligibility decision" and the "selection decision." *Tuilaepa v. California*, 512 U.S. 967, 971, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). The jury's eligibility decision involves the question of whether a defendant is eligible for the death penalty. *Id.* In a homicide case such as Petitioner's, for instance, the jury must convict the defendant of murder and find one " 'aggravating circumstance' " during the guilt or penalty phase for the defendant to be eligible for the death penalty. *Id.* at 972, 114 S.Ct. 2630. In the eligibility decision, the Supreme Court emphasizes the "need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition". *Buchanan v. Angelone*, 522 U.S. 269, 275–76, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998).

With regard to the selection decision, the Supreme Court broadens the inquiry to include "all relevant mitigating evidence to allow an individualized determination" on the basis of the defendant's character and the actual facts of the crime. *Id.* at 276, 118 S.Ct. 757; *see also Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (concluding that "an individualized decision is essential in capital cases"); *Woodson v. North Carolina*, 428 U.S. 280, 303–304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (plurality opinion). The Supreme Court requires the sentencer making the selection decision to consider "any constitutionally relevant mitigating evidence," and the Court allows a state to "shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." *Buchanan*, at 276, 118 S.Ct. 757. In fact, the Supreme Court decisions dealing with the selection decision "suggest that complete jury discretion is constitutionally permissible." *Id.* at 276–77, 118 S.Ct. 757 (citing *Tuilaepa*, 512 U.S. at 978–79, 114 S.Ct. 2630; *Zant v. Stephens*, 462 U.S. 862, 875, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)).

Thus, in determining whether a state court's jury instructions satisfy constitutional principles as to the selection decision, a federal court asks "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); *see also Estelle v. McGuire*, 502 U.S. 62, 72–73, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Supreme Court cautions that, irrespective of the distinguishing features of the eligibility decision and the selection decision, one principle is common to both: "The State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Tuilaepa*, 512 U.S. at 973, 114 S.Ct. 2630 (citing *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (finding that capital procedures must "minimize the risk of wholly arbitrary and capricious action")); *see also Furman v. Georgia*, 408 U.S. 238, 257, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (plurality opinion).

Having discussed generally the standards involved in addressing the issues brought by Petitioner in Claim 16, the Court now addresses each challenged instruction to decide whether the instruction prevented the jury's consideration of constitutionally relevant evidence. *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190. In our analysis, we take into consideration the fact that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973) (citing *Boyd v. United States*, 271 U.S. 104, 107, 46 S.Ct. 442, 70 L.Ed. 857 (1926)).

## 1. Reasonable Doubt & Weighing Process

■■■ The trial court instructed the jury about the burden of proof to be used in its sentencing determination:

The burden of proof in the sentencing hearing is upon the prosecution just as it was in the guilt or innocence trial. The burden is upon the prosecution to prove beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factors.

(Tr. at 2765). Rather than repeat the instructions the trial court read to the jury during the guilt phase of the trial, the trial court told the jury to refer back to the written instructions given the jurors during the guilt phase. During the guilt phase, the trial court instructed the jury on reasonable doubt:

What is reasonable doubt? *Reasonable doubt is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge.* It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

(Tr. at 2568 (emphasis added)). Petitioner notes that the trial court's definition of reasonable doubt is derived from Ohio Revised Code § 2901.05(D).

According to Petitioner, because the jury had already determined that it was firmly convinced of the truth of the charges by finding Petitioner guilty in the trial phase, the instruction required the jury to impose a death sentence. Citing *Sumner v. Shuman,* 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987), and *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), for support, Petitioner argues that the instruction "created a conclusive presumption in favor of death and had the effect of making the death sentence mandatory in violation of the Constitution" (doc. 165). *See Sumner,* 483 U.S. at 85, 107 S.Ct. 2716 (holding that a statute imposing mandatory death penalties for prison inmates convicted of murder while serving life sentences without possibility of parole violated the Eighth and Fourteenth Amendments); *Roberts,* 428 U.S. at 335–36, 96 S.Ct. 3001 (holding unconstitutional a state death penalty scheme that narrowly defined five categories for which the death penalty was mandatory).

After reviewing this matter, the Court finds that the context of the penalty phase proceeding as well as the instructions precluded the jury from basing its recommendation of the death penalty on simply its earlier finding of guilt. When the earlier instructions are read in context, it is clear that the trial court attempted to provide both specific and general definitions of reasonable doubt. Furthermore, as the Supreme Court found in *Boyde,* 494 U.S. at 383, 110 S.Ct. 1190, and *Buchanan,* 522 U.S. at 278, 118 S.Ct. 757, " 'the context of the proceedings would have led reasonable jurors to believe that evidence of petitioner's background and character could be considered in mitigation.' " It is unlikely that, in Petitioner's case, the jury would think back to instructions read days earlier and dismiss the entire penalty phase testimony. Moreover, the jury deliberated two days before recommending the death sentence. This indicates that the decision was not likely but simplified by the jury.

■■■ Next, Petitioner argues that the trial court incorrectly charged the jury with relation to the weighing process. Ohio Revised Code § 2929.03 requires the State of Ohio to prove that the aggravating factors a defendant was convicted of outweigh beyond a reasonable doubt the mitigating factors that the defendant decides to raise. On this point, the trial court instructed the jury that:

*The word outweigh means to weigh more than, to be more significant than.* It is the quality of the evidence that must be weighed. The quality of the evidence may or may not be identical with the quantity of the evidence; that is, the number of witnesses or exhibits presented.

The fact that one or more mitigating factors is present does not preclude the recommendation of the death sentence if you find beyond a reasonable doubt that the aggravating circumstance still outweighs the mitigating factors. The fact that any particular mitigating factor is not present does not preclude the recommendation of a life sentence if the aggravating circumstance does not outweigh whatever mitigating factors you find do exist.

(Tr. at 2764 (emphasis added)). Citing *Gregg*, 428 U.S. at 189, 96 S.Ct. 2909, Petitioner contends that the trial court's definition of "outweigh" failed to adequately define the juror's discretion because the instruction required Petitioner to demonstrate that his mitigating evidence was more significant than Mr. Mitchell's life.

Read in context, though, the trial court's instruction clearly describes to the jury the discretion granted it to weigh the aggravating circumstance and the mitigating factors. The instruction did not inaccurately place the burden of proof on Petitioner and it correctly gave the jury the duty of weighing all of the information presented by the prosecution and the defense during the penalty phase. The Court concludes that there is no reasonable likelihood that the jury applied the challenged instruction in a way that prevented consideration of constitutionally relevant evidence or unconstitutionally created bias in sentencing.

## 2. Mitigating Factors

 Ohio Revised Code §§ 2929.03 and 2929.04 guide the discretion of the trier of fact by limiting the mitigating factors a trier of fact may consider to support

the imposition of the death penalty. The trial court gave the following definition of mitigating factors:

Mitigating factors are factors that, while they do not justify or excuse the crime of aggravated murder, *nevertheless may be considered by you as extenuating, lessening, weakening, excusing to some extent or reducing the degree of the defendant's culpability.*

The Ohio Revised Code enumerates the mitigating factors, some of which may not apply in this matter. These factors include but are not limited to the following: one, the nature and circumstances of the offense; two, the history, character and background of the offender; three, whether the victim of the offense induced or facilitated it; four, whether it is unlikely the offense would have been committed but for the fact the defendant was under duress, coercion or strong provocation; five, whether at the time of committing the offense the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; six, the youth of the offender; seven, the offender's lack of a significant history of prior criminal convictions and delinquency adjudications; eight, if the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim; nine, any other factors that are relevant to the issue of whether the offender should be sentenced to death.

(Tr. 2762–63 (emphasis added)).

Regarding the trial court's definition of mitigating factors, Petitioner argues that the trial court incorrectly intimated to the jury that mitigating factors must excuse or reduce blame in order to support a life sentence. Petitioner further asserts that the trial court's definition of a mitigating factor denied Petitioner the benefit of

much of his mitigation evidence regarding his childhood.

In addition, Petitioner contends that the trial court erred in charging the jury on all of the mitigating factors listed in Ohio Revised Code § 2929.04 (*see* Tr. at 2763–64). By instructing the jury on all of the factors, Petitioner argues, the trial court changed the focus of the mitigation hearing from a qualitative analysis of the evidence to a quantitative analysis of the number of mitigating factors presented and impermissibly converted the mitigating factors into aggravating circumstances. Petitioner also argues that the trial court's instruction related to the Ohio Revised Code § 2929.04(B)(7) mitigating factor (Tr. at 2764) left too much discretion in the hands of the jury.

Having reviewed Petitioner's arguments concerning this instruction, the Court finds them to be without merit. Taken in context, the trial court's instructions do not create a reasonable likelihood that the jurors understood the challenged instructions to preclude consideration of relevant mitigating evidence offered by Petitioner during the penalty phase. *See State v. DePew,* 38 Ohio St.3d 275, 289–90, 528 N.E.2d 542, 558 (1988) (finding no prejudicial error where the trial court read all the statutory mitigating factors to the jury but did not comment on the factors actually presented by the defendant). Again, the Court finds that it is unlikely the jury would ignore hours of testimony by Petitioner's family and friends, or that the jury would simply undertake a quantitative analysis after the trial court advised against one. The jury in this case deliberated two days on the question of whether to recommend the death sentence, indicating that the jury did consider testimony regarding mitigating factors. The Court further notes that the Supreme Court in *Buchanan* observed that "we have never ... held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence." *Id.,* 522 U.S. at 276, 118 S.Ct. 757.

For these reasons, the Court finds no merit to Petitioner's claim that the trial judge's sentencing instructions led unfairly to the jury's ultimate decision.

Accordingly, the Court does not find that the portions of Claim Sixteen involving the trial court's instructions on reasonable doubt and mitigating factors would have been "dead bang winners" on appeal. Thus, Petitioner cannot satisfy the prejudice prong of the *Strickland* test because of his counsel's failure to raise this Claim on appeal.

## G. CLAIM EIGHTEEN

**The statutory provisions governing the Ohio capital punishment scheme violate the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, Article VI of the United States Constitution, and various international laws and treaties.**

In numerous subclaims, Petitioner argues that the Ohio capital punishment scheme violates the United States Constitution as well as international law. Specifically, Petitioner contends that the scheme is unlawful because:

(1) Death as a punishment makes no meaningful contributions to interests of deterrence, incapacitation/isolation, or retribution/moral reinforcement and is not the least restrictive or most effective means to satisfy these interests;

(2) The death penalty is exacted disproportionately on African–Americans, evidenced, Petitioner asserts, by Petitioner's allegation that approximately 50 percent of the people on death row in Ohio are African–American;

(3) Ohio allows prosecutors unfettered discretion in deciding whom to charge with a capital offense;

(4) Ohio's capital punishment scheme requires proof of an aggravating specification without consideration

of mitigating factors during the guilt phase of a capital trial;

(5) The scheme allows use of an aggravating factor that merely repeats an element of the crime to narrow the class of death-eligible offenders;

(6) The scheme provides trial judges the discretion to dismiss the capital specifications for capital defendants who plead guilty or no contest;

(7) The submission of presentence investigation reports and mental evaluations are mandatory if requested by the capital defendant pursuant to Ohio Revised Code § 2929.03(D)(1);

(8) The scheme requires capital defendants to prove the existence of mitigating factors by a preponderance of the evidence and does not require the state to prove the absence of mitigating factors or that death is the only appropriate penalty;

(9) The scheme does not allow the trier of fact at the penalty phase to be influenced by any consideration of sympathy or mercy for a capital defendant;

(10) The scheme fails to provide the sentencing authority with an option to chose a life sentence when no mitigating factors are presented;

(11) Ohio's proportionality review of death penalty cases is inadequate because trial courts are not required to prepare life opinions for appellate case comparison;

(12) Ohio's appellate review process is inadequate, leading to an excessive approval of the death penalty;

(13) International law prohibits the imposition of the death penalty.

 Respondent contends that Petitioner's arguments find no support in the law. After reviewing this Claim, the Court agrees. In *Gregg v. Georgia,* 428 U.S. 153, 171–187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, Stevens, JJ.), the Supreme Court concluded that capital punishment was neither excessive nor disproportionate as those terms are understood in Eighth Amendment jurisprudence. *Id.* at 187, 96 S.Ct. 2909. The Supreme Court also concluded that capital punishment did not violate the Eighth Amendment's prohibition against cruel and unusual punishment, holding that:

> Considerations of federalism, as well as respect for the ability of a legislature to evaluate, in terms of its particular State, the moral consensus concerning the death penalty and its social utility as a sanction, require us to conclude, in the absence of more convincing evidence, that the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe.

*Id.,* 428 U.S. at 186–87, 96 S.Ct. 2909. In rejecting an argument that capital punishment is not the least restrictive or most effective means of furthering societal interests, the Supreme Court recognized that retribution, deterrence, and incapacitation of dangerous offenders are legitimate societal interests supporting capital punishment. *Id.* at 183–86, 96 S.Ct. 2909. Thus, Petitioner's assertions to the contrary do not hold up under Supreme Court precedent.

 While the death penalty is not *per se* unconstitutional, "[i]f a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v. Florida,* 468 U.S. 447, 460, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) (citing *Zant v. Stephens,* 462 U.S. 862, 873–80, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Furman v. Georgia,* 408 U.S. 238, 294, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring)). Earlier, in *Gregg,* the Supreme Court described the minimum Eighth Amendment requirements for a death penalty scheme:

In summary, the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

*Id.* at 195, 96 S.Ct. 2909. In clarifying this standard, the Supreme Court observed that the Eighth Amendment only requires that a sentencer's discretion be curbed enough to prevent arbitrary and capricious action, not that certain weight be assigned to aggravating circumstances and mitigating factors. *See Tuilaepa v. California,* 512 U.S. 967, 979, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (concluding that "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."); *see also California v. Ramos,* 463 U.S. 992, 1008–1009 n. 22, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983); *Zant,* 462 U.S. at 875, 103 S.Ct. 2733; *Proffitt v. Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

The Ohio capital punishment scheme assailed by Petitioner falls within the boundaries of the standard set by the Supreme Court. Ohio's scheme allows for the death penalty when a defendant is found guilty beyond a reasonable doubt of aggravated murder and at least one statutorily-designated aggravating specification. Then, during the bifurcated penalty, or sentencing, phase of a capital trial, the sentencer is provided standards and information with which to use in deciding whether a defendant should be sentenced to death. The capital defendant may present mitigation evidence during the penalty phase, and the prosecution is required to prove beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factors. After the jury considers this evidence and issues its recommendation, the trial court undertakes an independent review of the evidence.

Nonetheless, Petitioner asserts that the Ohio capital punishment scheme is unconstitutional because the scheme is disproportionally exacted on African–Americans. In support of this argument, Petitioner proffers a study prepared by the Ohio Public Defender indicating that, although African–Americans make up about 10 percent of Ohio's population, approximately half of death row inmates are African–American. The study by the Ohio Public Defender further avers that more than 40 African–Americans are on death row for killing Caucasians while only two Caucasians are on death row for killing African–Americans. Petitioner asserts that this study shows that Ohio's capital punishment scheme results in the imposition of the death penalty in a racially discriminatory manner.

Disturbing as this study is to the Court, the Court is required to follow Supreme Court precedent holding that such studies are insufficient to prove a constitutional violation. In *McCleskey v. Kemp,* 481 U.S. 279, 286–87, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the Supreme Court found that a study similar to the one proffered in this case was alone insufficient to support an inference that the decisionmakers in the defendant's case acted with discriminatory purpose or that the state enacted or maintained its capital punishment scheme in order to ensure an anticipated discriminatory result. *Id.* at 292–94, 107 S.Ct. 1756. Here, Petitioner fails to present evidence beyond that of the study supporting a finding that racial discrimination affected the decisionmakers in his case or that the Ohio legislature enacted or maintains the state's capital punishment scheme to ensure a racially-disparate impact on minorities. Thus, the Court must find Petitioner's argument to be without merit.

▮ Moreover, the fact Ohio allows prosecutors discretion in deciding whom to charge with a capital offense does not diminish the constitutional legitimacy of Ohio's capital punishment scheme. The Supreme Court rejected a similar argument in *Gregg*, stating that:

> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.

*Id.*, 428 U.S. at 199, 96 S.Ct. 2909. Petitioner fails to demonstrate to this Court any reason in this case for departing from Supreme Court precedent. In addition, the Sixth Circuit has observed that discretion is inherent generally in the criminal justice system:

> It is well-settled that the procedural aspects of the administration of criminal justice abound with situations in which the exercise of discretion by a myriad of participants occupies a significant role in determining the destiny of an alleged offender.

*United States v. Talbot*, 825 F.2d 991, 999 (6th Cir.1987) (declining to find that a discretionary decision by a federal prosecutor violated due process); *see Dennis v. Mitchell*, 68 F.Supp.2d 863, 902–903 (N.D.Ohio 1999).

▮ Petitioner's argument that the Ohio scheme violates the Constitution by requiring proof of any aggravating circumstance during the guilt phase of a capital trial is also without merit. Proof of aggravating factors helps to narrow the class of offenders eligible for the death penalty and, thereby, channels the sentencer's discretion. *Lowenfield v. Phelps*, 484 U.S. 231, 244, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). Narrowing the class of offenders eligible for the death penalty is required by the Eighth Amendment, *Zant*, 462 U.S. at 877, 103 S.Ct. 2733, but this narrowing may be done during the guilt or penalty phase of a capital trial and the narrowing may be accomplished through the use of aggravating circumstances. In *Lowenfield*, the Supreme Court wrote:

> The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by the jury findings at either the sentencing phase of the trial or the guilt phase.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> ... The legislature may itself narrow the definition of capital offenses ... so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

*Id.*, 484 U.S. at 244–46, 108 S.Ct. 546 (citing Zant, 462 U.S. at 876 n. 13, 103 S.Ct. 2733; *Jurek v. Texas*, 428 U.S. 262, 269–71, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)); *see Tuilaepa*, 512 U.S. at 971–72, 114 S.Ct. 2630; *Dennis*, 68 F.Supp.2d at 903.

▮ Petitioner further argues that Ohio's capital punishment scheme is unconstitutional because it allows an aggravating circumstance merely to repeat an element of the offense of aggravated murder. Petitioner asserts that this fails to genuinely narrow the class of death-eligible offenders. However, in *Lowenfield*, 484 U.S. at 235, 108 S.Ct. 546, the Supreme Court held that an aggravating factor that repeats an element of the crime is constitutional as long as the jury's discretion is sufficiently narrowed. Ohio's statutory provisions meet this requirement.

Rather than authorize a mandatory death penalty for aggravated murder, Ohio requires that the killing be purposeful *and* that the defendant be the principal offender in the aggravated murder or have committed the aggravated murder with prior calculation and design before such a defendant is eligible for the death penalty.

In specific terms, § 2903.01(B) of the Ohio Revised Code defines aggravated murder as purposely causing the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnaping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape. If a defendant is convicted of aggravated murder, the death penalty may be imposed only if at least one aggravating circumstance is also proven beyond a reasonable doubt. Section 2929.04(7) states that an aggravating circumstance exists if the defendant committed aggravated murder while committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnaping, rape, aggravated arson, aggravated robbery, or aggravated burglary *and* either the defendant was the principal offender in the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation or design. This and other aggravating circumstances narrows the class of death-eligible offenders by ensuring that not all offenders convicted of aggravated murder are eligible for capital punishment. Therefore, Petitioner fails to persuade this Court that the narrowing features of Ohio's capital punishment scheme are unconstitutional.

■ In contrast to Petitioner's argument, this Court also concludes that the Ohio death penalty scheme does not create an unconstitutional risk of death for capital defendants who invoke their fundamental right to a trial by jury. Ohio Rule of Criminal Procedure 11(C)(3) permits a trial judge to dismiss capital specifications from indictments where defendants plead guilty or no contest if "in the interest of justice." Petitioner asserts that such discretion should also be allowed when a capital defendant proceeds to trial. Otherwise, Petitioner contends, the defendant's exercise of his right to a trial by jury is unconstitutionally burdened. Petitioner, though, cites no case law to support his position.

In *United States v. Jackson,* 390 U.S. 570, 582–83, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), the Supreme Court held that a statutory provision that automatically dismissed capital specifications upon the guilty pleas of capital defendants was unconstitutional. The Supreme Court, however, has never invalidated a statute allowing a defendant to avoid the possibility of a death sentence with a guilty plea. To the contrary, no *per se* rule against encouraging guilty pleas exists. *See Corbitt v. New Jersey,* 439 U.S. 212, 223, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978); *Spinkellink v. Wainwright,* 578 F.2d 582, 608–609 (5th Cir. 1978) (citing *Brady v. United States,* 397 U.S. 742, 747, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). Unlike the defendant in *Jackson,* a capital defendant in Ohio who pleads guilty could still face the death penalty. Thus, Ohio Rule of Criminal Procedure 11(C)(3) is not unconstitutional. *See Dennis,* 68 F.Supp.2d at 903–904; *State v. Buell,* 22 Ohio St.3d 124, 138, 489 N.E.2d 795, 808–809 (1986).

■ Petitioner also attacks the constitutionality of § 2929.03(D)(1), which provides, in relevant part, that any presentence investigation report or mental examination requested by the defendant in preparation for the mitigation hearing must be disclosed to both the prosecuting attorney and the sentencer. Petitioner argues that this statutory provision hinders a defendant's ability to gather and then provide selected, admissible information for the mitigation hearing, thereby violating his rights to due process and effective assistance of counsel. This provision warrants discussion.

■ Under Ohio law, the right to present mitigating evidence during the penalty phase of a capital trial belongs to the capital defendant. *See* Ohio Rev.Code § 2929.04(B). Neither the trial court nor the prosecutor may comment on the mitigating factors listed in § 2929.04(B) that the defendant does not raise during the penalty phase. *See State v. DePew*, 38 Ohio St.3d 275, 289, 528 N.E.2d 542, 557 (1988). Nonetheless, if a defendant relies on § 2929.03(D)(1) to gather mitigating evidence, the reports thereby prepared are presented to the jury and the judge without any redaction of irrelevant or prejudicial information. Use of this provision, then, essentially takes away from the defendant the right to channel the mitigating evidence described in § 2929.04(B).

Although the provision is troubling to this Court, we cannot hold that Ohio's death penalty scheme is unconstitutional because of it. We reach this conclusion based on the fact that a defendant is not required to request a presentence investigation report or a mental examination. *See* Ohio Rev.Code § 2929.03(D)(1); *Buell*, 22 Ohio St.3d at 138, 489 N.E.2d at 808–809. In addition, the Court notes that Ohio Revised Code § 2929.024 allows a trial court to provide funds to an indigent defendant for investigative services, experts, and other services necessary in the preparation of a defense. Therefore, an indigent defendant is not required to resort to § 2929.03(D)(1). *Cf. State v. Esparza*, 39 Ohio St.3d 8, 16–18, 529 N.E.2d 192, 200–203 (1988) (Brown J., dissenting). For these reasons, we conclude that § 2929.03(D)(1) is not unconstitutional.

■ Petitioner next asserts that Ohio's capital punishment scheme is unconstitutional because the prosecutor is not required to prove the absence of mitigating factors or that death is the only appropriate penalty. Petitioner further contends that the scheme is unconstitutional because capital defendants are required to prove the existence of mitigating factors by a preponderance of the evidence. Once again, the weight of authority is stacked against Petitioner. First, in Eighth Amendment jurisprudence, the "appropriateness" of a death sentence is considered by a jury or trial judge. According to the Supreme Court, once a defendant is found to be eligible for the death penalty, the jury or the trial court must then undertake an individualized sentencing determination to determine whether the death penalty is appropriate. *See Blystone v. Pennsylvania*, 494 U.S. 299, 305, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); *Ramos*, 463 U.S. at 1007, 103 S.Ct. 3446; *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). As we found earlier, Ohio's capital punishment scheme falls within these constitutional boundaries. Petitioner fails to show any law supporting his argument that a state should be required to prove that death is the only appropriate punishment, or that a state should be required to prove the absence of mitigating factors.

■ Secondly, with regard to Petitioner's argument that the Ohio scheme is unconstitutional because a capital defendant is required to prove the existence of mitigating factors by a preponderance of the evidence, the Court finds Supreme Court precedent indicating just the opposite. In *Walton v. Arizona*, 497 U.S. 639, 649–51, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (plurality), the Supreme Court wrote:

> So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

*Id.*, 497 U.S. at 650, 110 S.Ct. 3047; *see also Lockett*, 438 U.S. at 609 n. 16, 98 S.Ct. 2954. In Ohio, as described in more detail above, the prosecution must prove beyond

a reasonable doubt that any aggravating circumstances outweigh any mitigating factors. In addition, Ohio allows capital defendants "great latitude" in presenting mitigating evidence. *See* Ohio Rev.Code § 2929.03(D)(1); *State v. Stumpf*, 32 Ohio St.3d 95, 101–102, 512 N.E.2d 598, 605 (1987); *State v. Jenkins*, 15 Ohio St.3d 164, 171–72, 473 N.E.2d 264, 275 (1984).

The law also leads away from Petitioner's argument that the Ohio capital punishment scheme is unconstitutional because the trier of fact must be instructed not to be influenced by sympathy for the capital defendant. The Supreme Court twice declined to disapprove of instructions directing jurors not to be influenced by sympathy, mercy, or passion in deciding on the appropriate sentence for the capital defendant. *See Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990); *California v. Brown*, 479 U.S. 538, 539, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); *see also Austin v. Bell*, 927 F.Supp. 1058, 1064–65 (M.D.Tenn.1996). Furthermore, contrary to Petitioner's assertions, Ohio's scheme is not unconstitutional because the sentencer lacks the option to impose a life sentence even where the aggravating circumstances outweigh the mitigating factors or where no mitigating factors exist. Ohio Rev.Code § 2929.03(D)(2); *Scott v. Anderson*, 58 F.Supp.2d 767, 796 (N.D.Ohio 1998) (citing *Blystone*, 494 U.S. at 305, 110 S.Ct. 1078) (rev'd on other grounds, *Scott v. Mitchell*, 209 F.3d 854 (6th Cir.2000)). In fact, allowing such an option would unconstitutionally interject arbitrariness and capriciousness back into the sentencing process by inviting the sentencer to disregard the procedures mandated by the Ohio legislature.

Petitioner also attacks Ohio's scheme of proportionality review by appellate courts. Petitioner asserts that, because trial courts are not required to write or record opinions about cases in which death-eligible defendants receive life sentences, appellate judges fail to consider such opinions in their proportionality reviews. Petitioner's argument fails here as well. The Supreme Court does not require proportionality review as an additional safeguard against arbitrary and capricious sentencing. In *Pulley v. Harris*, 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Supreme Court concluded that "[t]here is [ ] no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it." *Cf. Gregg*, 428 U.S. at 198, 204–206, 222–23, 96 S.Ct. 2909 (discussing proportionality review in favorable terms, but not requiring such review).

With regard to appellate review generally, Petitioner contends that Ohio's appellate review of capital cases is too cursory and fraught with poor methodology and incomplete data. Petitioner is correct that appellate review is vital to ensuring the death penalty is not imposed arbitrarily and capriciously. *See Zant*, 462 U.S. at 884, 103 S.Ct. 2733; *Gregg*, 428 U.S. at 211, 96 S.Ct. 2909; *Proffitt*, 428 U.S. at 253, 96 S.Ct. 2960; *Jurek*, 428 U.S. at 276, 96 S.Ct. 2950. In *Pulley*, the Supreme Court noted that *Gregg* "suggested that some form of meaningful appellate review is required" of capital cases. *Pulley*, 465 U.S. at 45, 104 S.Ct. 871. The appellate review approved of by the Supreme Court in *Gregg* included review of each death sentence to determine "whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases." *Gregg*, 428 U.S. at 198, 96 S.Ct. 2909.

Ohio's appellate review provides similar protections to capital defendants. In Ohio, the appellate courts review capital cases to determine whether the evidence supports any aggravating circumstances found by the sentencing court and whether the sen-

tencing court properly weighed the aggravating circumstances and mitigating factors. *See* Ohio Rev.Code § 2929.05(A). The appellate courts also conduct their own independent review of the evidence to determine whether the aggravating circumstances outweigh the mitigating factors, and they determine whether the death sentence is appropriate by considering whether the sentence was excessive or disproportionate to the penalty imposed in a similar case. *Id.* In cases involving offenses committed prior to January 1, 1995, both the Ohio courts of appeals and the Ohio Supreme Court review capital cases. In all other cases, the task falls to the Ohio Supreme Court alone. Because Ohio's appellate review satisfies Supreme Court precedent, this Court finds Petitioner's arguments lacking in merit.

Finally, Petitioner contends that the State of Ohio violates the Supremacy Clause of the United States Constitution by not following the dictates of (1) the Charter of the Organization of American States (hereinafter, the "OAS Charter"); (2) the American Convention on Human Rights and the Additional Protocol to the American Convention on Human Rights to Abolish the Death Penalty (hereinafter, the "American Convention" and the "Additional Protocol"); (3) the American Declaration of the Rights and Duties of Man (hereinafter, the "American Declaration"); and (4) customary international law. The Supremacy Clause provides, in pertinent part, that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Petitioner alleges that the Supremacy Clause binds courts in the United States to the terms of these documents and Petitioner avers that these documents guarantee the right to life as well as the freedom from inhumane punishment.

■ Having reviewed this portion of Claim Eighteen, though, the Court finds no indication that the international obligations of the United States compel elimination of capital punishment. *See People v. Ghent*, 43 Cal.3d 739, 778–79, 781, 239 Cal.Rptr. 82, 739 P.2d 1250, 1276, 1277 (1987) (Mosk, J., concurring); *see also* David Sloss, *The Domestication of International Human Rights*, 24 Yale J. Int'l L. 129 (1999); Christy A. Short, *The Abolition of the Death Penalty*, 6 Ind. J. Global Legal Stud. 721 (1999); William A. Schabas, *International Law and Abolition of the Death Penalty*, 55 Wash. & Lee 797 (1998).

First, without examining whether these documents are self-executing instruments that create private causes of action in the federal courts, *see* Sloss, *supra*, at 138–152, the Court observes that only one—the Additional Protocol to the American Convention—prohibits the use of the death penalty. Importantly, the United States is not a signatory to the American Convention or its Additional Protocol. Short, *supra*, at 730. Moreover, the Court notes that the United Nation's International Covenant on Civil and Political Rights (hereinafter, the "ICCPR"), which the United States Senate ratified in 1992, does not require its member countries to abolish the death penalty. *Id.* at 725–26; *See Ghent* at 781, 239 Cal.Rptr. 82, 739 P.2d at 1277 (Mosk, J., concurring). Instead, the ICCPR prohibits cruel, inhumane, or degrading punishment. The United States agreed to abide by this prohibition only to the extent that the Fifth, Eighth, and Fourteenth Amendments preclude cruel and unusual punishment. Short, *supra*, at 726.

■ Secondly, the OAS Charter, which makes no mention of capital punishment in its articles, lacks the power to prohibit the death penalty the United States. *State v. Phillips*, 74 Ohio St.3d 72, 103–104, 656 N.E.2d 643, 671 (1995) (reh'g granted, opinion recalled on other grounds, *State v. Phillips*, 75 Ohio St.3d 1504, 665

N.E.2d 219 (1996)). When the United States ratified the OAS Charter, it did so:

with the reservation that none of its provisions shall be considered as enlarging the powers of the Federal Government of the United States or limiting the powers of the several states of the Federal Union with respect to any matters recognized under the Constitution as being within the reserved powers of the several states.

OAS Charter, 2 U.S.T. 2394 (1951). Thirdly, as the Court emphasized above, the United States is not a signatory to the American Convention or its Additional Protocol. Fourthly, the American Declaration, which only protects against the arbitrary taking of liberty, is not a treaty and thus cannot legally bind a federal court. *Phillips*, 74 Ohio St.3d at 104, 656 N.E.2d at 671; Short, *supra*, at 731. Fourthly, because about 90 countries across the globe still retain the death penalty, no customary international law yet exists to support the prohibition of the death penalty. Schabas, *supra*, at 799, 845; *see Wills v. Texas*, 511 U.S. 1097, 1100 n. 2, 114 S.Ct. 1867, 128 L.Ed.2d 488 (1994). Thus, considering all of the above, this Court is bound to hold that international law does not preclude the State of Ohio from establishing and carrying out a capital punishment scheme.

Accordingly, the Court concludes that Petitioner fails to demonstrate that Claim Eighteen would have been a "dead bang winner" on appeal. Thus, Petitioner cannot satisfy the prejudice prong of the *Strickland* test because of his counsel's failure to raise this Claim on appeal.

### III. Petitioner Fails Prejudice Prong

While the Court holds that Petitioner satisfies the performance prong of the *Strickland* test by demonstrating that his appellate counsel abandoned their duty to provide careful advocacy, we nonetheless conclude that Petitioner cannot meet the prejudice prong. As detailed in the foregoing subsections, the issues not raised on

appeal by his counsel may have been obvious on the record, but they were not clearly stronger than the issues actually raised. *See Mapes*, 171 F.3d at 427–28. In addition, the Ohio appellate courts would have subjected many of the issues, including those concerning the voir dire, jury instructions, and evidentiary rulings, to deference. *Id.* Moreover, none of these issues would have necessarily resulted in a reversal on appeal. *Cook*, 45 F.3d at 395. In sum, Petitioner fails to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, the Court holds that Claim Seventeen is without merit.

### CLAIM TWENTY–ONE

**The policies and procedures adopted and employed by the Hamilton County Prosecutor's Office in conjunction with the Hamilton County Common Pleas Court in summarily dismissing capital state post-conviction petitions and the refusal of the Ohio state courts to follow the statutorily mandated process for redress by those convicted violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

While this Claim was not raised at trial, on direct appeal or in state post-conviction, the Court held in our December 21, 1998 Order that Respondent waived his defense of procedural default by not affirmatively stating the defense in either the Return of Writ or the Supplemental Return of Writ. *See Fagan v. Washington*, 942 F.2d 1155, 1157 (7th Cir.1991); *Reese v. Nix*, 942 F.2d 1276, 1280 (8th Cir.1991). Therefore, the Court now addresses the merits of this Claim.

In bringing this Claim before the Court, Petitioner relies on Justice William J. Brennan, Jr.'s concurring opinion in *Case v. Nebraska*, 381 U.S. 336, 346–47, 85 S.Ct. 1486, 14 L.Ed.2d 422 (1965). Justice

Brennan outlined his understanding of a proper post-conviction system in his concurring opinion, writing that:

> The procedure should be swift and simple and easily invoked. It should be sufficiently comprehensive to embrace all federal constitutional claims. In light of *Fay v. Noia, supra* [372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)], it should eschew rigid and technical doctrines of forfeiture, waiver, or default. *See Douglas v. Alabama,* 380 U.S. 415, 422–423, 85 S.Ct. 1074, 13 L.Ed.2d 934; *Henry v. Mississippi, supra* [379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965)]. It should provide for full fact hearings to resolve disputed factual issues, and for compilation of a record to enable federal courts to determine the sufficiency of those hearings. *Townsend v. Sain, supra* [372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)]. It should provide for decisions supported by opinions, or fact findings and conclusions of law, which disclose the grounds of decision and the resolution of disputed facts.

*Id.* The Court notes, though, that Justice Brennan limited the impact of his words, cautioning that "there is no occasion in this case to decide whether due process requires the States to provide corrective process." *Id.* at 347, 85 S.Ct. 1486.

Nonetheless, Petitioner assails Ohio's post-conviction procedures, contending that the procedures fall short of Justice Brennan's guidelines and fail to meet the basic requirements of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. Citing as support several capital cases dealt with on post-conviction since the 1981 reintroduction of the death penalty in Ohio (*see* doc. 188), Petitioner alleges that Ohio's post-conviction system is ineffective because (1) no opportunity for discovery or evidentiary

hearings exists; (2) Hamilton County courts routinely adopt *in toto* the findings of fact and conclusions of law submitted by the Hamilton County Prosecutor's Office; (3) the Ohio Supreme Court has declined to exercise its discretion to review on appeal a decision reached on post-conviction by a Hamilton County court in a capital case; and (4) the Ohio courts allow the doctrine of res judicata [16] to bar post-conviction relief for any issue that could have been raised at trial or on appeal.

The Court observes that these are the same arguments Petitioner raised earlier in his attempt to establish cause for his procedural default of numerous claims (*see* doc. 143). In our December 21, 1998 Order, we rejected these arguments and held that, despite the fact that the doctrine of res judicata, the dearth of discovery or evidentiary hearings, and the adoption by the state courts of the prevailing party's findings and conclusions restrict opportunities for relief in Ohio's post-conviction system, Petitioner failed to show that Ohio's post-conviction system violates the United States Constitution (*Id.*). Even if this Court had held otherwise, we are nevertheless precluded from granting Petitioner a writ on this basis. In a discussion of the scope of federal habeas corpus proceedings, the Supreme Court explained in *Preiser v. Rodriguez,* 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), that,

> It is clear, not only from the language of ... § 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody.

*Id.* at 484, 93 S.Ct. 1827.

Drawing from this analysis in *Preiser,* the Sixth Circuit held state post-conviction

---

**16.** *See State v. Perry,* 10 Ohio St.2d 175, 226 N.E.2d 104, 105–106 (1967) (syllabus para. 7) (holding that "[c]onstitutional issues cannot be considered in post-conviction proceedings under Section 2953.21 et seq., Revised Code, where they have already been or could have

been fully litigated by the prisoner while represented by counsel, either before his judgment of conviction or on direct appeal from that judgment, and thus have been adjudicated against him").

proceedings could not be challenged within a petition for a writ of habeas corpus brought pursuant to Title 28 U.S.C. § 2254(a). *Kirby v. Dutton,* 794 F.2d 245, 247 (6th Cir.1986). The Sixth Circuit in *Kirby* observed that:

> Our conclusion that habeas corpus is not applicable to Kirby is bolstered by the decisions of other circuits facing the question of whether habeas corpus can be used to challenge state post-conviction proceedings. These courts have concluded, in agreement with the *Preiser* analysis, that the writ is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction proceedings, such as Kirby claims here because the claims address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration.

*Id.,* 794 F.2d at 247 (citing as support *Vail v. Procunier,* 747 F.2d 277, 277 (5th Cir. 1984) (holding that "[i]nfirmities in state habeas corpus proceedings do not constitute grounds for federal habeas relief."); *Mitchell v. Wyrick,* 727 F.2d 773, 774 (8th Cir.1984); *Williams v. Missouri,* 640 F.2d 140, 144 (8th Cir.1981); *United States ex rel. Curtis v. Illinois,* 521 F.2d 717, 721 (7th Cir.1975) and distinguishing *Dickerson v. Walsh,* 750 F.2d 150, 153 (1st Cir. 1984)); *see also Williams–Bey v. Trickey,* 894 F.2d 314, 317 (8th Cir.1990); *Bryant v. Maryland,* 848 F.2d 492, 493 (4th Cir. 1988).

The Sixth Circuit in *Kirby* further clarified that a petition for a writ of habeas corpus "must directly dispute the fact or duration of the confinement." *Id.,* 794 F.2d at 248. After reviewing this Claim, we find that Petitioner's Claim is not cognizable in a federal habeas proceeding. Petitioner does not directly dispute the fact or duration of his confinement, but instead focuses on errors in Ohio's post-conviction proceedings. These proceedings are collateral to his detention. *See Kirby,* 794 F.2d at 247 (quoting *Williams,*

640 F.2d at 144). Accordingly, Petitioner's Claim Twenty–One is without merit.

### CONCLUSION

For the foregoing reasons, this Court hereby CONDITIONALLY GRANTS Derrick Jamison's petition for a writ of habeas corpus based on the State of Ohio's suppression of exculpatory evidence material to the questions of guilt and sentencing. Accordingly, the Court ORDERS that the warden release Mr. Jamison from custody 120 days from the entry of this Order unless the State of Ohio initiates a new trial in this case. The Court further ORDERS that his release be stayed pending any appeal of this Order.

SO ORDERED.